EXHIBIT

pp. 1-50

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

VINCENT FERRARA              )  CA 00-11693
                             )  Boston, MA
v.                           )  May 3, 2005
                             )
UNITED STATES OF AMERICA     )

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE
MOTION HEARING

APPEARANCES:

United States Attorney
by JAMES HERBERT, JAMES LANG, & ROBERT RICHARDSON, AUSAs
One Courthouse Square, Boston, MA 02210
for Government

MARTIN WEINBERG, ESQ. & DAVID CHESNOFF, ESQ.,
for Vincent Ferrara

JUDITH A. TWOMEY, RPR
Official Court Reporter
One Courthouse Way
Courtroom 10~Room 5200
Boston, MA 02210
(617)946-2577

THE CLERK:  This is Civil Action Number

00-11693, Vincent Ferrara versus the United States of

America.

Court is in session.  You may be seated.

THE COURT:  Good morning.  Would counsel please

identify themselves for the court and for the record.

MR. HERBERT:  Good morning, your Honor.  James

Herbert, along with James Lang and Robert Richardson, for

the government.

MR. WEINBERG:  Good morning, your Honor.  Martin

Weinberg, David Chesnoff, Kimberly Homan on behalf of the

petitioner, Vincent Ferrara, who is present in court.

THE COURT:  I'm sorry that we're delayed.  There

were some materials that the government filed that are

now under seal that I got about 20 minutes ago.

Who's going to speak for the government today?

MR. HERBERT:  I am, your Honor.

THE COURT:  Well, this is going to come up with

regard to a number of the issues, since there are many

representations that were made previously to me that the

government is now trying to reopen, and I'm going to

address that, but I had been told in Mr. Durham's

affidavit -- Mr. Durham told me in January 2003 that he

was going to promptly inform counsel for Mr. Ferrara and

Mr. Barone of Mr. Jordan's allegations.  And that hadn't

3

1   happened when I conducted the March 2003 hearing in this

2   case.  And, eventually, Mr. Weinberg, I think, filed a

3   motion to amend.  And when I caused Mr. Durham and Mr.

4   Sullivan to file affidavits related to that, I was

5   informed that Mr. Sullivan had said, since his office was

6   handling this, he wanted your office to make a

7   disclosure.  Mr. Durham told me they had discussed that

8   with you, that a decision was made that it wasn't

9   appropriate for you to represent the government in this

10  matter because you were a witness, and the matter had

11  gone to Mr. Lang, who hadn't made the disclosure at the

12  time of the March hearing or the time of the April motion

13  on behalf of Mr. Ferrara.  And, I mean, it is generally

14  up to the United States Attorney as to who will speak for

15  the Department of Justice in court, but Mr. Lang did very

16  energetic and skillful job and, as I told him when I

17  handed him that 124-page decision where I went through

18  everything, you argued as carefully, as I said, because I

19  know this is a matter of considerable consequence to

20  everybody.  He was dealt a hard hand.  But many things,

21  including one of the two affidavits that you gave me

22  today, are just inconsistent with the representations

23  which he made to me and on which I've relied up to this

24  point.

25            MR. HERBERT:   Well, your Honor, I think that if

1    we the court wants to get into the details of that, I'm

2    not sure that we would agree that there is that

3    inconsistency.  I understand representations have been

4    made in the past, but I think there might have been some

5    misunderstanding as to what the government's position was

6    with respect to the affidavit you're referring to.

7            But, in any event, if I could just address the

8    sequence of events, the court is correct that initially a

9    decision was made not to have any of the original members

10   of the Ferrara case work on this 2255 because of the

11   nature of the allegations.  And while I don't recall

12   filing or seeing a filing that indicated that I was a

13   witness, certainly I accept --

14           THE COURT:  Want me to get Mr. Durham's

15   affidavit?  I've read it.

16           MR. HERBERT:   No.

17           THE COURT:  Since I've learned in the last 15

18   years that I just can't assume that anything is either

19   done or reliably represented to me, in this case.  In the

20   vast majority of cases that I have with the US Attorney's

21   office, people are intelligent, energetic, honorable, all

22   doing their best.

23           MR. HERBERT:  Well, you know what, your Honor,

24   the people in this case are -- I'll leave out the

25   intelligent -- but honorable and energetic, to be sure.

1    And I do take exception if the court is suggesting that

2    counsel in front of the court today  --

3         THE COURT:  What I'm suggesting is that Mr.

4    Durham gave me an affidavit under oath which I'll pull

5    out.

6         MR. HERBERT:   Believe me, I'm not questioning

7    --

8         THE COURT:  Excuse me.  That said that it would

9    be inappropriate for somebody, in effect, who had -- who

10   was a potential witness.  And, again, I'm trying to

11   depersonalize this whole thing as much as possible.  When

12   I wrote about the delay in my 124-page decision, I

13   deliberately didn't put your name in there.  All of this

14   is, you know, going to be in the permanent public

15   records.  And I know a lot of these things are hard.

16   But, fundamentally, what we're talking about here is that

17   handwritten Coleman memorandum and the information that

18   it contained that the government had an obligation to

19   produce.  In effect, on page 1 of what you filed last

20   Wednesday, you said the government should have produced

21   it.  There were three prosecutors in that case, Mr.

22   Auerhahn, Mr. Sullivan, and you.  And as the Supreme

23   Court in Kyles clarified, all three of you had an

24   obligation to go and ask the investigators, is there any

25   exculpatory evidence?

1          When Mr. Lang learned about that in September

2     2003, he had Mr. DiNisco go look for it, 11 years after,

3     12 years after it should have been produced, and it took

4     him about two hours to find it.

5          MR. HERBERT:    And I was part of that effort to

6     find it after Mr. Coleman came into this court and said,

7     I wrote a memo, for the first time notifying at least

8     myself of that.

9          THE COURT:    Did you ever ask him if he had

10    exculpatory evidence back in 1991 or '92?

11         MR. HERBERT:    I probably did not.    That was --

12    we had division of labor on that case.    I don't shirk

13    responsibility for anything with respect to that case.

14    I'm not disputing what the court says with respect to the

15    government's collective and individual responsibilities.

16    The fact remains, however, with respect to this matter, I

17    was not a witness.    The defense had an opportunity to

18    call me at the evidentiary hearing.    The court could

19    have.    I was not a witness.

20         THE COURT:    You filed an affidavit.

21         MR. HERBERT:    I filed an affidavit as to a

22    matter with respect to the legal conclusion that the

23    court was drawing.    But the fact is the reason I'm here

24    now at this stage, certainly, the government had been

25    more than ably represented by Mr. Lang and Mr.

1    Richardson.  They've done a phenomenal job.  The reason

2    I'm here is because the court has now granted a petition

3    of relief in the form of a resentencing on a case for

4    which I was one of the prosecutors and with which -- with

5    respect to which I was most familiar with the facts, as

6    among the three of us.  That's why I'm here with respect

7    to this.

8          Now, even with respect to today's hearing, we

9    have divided the labor, so I would respectfully request

10   when we get down to proffering or presenting the

11   evidence, that Mr. Lang and Mr. Richardson be permitted

12   to participate, as we would in any evidentiary hearing.

13          THE COURT:  We'll see.

14          (Short pause.)

15          THE COURT:  Well, part of the problem in all of

16   this is that Mr. Ferrara may be doing more time than he

17   should because this has taken so long.  So rather than go

18   through the affidavits now -- you'll be able to find them

19   -- you can represent the government, but some of this is

20   going to go back to the representations that, as well as

21   the orders that I issued, that Mr. Lang made because --

22   and this is Mr. Ferrara against the United States, not

23   against any one of you individually, and a number of

24   these issues I reasonably expected were not going to be

25   raised.  But we'll get to that.  You'll get a chance to

8

1    address it.  All right.

2            Now, as usual, I'd like to try to make sure we

3    have a clear and common sense of where we are.

4            We're here pursuant to my April 12, 2005

5    memorandum and order granting Mr. Ferrara's 2255

6    petition.

7            In addition, I issued an order on April 12, 2005

8    providing the parties with the April 11, 2005 memorandum

9    I had received with regard to the Probation Department's

10    calculations concerning when Mr. Ferrara would have been

11    released if he had received various sentences because

12    he's earned all the good time credit that one can earn in

13    the federal prison system for a reduction of 15 percent

14    of your sentence for each year after the first year, as I

15    understand it.

16            Then I received your submissions of April 27,

17    and I issued my April 28 order to try to get everything

18    and everybody here who might be needed to proceed and,

19    hopefully, complete this hearing today.

20            With regard to that April 28 order, did the

21    government provide on April 28 the items and the sealed

22    Romanso (sic) affidavit to counsel for Mr. Ferrara,

23    basically, the transcripts of the prison recordings and

24    the visiting list?

25            MR. HERBERT:   We did, your Honor.

9

1         THE COURT:  And was there other information or

2    evidence that was produced by the government that day to

3    Mr. Ferrara?

4         MR. HERBERT:  I believe it was the next day,

5    your Honor.

6         THE COURT:  What was that that was produced?

7              (Government counsel confer.)

8         MR. HERBERT:  I believe it was the next day

9    that we produced the CD and the other materials related

10   to those calls.

11        THE COURT:  I said immediately.  I thought that

12   would be the same day.  But, okay, I'll hear Mr.

13   Ferrara's counsel on that if there's a fairness problem.

14        And did Mr. Ferrara produce on April 28 or

15   otherwise immediately any evidence he may wish to

16   introduce today, including anything relating to his

17   medical condition?

18        MR. WEINBERG:  He did not, your Honor.

19        THE COURT:  And is there anything that you're

20   hoping to rely on today?

21        MR. WEINBERG:  Not in terms of documents, your

22   Honor, but, yes, they would be representations to the

23   court regarding what has happened to Mr. Ferrara during

24   the past 15 and-a-half years.  There's information that

25   the government has in its collective knowledge, its

1  Bureau of Prisons' files, et cetera. But it's not the

2  cornerstone of our sentencing representations to the

3  court.

4        Mr. Ferrara, I should say, has been in transit

5  since the day after the habeas was issued. He was

6  originally brought to New York from Pennsylvania by car.

7  He was then flown to Oklahoma where he was in one of

8  these holding cells for five days with one call. He was

9  then brought to Atlanta where he was locked up in an

10  isolation cell for several days. He was brought by the

11  Marshals Wednesday night to Middleton. I first found out

12  about his stay in Middleton when Mr. O'Leary called me on

13  Friday. We visited him on Sunday. Mr. Chesnoff flew in

14  from Los Vegas to co-represent him in these proceedings.

15  We don't seek a continuance, your Honor, for the reasons

16  that have been very eloquently stated by your Honor in

17  his opinion and because of the duration of his

18  incarceration. And I don't think there would be any

19  prejudice to the government regarding whatever

20  representations I make regarding his medical condition.

21  If anything, the prejudice goes from the government to

22  us, given the late discovery we received by hand delivery

23  on Friday afternoon, an envelope which contained, you

24  know, 21 prison calls, most of them 15 minutes. Mr.

25  Chesnoff and I spent Sunday and Monday listening to call

11

1    after call after call.  There was no transcripts provided

2    in connection with these calls.  The only transcripts the

3    government provided were this morning when they provided

4    transcripts of 24-year old and 20-year old electronic

5    surveillance that was part of the original case that

6    resulted in Mr. Ferrara's --

7              THE COURT:  I haven't read those transcripts

8    yet.

9              MR. WEINBERG:  Those are the only transcripts,

10   your Honor.  There's a summary from the FBI and FBI

11   agents.  The summary was delivered to us 20 minutes ago.

12             THE COURT:  The summary meaning the affidavit?

13             MR. WEINBERG:  No, the original -- there was one

14   affidavit provided on the 27th.  The second affidavit was

15   provided in draft by Mr. Herbert when I picked it up at

16   the US Attorney's office this morning.  I understood from

17   communications with him last night, it was not prepared.

18   We got a final when we walked into court.  We also got

19   when we came into court a five-or ten-page -- I haven't

20   even read it -- a summary by the agent of her summaries

21   of the 21 prison calls, which she then resummarizes in

22   the affidavit.

23             THE COURT:  I wonder if we're talking about --

24   I'm talking about the affidavit of Daniel Romanso.

25             MR. WEINBERG:  We received the draft this

1        morning.  I had made arrangements with Mr. Herbert.

2                THE COURT:  Is Daniel Romanso a female?  I don't

3        know if we're talking about the same document.

4                MR. WEINBERG:  Daniel R. Romanso.  It is an

5        affidavit that was filed on the 27th, a supplement that

6        was filed this morning.  We got a draft of it about 8:40

7        this morning at the US Attorney's office.  The final

8        looks to be similar to the draft, but there's not only a

9        series of appendices that were not available to us until

10       we walked into court today but, also, this set of

11       documents, despite a court order saying on April 28, the

12       government shall produce immediately to Ferrara any other

13       information or evidence it wishes to attempt to introduce

14       at Ferrara's resentencing.

15               THE COURT:  I don't know what's in those

16       redwells.  I know I ordered them to bring the Jencks and

17       Brady materials.  Is that what's in the redwells?

18               MR. HERBERT:  Yes, your Honor.

19               THE COURT:  So that's not --

20               MR. WEINBERG:  Well, there is supplements to the

21       Romanso affidavit.  The point being that we're going to

22       make representations to what's happened to him in the

23       last 15 and-a-half years, and the Bureau of Prisons'

24       records bear out where he's been in his prison odyssey

25       through six or seven different institutions and the

1    medical condition, you know, that he's in, but we don't,

2    because of his being in transit, you know, have the

3    specific records from specific locations to demonstrate

4    some of the medical events that have occurred in his

5    life.  I don't think they're going to be contested, your

6    Honor.

7                THE COURT:  We'll see.

8                In my present conception, I'm not going to be

9    hearing any testimony or receiving any additional

10   evidence except perhaps it may be likely with regard to

11   dangerousness.  But are all the potential witnesses

12   present, Mr. Herbert?

13               MR. HERBERT:   Yes, your Honor.

14               THE COURT:  And they should be sequestered.  Are

15   they in the courtroom?

16               MR. HERBERT:   They're not in the courtroom,

17   your Honor.  In fact, should the court allow us to

18   present live testimony, we would need five minutes,

19   probably, to get each of them here.

20               THE COURT:  Okay.  But you have now brought the

21   Jencks statements and exculpatory evidence related to

22   anybody who might testify?

23               MR. HERBERT:   Yes, your Honor.

24               THE COURT:  My present intention is the

25   following.  I intend to hear arguments on the Guidelines,

14

1    what the sentence should be and, with regard to the stay,

2    should I decide that Mr. Ferrara is entitled to be

3    released now, in effect?

4         I'm going to have to make some procedural

5    decisions today on the scope of the evidence to be

6    received.  I expect, I wouldn't say it's my present

7    intention, however, in view of the number of additional

8    issues that have been raised, to take the matter under

9    advisement and to write something both with regard to the

10   sentence and the stay and to resume when that's complete.

11        So, basically, contrary to what I expected when

12   I issued my 124-page decision on April 12, I don't expect

13   this matter will be resolved before this court today.

14   But I hope we'll complete this hearing today, and then

15   I'll get to work.  To be more precise, I'll get back to

16   work at my desk.

17        Now, with regard to the framework, this case is

18   in an unusual posture, so I think it will be valuable to

19   review my sense, essentially, of where we are.

20        As I described in the April 12 memorandum and

21   order, most completely at about pages 105 to 107, I'm now

22   called upon to exercise my broad and flexible power to

23   fashion an appropriate equitable remedy for the

24   government's violation of Mr. Ferrara's right to due

25   process, as the First Circuit described in the Torres

1    Tauro (sic) case.   That remedy should be tailored to the

2    injury suffered by the violation.

3         I don't intend to reward Mr. Ferrara or punish

4    the public by giving him a lesser sentence than he would

5    have been -- would likely have received previously.  In

6    fact, when I was the Acting United States Attorney in

7    United States versus Kelly in 1982, I spoke to this.

8         The proper remedy for government misconduct is a

9    remedy imposed on the prosecutors.  I have to assume that

10   Mr. Sullivan has sent my findings to the Public Integrity

11   Section of the Department of Justice.

12        I was told in October 2003 by Mr. Sullivan that

13   the Office of Professional Responsibility was going to do

14   a priority, prompt, thorough investigation.  And there

15   are other disciplinary mechanisms to address the

16   prosecutorial misconduct, the egregious prosecutorial

17   misconduct that's been convincingly demonstrated in this

18   case.  But contrary to part of what Mr. Ferrara has

19   argued, I don't, subject to hearing further from the

20   parties, think that he's entitled to any reward for that.

21        But as Mr. Lang told me on April 1, 2004,

22   correctly, and as I wrote, in this case, I can and should

23   unbundle Mr. Ferrara's sentencing package, as was done in

24   the Handa (sic) case.

25        And I think the Second Circuit in Carmichael,

16

1    which I cited, but didn't actually quote this particular

2    language, 216 F 3rd 224 at 227, got it right.  It wrote:

3    The remedy should be one that as much as possible

4    restores the defendant to the circumstances that would

5    have existed if there had been no constitutional error.

6            That's -- we're not here for an original

7    sentencing; we're here for the exercise of my broad but

8    not unfettered equitable authority pursuant to Section

9    2255.

10           But do counsel want to comment or question that

11   standard?

12           MR. HERBERT:    Not from the government, your

13   Honor.

14           MR. WEINBERG:    Not from the defense, your Honor.

15           MR. HERBERT:    I should say, that's obviously

16   without prejudice to our argument that the reasoning that

17   led us to the unbundling was incorrect and, therefore, we

18   dispute that there should be any unbundling.

19           THE COURT:    I understood that and --

20           MR. WEINBERG:    May I, your Honor, add the

21   caveat, hopefully, without prejudice to our right to

22   argue that our representations to the court in both '04

23   and '05 that resentencing under your equitable powers was

24   the appropriate vehicle to rectify the government

25   misconduct was based in part on our understanding of what

1    the government's position was going to be today, as

2    represented over and over again, both in court and in

3    writings by Mr. Lang in response to court questions and

4    court orders.  And there's been a marked deviation with

5    the new counsel that has come into this case over the

6    past week.

7           THE COURT:  I noted that.

8           Then the second thing that I think it's

9    important to recognize at the outset is, as the parties

10   and I agree, the resentencing is governed by the law as

11   it now exists after the Supreme Court's Booker decision.

12   That means the Guidelines are advisory, and I have to

13   consider the Guideline ranges, but may tailor the

14   sentence in light of the section 3553A factors as well,

15   as Justice Breyer wrote in Booker, 125 Supreme Court 738

16   at 756.

17           It seems to me that the Second Circuit

18   interpreted the meaning of Booker not only quickly but

19   well in Crosby, 297 F 3rd 103 at 111, and following.  It

20   says, ordinarily, I should first calculate the

21   Guidelines.  And then I hear ordinarily calculating the

22   Guidelines is repeated in a number of circuits, the Fifth

23   Circuit in the Maris case.

24           But as the Second Circuit went on in Crosby:  In

25   one circumstance, precise calculation of the Guideline

1    range may not be necessary.  Now that the duty to apply

2    the applicable Guideline range is not mandatory,

3    situations may arise where either of two Guidelines

4    ranges, whether or not adjacently applicable, but the

5    sentencing judge having complied with section 3553A,

6    makes a decision to impose a non-Guideline sentence,

7    regardless of which of the two ranges apply.  This leeway

8    should be useful to sentencing judges in some cases to

9    avoid the need to resolve all of the factual issues

10    necessary to make precise determinations of some

11    complicated matters, for example, determination of

12    monetary loss.  Similarly, close questions may sometimes

13    arise as to the precise meaning or application of a

14    policy statement authorizing a departure of a judge who

15    has considered policy statements concerning departures

16    and not definitively resolved such questions if the judge

17    has fairly decided to impose a non-Guideline sentence.

18            Or as the Eighth Circuit put it in that Hack

19    case that Mr. Ferrara's counsel cited:  There may be

20    situations where sentencing factors may be so complex or

21    other section 3553A factors so predominate that the

22    determination of a precise sentencing range may not be

23    necessary or practical.

24            So, basically, it's my intention to try to

25    calculate the Guideline range today and do that in a

19

1    manner that will put Mr. Ferrara in the circumstances in

2    which he would have been if he had not been deprived of

3    due process.  But I also understand I have the

4    flexibility and discretion described in Crosby and Hack,

5    for example.

6         Do the parties want to respond to that?  I would

7    like to kind of get the standards clearly in mind before

8    we proceed.

9         MR. WEINBERG:  No, those standards are the ones

10   that are understood by Mr. Ferrara to govern sentencing

11   post-booker and we, of course, completely adopt the

12   language from the Second and Eighth Circuits that not

13   every issue raised by the government mandates resolution.

14   If they would not ultimately have a material effect on

15   your Honor's sentence in the world post-Booker where

16   courts have more authority, it's consistent with

17   statutory factors as well as consideration of the

18   Guidelines to impose a fair sentence that would accord

19   all of the various factors that are listed by Congress in

20   3553A.

21        THE COURT:  You ought to take that microphone

22   and be sure you speak into it, as should Mr. Herbert.

23        Mr. Herbert, do you have any reaction to that?

24        MR. HERBERT:   Yes, your Honor.  Without

25   speaking to hypothetical cases that the courts in Hack

1    and Crosby might have been speaking to, I would just say

2    that the government's position in this case is that the

3    court should calculate the Guidelines precisely for

4    purposes of this case.  And this is not one of those

5    cases where the calculations are so complex or 3553

6    factors overwhelm the significance of the Guideline

7    calculation.  And, therefore, we'd say the court should

8    proceed with the same Guideline calculation it would have

9    before Booker, at least as an initial matter.

10          THE COURT:  That's going to be my goal.  It may

11    end up that there are some alternative calculations and,

12    depending on the rulings I make, they might not make any

13    difference as a practical matter, because they may

14    indicate whether Mr. Ferrara has served five years too

15    much, two years too much, or three months too much.  But

16    it's going to be my goal to make those calculations.

17          MR. HERBERT:  Yes, sir.

18          THE COURT:  But, basically, as I said, to

19    calculate the sentence as it would have been properly

20    generated in 1992.

21          Now, the Probation Department recommended in its

22    April 11, 2005 manual using the 1987 Guideline manual

23    which, evidently, is the manual that was used in the 1992

24    sentencing.

25          Does anybody have any different view?

1          MR. WEINBERG:  No, your Honor.

2          MR. HERBERT:  Just to note that it was, I

3     think, the manual in effect is the '87 manual

4     incorporating amendments effective January 15 of 1988.

5          THE COURT:  Okay.  And you should point out to

6     me if that makes any possible difference.  I think what I

7     have here is the original '87 manual which, for example,

8     Mr. Weinberg made an argument relating to what is a prior

9     sentence, if I consider that that is rooted in language

10    that came up sometime after the '87 language -- manual.

11         MR. HERBERT:  Yes, your Honor.

12         THE COURT:  But perhaps it was just a

13    clarification.

14         Now, with regard to determining what I have to

15    decide, I think what I'm going to do is ask Mr. Ferrara

16    if he's reread the presentence report and if he's read

17    Mr. Weinberg's submissions since my April 12, 2005

18    memorandum and order because, essentially, I'm treating

19    Mr. Weinberg's arguments as objections to the presentence

20    report as well as responses to the government's

21    arguments.  And then I'm inclined to ask him whether he

22    has any other objections to the presentence report.

23         Is that a reasonable way to proceed?

24         MR. WEINBERG:  It is, your Honor, so long as

25    it's consistent with the plea agreement wherein Mr.

22

1    Ferrara was not required to allocute to the government's

2    extensive version of facts as a condition of the entry of

3    a plea.  I would not want him tackling each of the

4    factual allegations.  I can say to the court that Mr.

5    Ferrara on Sunday evening from Mr. Chesnoff and I

6    received the presentence report.  He received copies of

7    the first two of the memoranda that I filed and a draft

8    of the one that was filed yesterday morning.  The only

9    thing omitted from it was the quotations from Crosby and

10   the First Circuit case of Carrozza.  And that he has read

11   the presentence report and that with the exception of the

12   legal contentions that are made as to these different

13   Guideline calculations, Mr. Ferrara has no objections to

14   the representations in the Probation report except to

15   note that his continued position, as it was when he was

16   interviewed by Probation, is that he's not responsible

17   for the allegations of homicide that were the subject of

18   the habeas corpus petition.

19           THE COURT:  If you want, you can take a minute

20   to talk to Mr. Ferrara, because we shouldn't lose site of

21   the fact that part of the reason we're here, part of the

22   reason I'm doing this again is that Mr. Ferrara adamantly

23   asserts that he lied to me when I took his plea on

24   January 22, 1992.  He was telling everybody else that he

25   wasn't responsible for the Limoli murder and pled guilty

1    to it, nevertheless, in front of me.  So I want to try to

2    pin down, in effect, what the objections are and not have

3    any loose ends.

4              MR. WEINBERG:  The objections are to the failure

5    to confer acceptance of responsibility to the criminal

6    history score at the time and to the allegations that he

7    was criminally culpable for the Limoli, Corlito, and

8    Defronso murders.

9              THE COURT:  We haven't mentioned Grasso yet, but

10   he had immunity for those.

11             MR. WEINBERG:  He did, your Honor.  And I don't

12   think that the context -- since one of the issues here is

13   what the court would have done were there not the

14   allegations that were compromised by government

15   misconduct, I think Mr. Ferrara should be in the position

16   he was in 1992 at sentencing.  He's already pled guilty.

17             THE COURT:  Let me do the following.

18             Mr. Ferrara, have you reread the presentence

19   report?

20             THE DEFENDANT:  Yes, I have, your Honor.

21             THE COURT:  Pull the microphone up, please.

22             And did you also read the filings that Mr.

23   Weinberg and Mr. Chesnoff have made on your behalf since

24   I issued my memorandum and order on April 12?

25             THE DEFENDANT:  Yes, your Honor, I've read the

1    presentence report, and my position is still the --

2           THE COURT:  I just want to know whether you've

3    read it.

4           Are you fully satisfied with the work that Mr.

5    Chesnoff and Mr. Weinberg has been doing for you?

6           THE DEFENDANT:  Absolutely.

7           THE COURT:  What's that?

8           THE DEFENDANT:  Absolutely.

9           THE COURT:  And you know that Mr. Weinberg has

10   just stated that you want me to decide the objections

11   regarding your role in the Weinstein extortion and, I

12   think he says, whether you should receive acceptance of

13   responsibility; do you understand that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And do you understand that he and

16   Mr. Chesnoff have also made arguments against the

17   government's recent arguments about what your sentence

18   should be; do you understand that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Are there any other arguments that

21   you want them to make on your behalf?

22          THE DEFENDANT:  No, sir.

23          THE COURT:  Okay.

24          MR. CHESNOFF:  Thank you.

25          THE COURT:  Well, I'm going to proceed on that

25

1    basis.

2            We'll start with at least one of the two issues

3    that I thought were the final two issues when I issued my

4    April 12 decision.

5            One of them that I actually am inclined to leave

6    until the end of the hearing -- well, basically, there

7    were two issues raised in the 1992 presentence report

8    that I didn't resolve in the 1992 sentencing hearing

9    because they didn't affect the Guideline range, which was

10   life because of the Limoli murder for which Mr. Ferrara

11   accepted responsibility before me, at least, or the

12   sentence.  It was an agreed-upon sentence that I had to

13   accept or reject of 22 years.

14           The government -- the Probation Department gave

15   Mr. Ferrara a two level reduction for acceptance of

16   responsibility, in part, because he was much more

17   cooperative and responsive with the Probation Department

18   than any of his codefendants.  I denied that to Mr.

19   Ferrara, finding that it wasn't material, and his

20   codefendants weren't getting it, and his counsel, Mr.

21   Goodman at the time, did not address the issue.

22           There's a question in my mind as to whether I

23   ought to revisit that, because I'm generally not

24   inclined, as I'll explain when we get to it, to address

25   any issue if it weren't raised in 1992.  This one was

1    raised, but I ruled on it.  But it's possible, and we can

2    get to this when it comes into sharper focus later, the

3    whole idea of acceptance of responsibility is related to

4    the issue of future dangerousness, and it may be that I

5    should decide acceptance of responsibility.

6           The one issue that I think should be addressed

7    right now is what the adjustment should be for Mr.

8    Ferrara's role in the extortion of Weinstein and Saganski

9    (sic).

10           The Probation Department awarded three points,

11    essentially treating Mr. Ferrara as a supervisor or a

12    manager of organized criminal activity involving five or

13    more people.  The government argues that it should be

14    four rather than three.  The burden of proof is on the

15    government, so the government should address that first.

16           MR. HERBERT:  Yes, your Honor.  We would with

17    respect to all of these arguments rely, of course, to the

18    arguments made in our written sentencing memorandum.  But

19    just to --

20           THE COURT:  I'm sorry, when you say the written

21    sentencing memorandum, you're talking about the one you

22    filed last week?

23           MR. HERBERT:  Yes, your Honor.

24           THE COURT:  And let me just --

25           MR. HERBERT:  Dated April 27, 2005.

1            THE COURT:  I'm very familiar with it.  I just

2      have to get it out of the pile.

3            (Short pause.)

4            THE COURT:  Go ahead.

5            MR. HERBERT:   Just to flesh that out for

6      purposes of today's hearing, with respect to -- and it is

7      the government's position that the court should be

8      assessing the defendant's role with respect to that

9      particular racketeering act for these purposes.  But with

10     respect to the extortion of Saganski and Weinstein, the

11     defendant clearly did, under the facts that had been

12     presented to the court, the trial brief and the

13     presentence report, play a leadership role in connection

14     with the planning and execution of that extortion scheme.

15     Ferrara and his codefendant, Bobby Carrozza, as copos in

16     this hierarchal organization were the two highest ranking

17     members of the enterprise who were directly present for

18     the extortion.  Joseph Russo was somebody who was going

19     to benefit from that, but these were the two that were

20     directly present and involved in it.

21           Ferrara, as the tape shows, assumed the

22     leadership role with respect to the actual extortion

23     itself.  He later in a discussion with Dennis Lepore,

24     they each take credit for having thought of the idea and

25     various aspects of its implementation.  But on tape,

1      clearly, the pivotal moment where the defendants

2      concluded that the extortion victims were not being

3      sufficiently compliant, it was defendant Ferrara who

4      stepped in and changed the tone of the discussion, shall

5      we say, and made it clear that this was not a request.

6      And under these circumstances, since this offense clearly

7      involved five or more criminally culpable participants,

8      specifically, Russo, Ferrara, Carrozza, Lepore, Mercurio,

9      and Dominic Isabella, he should be given a four-level

10     upward adjustment under section 3B1.1.  Certainly at no

11     time has he raised any objections to the factual

12     recitation with respect to that that would call into

13     question a four-level enhancement for that extortion

14     conduct.

15          MR. WEINBERG:  Very briefly, in relying on the

16     presentence report, your Honor, the first important

17     factor that negates the government argument is that the

18     report over and over again talks about group

19     decision-making.

20          On page 20, it talks about after Isabella's

21     entrance --

22          THE COURT:  Hold on a second.  Let me get it.

23          (Short pause.)

24          MR. WEINBERG:  Actually, starting at the bottom

25     of 19, your Honor, at the last full paragraph, the

1    conversation began on January 14 with Ferrara, Mercurio,

2    Carrozza, Lepore, and Isabella, the five of the six who

3    shared equally the proceeds "discussing what amount of

4    money they should demand and formulating their strategy

5    for dealing with the anticipated reluctance of Saganski

6    to part with the money.  They brought Saganski and

7    Weinstein into the storeroom."

8         On the next page there's greater detail that

9    after Isabella's entrance -- this is right below the

10   Lepore quote -- the five coconspirators then discussed

11   the fact that five months had passed, and they agreed

12   that they would demand half a million dollars, the point

13   being that Mr. Ferrara wasn't a general who spontaneously

14   designed the strategy in this event.  There was group

15   decision-making.  There was shared proceeds.  An argument

16   could be made that they were so coequal that there

17   shouldn't even be a plus three role assessment, that that

18   was not an argument that was made in 1992 by the

19   defendant, and I'm going to try to comply with the

20   representations that have been made on this record prior

21   to May 3.  We're asking for a plus 3, your Honor.

22   There's absolutely no evidence of the kind of leadership

23   that would distinguish, in the words of the Guideline,

24   leader or organizer from manager or supervisor.

25        If the government goes out of the

29

1    conversation began on January 14 with Ferrara, Mercurio,

2    Carrozza, Lepore, and Isabella, the five of the six who

3    shared equally the proceeds "discussing what amount of

4    money they should demand and formulating their strategy

5    for dealing with the anticipated reluctance of Saganski

6    to part with the money.  They brought Saganski and

7    Weinstein into the storeroom."

8          On the next page there's greater detail that

9    after Isabella's entrance -- this is right below the

10   Lepore quote -- the five coconspirators then discussed

11   the fact that five months had passed, and they agreed

12   that they would demand half a million dollars, the point

13   being that Mr. Ferrara wasn't a general who spontaneously

14   designed the strategy in this event.  There was group

15   decision-making.  There was shared proceeds.  An argument

16   could be made that they were so coequal that there

17   shouldn't even be a plus three role assessment, that that

18   was not an argument that was made in 1992 by the

19   defendant, and I'm going to try to comply with the

20   representations that have been made on this record prior

21   to May 3.  We're asking for a plus 3, your Honor.

22   There's absolutely no evidence of the kind of leadership

23   that would distinguish, in the words of the Guideline,

24   leader or organizer from manager or supervisor.

25          If the government goes out of the

1    tape-recordings of January 14 and into their RICO

2    hierarchy, he's one of three coequal people, but there's

3    no demonstration --

4            THE COURT:  Well, one is Carrozza; who's the

5    other?

6            MR. WEINBERG:  Russo.

7            THE COURT:  A consigliere is not higher than a

8    capo in this organization?

9            MR. WEINBERG:  I don't know what his specific

10   alleged role was in January of '97, but --

11           THE COURT:  No, '87.

12           MR. WEINBERG:  January '87.  To the extent the

13   government --

14           THE COURT:  But --

15           MR. WEINBERG:  He was either a third equal or

16   higher, and though he wasn't there, it doesn't dictate

17   who a leader or a leader wasn't.

18           THE COURT:  Frequently, leaders are not on the

19   spot.  They insulate themselves, working through others.

20           MR. WEINBERG:  I mean, if there was any person

21   more involved than others, it's Mr. Mercurio, who the

22   evidence shows selected the spot, perhaps knowing that

23   the spot was being electronically surveilled, but we'll

24   extract that issue out of this calculation.  He brought

25   them there.  He picked the location.  And then there was

1    discussions.  The discussions were completely consistent

2    with a five-person agreement.

3              THE COURT:  I thought there were six.

4              MR. WEINBERG:  The sixth was Mr. Russo.  The

5    five were caught on tape discussing as coequals what to

6    do in this situation.  In other words, Mr. Ferrara didn't

7    change any group plan and, from the quotes in the

8    presentence report, there's as many quotes attributed to

9    Mr. Lepore as Mr. Ferrara.  Certain of the five people

10   spoke more than others, but there is no indicia of a

11   hierarchal relationship to this predicate.  And the

12   ultimate proof is that despite his alleged role in the

13   enterprise, there was an absolutely even division of the

14   $250,000.  There was a $10,000, you know, overage when

15   the six people each got $40,000.  It didn't go to Mr.

16   Ferrara because he was the leader; it went to some

17   seventh party.

18             You know, so there's simply no basis --

19             THE COURT:  It went to Mr. Simone's family.  I'm

20   supposed to sentence him tomorrow afternoon.  Go ahead.

21             MR. WEINBERG:  So, therefore, we object to his

22   getting a role that would be more applicable to a leader

23   in a vertical hierarchal predicate, and there simply

24   wasn't that kind of predicate.  At most, he should have a

25   plus 3 for role --

1          THE COURT:  Would you like to respond to that

2    briefly?

3          MR. HERBERT:  Yes, your Honor, just briefly,

4    just to say that I think the premise of Mr. Weinberg's

5    argument there is not supported by the Guidelines

6    themselves.  This enhancement section, 3B1.1, by its

7    terms applies to leaders of group activities.  And the

8    Guideline itself simply says if the defendant was an

9    organizer or leader of a criminal activity that involved

10   five or more participants or was otherwise extensive,

11   increase by four levels, period, that's it.

12         And in the application note, application note 3

13   does specifically say there can, of course, be more than

14   one person who qualifies as a leader or organizer of a

15   criminal association or a conspiracy.

16         So I think Mr. Weinberg's premise that it has to

17   be -- that points have to be awarded in a hierarchal

18   fashion seems to be suggesting that there could be only

19   one person who qualifies for the four points is not

20   accurate under the Guidelines.  Mr. Ferrara was clearly

21   an organizer and a leader of this activity that involved

22   five or more criminally culpable participants and,

23   therefore, he gets the four points.

24         THE COURT:  Okay.  Well, I will consider all of

25   that and, as I said, it's not my intention to decide

33

1    these matters right now.

2         Now I think we get to -- this is where except

3    for acceptance of responsibility this is where I had been

4    led to believe we would be ending with my rulings but,

5    instead, we have the question of whether I should be

6    considering any of the other additional issues that the

7    government raised in its memorandum filed on April 27.

8         As I said earlier, as the Second Circuit said in

9    Carmichael, the goal is to put Mr. Ferrara where he would

10   have been in 1992 if the government had not violated his

11   constitutional right to due process.

12        One issue the government argues is that I should

13   now take into account the Grasso murder and the Salemme

14   shooting.

15        The plea agreement gave Mr. Ferrara and his

16   codefendants, as I recall it, but Mr. Ferrara, certainly,

17   immunity for the Grasso murder and the Salemme shooting.

18   My current sense is that it would be absolutely

19   inequitable for me to find that because the government

20   violated Mr. Ferrara's constitutional rights, he's lost

21   the immunity for which he bargained as part of his

22   lengthy plea agreement and that all of his other

23   codefendants enjoyed.

24        So my present intention is not to consider the

25   Grasso-Salemme matter at all.  There are other reasons

1    that reinforce that conclusion that I could go into.

2    But, basically, the government -- I will go into them,

3    because it frames some of the other issues.

4         The government did not seek to rely on this in

5    1992 with regard to Mr. Ferrara's codefendants, who would

6    have had comparable culpability.  That's Russo, Carrozza,

7    Lepore, Tuttoro I was sentencing at that time, not Mr.

8    Patriarca.

9         And it was Mercurio who likely set Salemme up to

10   be shot after he had been tipped off so he could flee

11   when he was dealing drugs in Georgia and got caught.  He

12   was brought back here.  And without telling me, at least,

13   Mr. Mercurio was an informant, the government argued that

14   he should get (A) a downward departure and get a

15   concurrent sentence with his Georgia sentence, which I

16   basically resisted but had no choice but to give

17   eventually, since the adversary system wasn't operating.

18        There are actually after Booker a series of

19   cases in which District Courts have considered potential

20   disparity between defendants in deciding what's a

21   reasonable sentence.  Judge Hornby did that in Revcock

22   (sic) and, in fact, rooted his decision partly in section

23   3553A6, the mandate to avoid unwarranted sentencing of

24   disparities among defendants with similar records who

25   have been found guilty of similar conduct.  It was done

1    in the Western District of Virginia in Hensley and in the

2    Eastern District of New York in Simon.

3         In the Schneiderhan case, I noted that

4    Schneiderhan argued to the Court of Appeals for the First

5    Circuit that there was unwarranted disparity after

6    Booker, and I think Judge Coffin, writing for the First

7    Circuit, found that the disparity between Schneiderhan,

8    who went to trial, and the defendants who pled guilty

9    would not have caused the District Judge to reduce

10   Schneiderhan's sentence.  But Judge Coffin didn't say

11   that the disparity between codefendants was an

12   impermissible basis for a sentence after Booker.  Also,

13   I'm inclined to think it would not be fair to Mr. Ferrara

14   to have some protracted evidentiary hearing on the

15   Grasso-Salemme shootings and his role in them.

16        I'm capable of searching electronically the

17   transcripts of this and other cases, and Grasso has not

18   been mentioned.  Mr. Lang didn't tell me the government

19   would be relying on Grasso.  To the contrary, he said

20   that the focus would be Corlito and Defronso if the

21   Limoli -- if Mr. Ferrara prevailed on his claim regarding

22   the Limoli murder, which we can get into shortly.

23        So, primarily, because of that immunity, I don't

24   view the unbundling as eliminating the plea agreement.  I

25   haven't vacated the convictions.

1          As I said, I think it would be absolutely

2    improper, probably unlawful, for me to take the

3    Grasso-Salemme matters into account.

4          Does the government want to be heard on that?

5          MR. HERBERT:    Yes, your Honor.

6          First of all, the defendant would not be losing

7    his immunity with respect to the Grasso murder for it to

8    be deemed relevant conduct for purposes of this

9    sentencing.    It would simply put him in the exact same

10   position he admitted in 1992 he was in, which was a

11   defendant with Guidelines of life.    And from there, we've

12   reached the heavily negotiated, through months of

13   negotiations, as the court has noted in upholding those

14   sentences, we reached the heavily negotiated extent of

15   the downward departure from what the defendant agreed was

16   a life Guideline to 22 years.

17          So ruling that the Grasso murder is one of the

18   murders that should be considered relevant conduct for

19   the defendant simply puts him back to the exact same

20   position he indeed was in in 1992.    It does not violate

21   the terms of the plea agreement, which simply gave him a

22   promise that this office and the District of Connecticut

23   would not prosecute him separately for those crimes,

24   which could lead to a new sentence, separate and apart

25   from the sentence he's receiving in this case.

1            So it's not a question of losing his immunity,

2    and there's no unfairness whatsoever with respect to it.

3            With respect to the disparity of sentences, here

4    again, that's not an issue because, with the other

5    defendants, again, the government with respect to, I

6    believe, all but perhaps Mr. Lepore, we were agreeing to

7    a downward departure anyway with respect to those.  And

8    so there wasn't a need under the sentencing that we were

9    proceeding with at that time, that 11E1C, now 11C1C

10   binding plea agreement with an agreed-upon disposition

11   for each of those defendants, there wasn't a need to make

12   all of the Guideline calculations that would have been

13   necessary had the defendant not pled guilty, gone to

14   trial, been convicted of all the offenses other than the

15   murder predicates and the Limoli substantives.  Under

16   those circumstances, certainly, if we're going back to

17   that time, then it would have been like an ordinary

18   sentencing, and we would have had to go through and do

19   the arithmetic on every single conceivable Guideline

20   enhancement.

21           THE COURT:  Part of what that ignores -- and I

22   know that you individually disagree -- but, of course,

23   it's an objective test, not a subjective test -- is I

24   found not only is there a reasonable probability that Mr.

25   Ferrara would have gone to trial if proper disclosures

1    had been made and prevailed with regard to Corlito,

2    Defronso, and Limoli and that they would have been proven

3    by a preponderance of the evidence -- and you

4    mischaracterize this in your brief, but we'll get to it.

5    I said that at least a half a dozen times in my 124-page

6    decision -- but I also found that there was a reasonable

7    probability.  I really believe, having lived through this

8    with you, observed -- not being in on them, but

9    remembering at least the last five days on that Martin

10   Luther King Day weekend, and it was on, it was off, it

11   was leaked, that you would have reached a plea agreement

12   that -- with Mr. Ferrara as part of the global pleas that

13   would have resulted in a sentence of measurably less than

14   22 years.

15         MR. HERBERT:  I should say that, your Honor, I

16   submitted an affidavit personally with respect to that

17   issue and did indicate in there that I can only speak for

18   myself.  But that said, we certainly adamantly take issue

19   with any suggestion that under any circumstances the

20   government ever would have gone below 22 years for Mr.

21   Ferrara, under any circumstances.  So I don't have the

22   slightest doubt about that.  But I understand the court

23   --

24         THE COURT:  I don't -- you're not going to

25   persuade me, and I doubt I'm going to persuade you, but,

39

1    actually -- and I say this out of respect.  I think if

2    you personally were aware of the egregious misconduct

3    that had occurred as of January 22, 1992 and you knew

4    that that Coleman memo was there, that I expected

5    exculpatory information had been produced, the defendants

6    expected it had been produced, that at the heart of the

7    government's case on these charges against Mr. Ferrara

8    were with somebody who was credibly to me at least

9    claiming to commit perjury, I think you would have been

10   more flexible and would have been happy to get on with

11   it.

12         But it's an objective test.  I've made my

13   rulings, and I'm very comfortable with them.

14         MR. HERBERT:    I understand, your Honor.  But,

15   obviously, as the government has stated in its filings

16   and will do so again, we respectfully take issue with the

17   court's findings of fact and conclusions of law with

18   respect to this sentencing and specifically --

19   specifically including the conclusion that disclosure of

20   the Coleman memo undermines confidence in the defendant's

21   decision to plead guilty.  We do not believe that it does

22   at all and nor do we believe that it would have had any

23   effect on the sentence that he would properly received.

24   But I understand that the court has made its findings,

25   and I'm not trying to get the court to --

40

1          THE COURT:  Let me ask you this.  The Grasso

2     murder was tried in Connecticut, wasn't it?

3          MR. HERBERT:  Yes, your Honor.

4          THE COURT:  How long did that trial take?

5          MR. HERBERT:  I don't recall, your Honor.  I

6     don't know how many days or weeks it took.  It was a

7     lengthy trial.

8          THE COURT:  Several weeks, at least?

9          MR. HERBERT:  At least several weeks, yes, your

10    Honor.

11         THE COURT:  Maybe several months?

12         MR. HERBERT:  I just don't recall.

13         THE COURT:  But it was long.

14         MR. HERBERT:  It was a long trial, yes.  There

15    were many defendants that were involved in it and many

16    charges besides the Grasso murder.

17         THE COURT:  And -- all right.

18         Well, Mr. Weinberg, do you want to be heard on

19    whether --

20         MR. WEINBERG:  I do, your Honor.

21         THE COURT:  -- primarily but not exclusively

22    because of this immunity agreement I should not take the

23    Grasso murder into account?

24         MR. WEINBERG:  Well, I think it's the immunity

25    agreement in the context of January 1992 when Mr. Ferrara

1    signed the plea agreement, agreeing to a 22-year

2    sentence.

3         There were three charged murders against him at

4    that time which distinguished him from his codefendants.

5         His codefendants as well as he knew that he was

6    suspected of some culpability for Grasso, and that was

7    integrated by the government into its plea agreement.

8    But it's Kafkaesque for the government to suggest (A)

9    that Mr. Ferrara would have pled guilty to a crime he

10   didn't commit if he knew that the only evidence against

11   him -- he was not alleged to be the shooter; Barone is

12   the shooter.  He's alleged to have ordered it.  There was

13   one witness, Jordan.  And if he knew that Jordan had

14   completely negated the only link between him and this

15   murder to -- for the government to contend continuously

16   he would have pled guilty to it, it's just baffling and

17   dizzying.

18        THE COURT:  Dizzying is right.  This much I got.

19   You persuaded me of that.

20        MR. WEINBERG:  I mean, he pled guilty to it

21   knowing that because he didn't do it that the evidence

22   against him was perjury.  And knowing that the Strike

23   Force had adopted that perjury, it was prepared to

24   prosecute him for a crime he didn't commit.  So, yes, he

25   pled guilty.  And to argue that had he known that he

1     would have had the equivalent of testimonial DNA --

2     that's what this exhibit 17 and exhibit 16 is -- it would

3     not only completely demolish the credibility of Jordan,

4     it would completely demolish the only bridge between him

5     and this act.

6         So if the government says a 22 is appropriate

7     because we, the government, subjectively believe he was a

8     participant in Limoli and Defronso and Corlito, the

9     starting point is what difference would it have made in

10    terms of an equitable remedy?  And, certainly, your

11    Honor, him having lived the nightmare of 15 and-a-half

12    years in jail waiting for the government to unconceal the

13    concealed evidence, to disclose to his counsel

14    essentially the most important core exculpatory evidence

15    they could have had, they had it, they didn't search for

16    it, they didn't ask for it and, even if they knew it,

17    they would have claimed it was a prior inconsistent

18    statement and, therefore, not discloseable, even though

19    he was about three hours away from making an opening and

20    starting his trial.

21        So, putting that aside, Grasso should not be

22    litigated in this court at this time for a number of

23    separate legal reasons.

24        The most important reason is that the government

25    speaks with one voice.  Mr. Lang was the prosecutor in

43

1    charge of the habeas corpus proceedings.  I cited to your

2    Honor in our pleadings the different memoranda filed by

3    Mr. Lang, who ably represented the government, who filed

4    lengthy memoranda addressing --

5              THE COURT:  Wait a minute.  You cited that in

6    what pleading?

7              MR. WEINBERG:  In the recent pleadings, your

8    Honor.

9              THE COURT:  I want to make sure I have them all.

10   You filed two, right?

11             MR. WEINBERG:  I filed three, your Honor.

12             THE COURT:  I don't think I've seen the third.

13             MR. WEINBERG:  The third was -- the first was

14   filed as the government and I exchanged filings; the

15   second --

16             THE COURT:  Friday and one yesterday?

17             MR. WEINBERG:  Friday, and then there was

18   yesterday where  --

19             THE COURT:  You better show me what you're

20   talking about.

21             MR. HERBERT:   I should say, your Honor, we

22   don't have the one filed yesterday either.  If there was

23   an electronic case filing transmission on that, then we

24   missed it.

25             THE COURT:  I'm sure -- I think it was.  Is this

44

1    the one you that you cite Crosby in it?

2            MR. WEINBERG:  Yes, your Honor.

3            THE COURT:  Let me see it, but I have it.

4            (Document passed.)

5            THE COURT:  I have it.

6            MR. WEINBERG:  Let me just briefly if I can,

7    your Honor, back up to the record in this case.

8            In February 11, 2004, we were before the court

9    --

10            THE COURT:  I'm only smiling because I pulled

11    out the February 11 order right before I came in.  Go

12    ahead.

13            MR. WEINBERG:  -- and informed the court that we

14    believe that the court should sever, essentially, the

15    very serious Guild Street allegations, because if the

16    court concluded that the Jordan allegations resulted in a

17    discrediting of the trustworthiness of the foundation

18    separating him from his codefendants back in January of

19    1992, the petitioner would advocate for the equitable

20    remedy of resentencing.

21            In the aftermath of that, Mr. Lang filed a

22    lengthy memoranda called Government's Memoranda Pursuant

23    to Court Order of February 11, 2004.  It was roughly --

24            THE COURT:  Excuse me.  There's a file with all

25    of these in the bottom of the cart.

1            MR. WEINBERG:  It was 70 pages, and the section

2   4 began:  Even if the Limoli charges were vacated, the

3   petitioner's murder of Defronso and Corlito would be

4   deemed relevant conduct and would result in a base

5   offense level of life.

6            And the parties thereafter exchanged multiple

7   pleadings directed to Corlito and Defronso.  The

8   government filed a notification pursuant to order of

9   February 11, a motion to reconsider, setting forth at

10  great length their contention that there was sufficient

11  evidence to warrant a base offense level assessment, not

12  a word of Grasso, not a word of Salemme.

13            In 2005 -- and there was -- I can track you like

14  a -- through all of these memoranda, there was extensive

15  efforts by the parties, and these are efforts that came

16  after extensive efforts to try to rectify the

17  government's nondisclosure of important exculpatory

18  evidence on Guild Street.  And there's been hour after

19  hour and week after week of memos and hearings before

20  this court.  And until Mr. Herbert reassociated himself

21  with the government's prosecution team, Grasso was a

22  non-issue.

23            If I can just finish.  '05, your Honor, your

24  Honor on January 18, '05  --

25            THE COURT:  All I was going to say -- you can

1       finish -- but all I'm going to say is that, you know, in

2       reliance on Mr. Lang's -- go ahead.  Go ahead.

3                MR. WEINBERG:  Just to finish, in '05, January

4       18, 2005, post within days of Booker, the court issues an

5       order, and it asks the parties to address the

6       implications of Booker and Fanfan for the resentencing of

7       Ferrara, and the government files its memoranda pursuant

8       to the court order of January 18 and on page 7 and 8,

9       again, urges the court to set the life Guideline based on

10      the Corlito and Defronso homicides, not a word in

11      February '05 regarding Grasso being a bases of sentencing

12      liability, much less criminal liability.

13                So we go back to January --

14                THE COURT:  What I was going to say is, you

15      know, as I told you all when I finished the Sampson

16      capital case at the end of 2004, January 2000 -- at the

17      end of 2003 -- January 2004, I came back to this case.  I

18      said I wanted to focus on it, to get everything I needed

19      to decide it.  And you're right, I was repeatedly told

20      that if Ferrara prevailed on Limoli, I would then focus

21      on Corlito and Defronso.

22                Go ahead.

23                MR. WEINBERG:  That's an independent bases --

24                THE COURT:  One thing I should say, I guess, is

25      that's part of what contributed to the time it took for

1    me to write that decision.  I reviewed all that, Corlito,

2    Defronso.  I went back to the Barone trial.

3         Go ahead.

4         MR. WEINBERG:  And we made a decision on

5    February 11 and reported to the court our belief of the

6    appropriateness of separating out the Jordan allegations

7    which were earmarked for a potential resentencing as

8    contrasted to the Guild Street allegations which would

9    have gone to the heart of whether or not a habeas would

10   have resulted in a new trial.  And that was an important

11   decision we made, and we made it in reliance on the

12   government's position, and the government never deviated

13   from that position from February 2004 until April 27,

14   2005.

15        THE COURT:  Let me make sure I understand this

16   because I've looked at this in the last couple of days

17   too.

18        The original petition argued about the

19   government misconduct relating to the electronic

20   surveillance concerning 34 Guild Street, the Mafia

21   induction ceremony, based on my factual findings in the

22   Salemme case.

23        MR. WEINBERG:  And based on the separate Brady

24   violations, and we asked the court to conduct an

25   evidentiary hearing to determine whether the government

1    had any justification for not disclosing to Ferrara in

2    '91 and for taking positions contrary to the reality that

3    was generated by the 1998 and 1999 hearings. And that's

4    where we were when the court on February 11, you know,

5    came back to Ferrara post-Jordan.

6          THE COURT:  What you're saying is that you

7    essentially gave up your right to rely on the electronic

8    surveillance related issues in return for the

9    government's representation that it would be Limoli and

10   Defronso and Corlito?

11         MR. WEINBERG:  Essentially, since that date in

12   February when we asked the court to focus on the Jordan

13   allegations and the implications for resentencing, your

14   Honor has heard not a word of a request to readdress

15   issues, the issues that were in the original 2000 habeas

16   corpus petition.

17         There's a separate, however, legal cornerstone

18   why the resolution of the Grasso allegations, you know,

19   is not warranted in this case, and it goes to the statute

20   about avoiding unwarranted sentencing disparities, and it

21   goes to the criteria that I believe is set by this court

22   to try to determine, you know, what is a fair sentence,

23   you know, is an equitable remedy for the habeas corpus

24   proceedings rather than -- and the government agreed to a

25   downward departure for Ferrara in January 1992.  They

49

1    agreed that under the mandatory inflexible Guidelines as

2    they existed pre-Booker, a downward departure was legally

3    authorized.  They don't get to set how far of a downward

4    departure there is except that there was a C plea.

5              THE COURT:  Exactly.

6              MR. WEINBERG:  And the C plea was based on the

7    counts that, again, were fatally compromised by the

8    conduct of the government leading up to the C plea.  But

9    the government agreed that the 22 years was an

10   appropriate response for the murder of Limoli and the

11   other related conduct that was charged in the RICO.

12             They agreed that Mr. Russo, a 16-year sentence

13   was appropriate, although there was a year I never really

14   totally understood because of the allocution issue.  But

15   they certainly  --

16             THE COURT:  They originally agreed that 15 years

17   was appropriate for Russo and then showing, I would say,

18   commendable pragmatic flexibility when Mr. Russo said he

19   didn't want to be quiet but wanted to deny the existence

20   of the LCN, they rather efficiently negotiated that he

21   could do that in return for another year.

22             MR. WEINBERG:  And they agreed to a 19-year

23   sentence for Carrozza, which included, as the First

24   Circuit found, allegations that Mr. Ferrara was not

25   involved in which dealt with drugs and dealt with

50

1    management of a drug conspiracy, and they agreed to a --

2            THE COURT:  I'm going to let you make these more

3    general arguments later.  I mean, I think it comes in on

4    reasonableness.

5            MR. WEINBERG:  The reason I'm making it is that

6    in terms of disparity and in terms of the court

7    determining whether or not a downward adjustment from 22

8    is warranted, Grasso -- their beliefs on Grasso involved

9    those three defendants, and yet the government agreed to

10   16, 19, and 22 years.  When Limoli and Defronso and

11   Corlito were the charged rather than uncharged conduct,

12   the conduct they alleged he was a principal in -- I still

13   don't -- have not mastered all of the allegations about

14   Grasso that have come into different opinions -- but the

15   bottom line is this court can --

16           THE COURT:  Would it take you time if we were

17   going to try the Grasso case in this sentencing to

18   prepare to do that?

19           MR. WEINBERG:  Unfortunately, your Honor, to

20   adequately represent him were the court to determine that

21   we should have a full hearing on Grasso would require an

22   extensive amount of time, and I would ask the court and

23   urge the court, given his nightmare in jail, to release

24   him on bail while we litigated whether or not the Grasso

25   allegation should have anything to do with the court's