EXHIBIT B
pp. 51 - 100

1      post-Booker sentence in determining the extent to which

2      -- when all of the statutory factors are considered and

3      all of the circumstances are considered -- the extent to

4      which your Honor should sentence him to below 22 years.

5      And that's why we gave the court the Crosby and Hack

6      authority that there's no mandate in a post-Booker world,

7      if the court determines that a sentence of time served

8      would be appropriate to resolve the enormously complex

9      issues of (A) whether or not he has trust -- whether

10     there's trustworthy proof of any culpability; (B), if

11     there is, whether any of the various grounds for downward

12     departure are warranted.

13                 MR. HERBERT:   May I respond, your Honor?

14                 THE COURT:   Briefly.

15                 MR. HERBERT:   Well, I can understand from the

16     tenor of the court's questions that these are important

17     issues and, given that these are important issues, I

18     would request an opportunity to respond to the points

19     that I think are relevant.

20                 I'll do it as quickly as I can, your Honor, but

21     --

22                 THE COURT:   Go ahead.

23                 MR. HERBERT:   First of all, Mr. Weinberg keeps

24     mischaracterizing the record in this case by suggesting

25     that Jordan was the only bridge between his client and

52

1     the Limoli homicide.  It clearly was not.  There is other

2     evidence, including evidence that this court found highly

3     credible that was completely consistent --

4               THE COURT:  Highly credible in what?

5               MR. HERBERT:   I'm talking about a witness who

6     was highly credible.

7               THE COURT:  When did I find --

8               MR. HERBERT:   In connection with the Barone

9     case.   I'm talking about Liz DiNunzio.

10              THE COURT:  Did I say she was highly credible?

11              MR. HERBERT:   I believe the court did.

12              THE COURT:  I saw you wrote that.

13              MR. HERBERT:   I believe in connection with

14    making the court's findings with respect to the

15    admissibility of the statements from her brother, the

16    court was relying on, in part, on her credibility.

17              THE COURT:  Let me tell you the following

18    because I saw that you cited in your memo my factual --

19    we're going to get to this -- factual findings in Mr.

20    Patriarca's case, 1995 decision regarding Mr. Limoli.

21              Anything I've ever said orally or in writing up

22    until April 12, 2005 regarding the Limoli murder should

23    not be relied upon before me or any other court.  My

24    confidence in all of that is utterly undermined by the

25    government's extraordinary misconduct.  That Coleman

53

1    handwritten memo is the smokingest gun I have ever seen.

2            I'm actually trying to just get through this in

3    a dispassionate way.

4            But you -- I really believe you didn't know

5    about that memo, and you didn't know that information.

6            We spent years, you know, working hard to do our

7    respective jobs in what turns out to have been a horrible

8    charade with human consequences.  But it is not -- if I

9    had known the information in that memo during the course

10   of Mr. Barone's 11-week trial, many rulings might have

11   been different.

12           To admit things, you need certain corroboration.

13   The First Circuit discussed this in the Barone case.

14           I made mistakes, they said, in admitting some of

15   Ms. DiNunzio's testimony.  It doesn't matter because

16   Jordan said the same thing or said something -- or

17   corroborated it.  The First Circuit will read what it

18   wrote.

19           But I let Mr. Weinberg go back a little bit, and

20   I want to be even handed, so I'll let you go back a

21   little bit too.

22           But I spent not every day for the year from last

23   April to this April working on that decision, but I spent

24   a lot of time wrestling with what Mr. Lang told me I

25   should wrestle with, and I don't find anything that

54

1    anybody told me about the Limoli murder to be highly

2    credible anymore, if I ever said that.

3         MR. HERBERT:    Well, I understand that's the

4    court's position, and the court understands that we

5    vehemently take issue with it, particularly the

6    characterization that that was a smoking gun.  The fact

7    remains Walter Jordan came in at the evidentiary hearing

8    in this proceeding and --

9         THE COURT:    I want to give you time, but Mr.

10   Ferrara might be suffering irreparable harm.  We're not

11   going back and rearguing my factual findings.  Mr.

12   Weinberg addressed it briefly; you've addressed it

13   briefly.  Is there more you'd like to say?

14        MR. HERBERT:    There is, your Honor.  There is.

15        First of all, all of this emphasis that is being

16   placed on what representations government counsel has

17   made in connection with this as to what -- which

18   homicides should count in determining Mr. Ferrara's

19   sentence is completely beside the point of what this

20   exercise is all about, which is this court looking to

21   sentence this defendant and having it determine now

22   post-Booker what acts are attributable to him as a

23   defendant being sentenced.

24        I mean, the First Circuit -- nobody has

25   mentioned the phrase "equitable estoppel," but I think

1    Mr. Weinberg and the court are both well aware that there

2    was a number of times where the First Circuit has raised

3    a serious question as to whether the concept of equitable

4    estoppel, meaning whether the government is bound by

5    something it says at one point in the proceeding at a

6    later stage of the proceeding, whether that even applies

7    in a criminal case.  The fact of the matter here is what

8    has to be done is this court has to get it right with

9    respect to this defendant.  It has to sentence this

10   defendant for the conduct that is attributable to him in

11   sentencing.

12           THE COURT:  Well, let's be specific, because

13   it's coming when we talk about Corlito and Limoli next.

14           You were sitting next to Mr. Lang at the April

15   1, 2004 hearing.  Do you remember that?

16           MR. HERBERT:   I'm sure I was, your Honor.

17           THE COURT:  And we talked about remedy.  Some of

18   this starts at page 108 -- starts earlier.

19           Mr. Lang told me because I wanted to get that

20   sentencing -- I wanted to see what I had to decide with

21   regard to remedy -- said if the basis of relief were to

22   be a finding by your Honor that had disclosure been made,

23   Mr. Ferrara would have balked at pleading to the Limoli

24   charges and would have negotiated some more favorable

25   deal, if that were the basis, I would suggest that the

1    appropriate remedy would be to vacate counts 3 and 4 of

2    the admissions of racketeering act 3 in count 1 and 2.

3    Recognizing the case law, I would suggest that the

4    sentencing or sentencing bundle could be undone and

5    certain counts vacated, leading to a resentencing.  We

6    would go to resentencing, and the government would be in

7    a position of arguing, as it has in its brief -- this was

8    briefed -- that you should very much consider, credit the

9    information indicating Mr. Ferrara's involvement in the

10   Defronso-Corlito killings in finding there's a life

11   sentence Guideline range on the resentencing.

12          And then I actually asked him:  Your argument

13   would be there should be a resentencing and then I should

14   decide whether the government has proven by a

15   preponderance of the evidence Limoli, Defronso, and

16   Corlito?  Mr. Lang said:  Well, we'd be focusing on

17   Defronso and Corlito at that point, your Honor.

18          And then I had already ordered -- let me just

19   pull this out -- February 27, 2004, after the February 11

20   hearing, on a motion to reconsider, I ordered that for

21   the purposes of Ferrara's petition, pursuant to 28 USC

22   Section 2255, the record concerning the Defronso and

23   Corlito murders will consist of the testimony of Jordan

24   and DiNunzio presented at trial in Barone and related

25   exhibits, and I ordered the government to identify all

57

1        that.   But I still discussed this further with the United

2        States and the person that Mr. Sullivan sent here to

3        represent the United States, Mr. Lang.

4               I asked, you know:   Should we hear witnesses?

5        And what does Mr. Lang on behalf of the United States say

6        to me?:   It is a number of years after the trial.   We are

7        now upwards, I think, of going on 19 years or something

8        after the events they would be testifying about.   So I

9        suggest it would serve no purpose to have Mr. Jordan or

10        Ms. DiNunzio come in and try to give us their present-day

11        recollections of exactly what Mr. Barone and Mr. Limoli

12        said to them.   The best record we have of what they could

13        relate to the court is what they testified to at the

14        Barone trial.

15               MR. HERBERT:   But it is --

16               THE COURT:   So you're saying that as a federal

17        judge I shouldn't rely on that representation because now

18        that I've done -- taken a year, 124 pages to do what the

19        government said I should do, including not listening to

20        DiNunzio, 19, now 20 years or 21 years after the events,

21        because you've lost, you now want to take a different

22        position, and I should let you do that while Mr. Ferrara

23        waits months or years for the matter to get resolved; is

24        that the government's position?

25               MR. HERBERT:   No, what the government is

58

1  saying, your Honor, is that's absolutely right, that it

2  is a long time after the fact, and the best record of

3  recollections of witnesses like Ms. DiNunzio was what was

4  testified to at the Barone trial. And the government

5  still maintains that the court should look to that trial

6  evidence in order to find that the defendant -- that the

7  government has proved that the defendant was responsible

8  for Limoli, Corlito, and Defronso, at least by a

9  preponderance of the evidence.

10          THE COURT: And I did that.

11          MR. HERBERT:   And that remains the government's

12  position, your Honor.

13          Now, the court having found in its opinion --

14  and we did not know what the court would write in its

15  opinion at that time -- the court having decided that it

16  would not even look to the Barone trial transcript

17  because Mr. Weinberg was not there to cross-examine,

18  instead, it was Mr. Egbert on behalf of Mr. Barone --

19          THE COURT: This is -- excuse me, do you have a

20  copy of my decision?

21          MR. HERBERT:   Yes, your Honor.

22          THE COURT: All right. Got it? You don't have

23  the Westlaw version, you have the typed version, right?

24          MR. HERBERT:   Correct, your Honor.

25          THE COURT: What you just cited is on page 111,

1    last paragraph, where I said it would not however -- it

2    would, however, not be fair to Ferrara to decide the

3    Corlito and Defronso matter solely on the basis of the

4    Barone trial testimony.

5            MR. HERBERT:    Correct.

6            THE COURT:   Now did you read the next page?

7            MR. HERBERT:    I read all the pages of the

8    decision, your Honor.

9            THE COURT:   Okay.   Look at the last paragraph.

10   Because after having said that, I wrote:   In any event,

11   the court finds that the evidence presented at the Barone

12   trial was insufficient to prove even by a preponderance

13   that Ferrara should be held responsible for the Corlito

14   and Defronso murders.

15           Then I spent several pages explaining why.

16           That statement that I didn't consider it is not

17   only erroneous but, coming from a man as intelligent as

18   you, has to look like a gross mischaracterization.   And

19   if you make it to me -- I hope I'm still in the condition

20   to remember what I wrote two weeks ago -- if you make a

21   representation like that to the Court of Appeals or the

22   Supreme Court, maybe they'll overlook at.   But there are

23   at least -- and I can tell you the pages -- six times in

24   there that I say that I have reviewed that -- maybe I

25   don't say I reviewed it -- but I did -- that I find --

1    even though it would be unfair to rely on that, I went

2    through it anyway.

3        MR. HERBERT:  Well, the court -- that's right,

4    the court made the statements --

5        THE COURT:  You read this whole thing.  Why

6    didn't -- why do you make the argument that I didn't do

7    it if I've written this on page 111?

8        MR. HERBERT:  What I was making the argument to

9    the court about was the point that the court was not

10   looking to the Barone trial transcripts and coming to the

11   conclusions that the government had urged upon it.

12       THE COURT:  I did.

13       MR. HERBERT:  No, the court just said it

14   doesn't find even by a preponderance of the evidence that

15   those murders are proven by the Barone trial transcripts,

16   something the government has vehemently disagreed with.

17       THE COURT:  I know, but you said that I didn't

18   consider it.

19       MR. HERBERT:  Well, I did not mean to suggest

20   that the court never looked at them, never read it, never

21   heard the evidence.  We were the ones, I believe, at

22   these hearings who suggested that the Barone trial

23   transcripts should be made part of this record.  There

24   have been numerous references to it.

25           So for the court to suggest that I was trying to

1    say the court never looked at it is simply an unfair

2    characterization on behalf of the court.

3              THE COURT:  You said that you wanted an

4    evidentiary hearing --

5              MR. HERBERT:   That's right.

6              THE COURT:  -- on Limoli, Corlito, and Defronso.

7    It says:  In light of the court's decision not to rely on

8    the evidence from the Barone trial regarding the Limoli,

9    Corlito, and Defronso murders, you request an evidentiary

10   hearing, even though Mr. Lang told me that that would not

11   be appropriate.  And I could not have repeatedly said you

12   failed to prove what you had to prove even by a

13   preponderance of the evidence regarding Limoli, Corlito,

14   and Defronso without having considered that evidence

15   myself.  This is a deconstructionism dream.  It's like

16   words have no meaning.  You don't see how anybody could

17   think that you stopped reading on page 111 and didn't go

18   to 112.  And I know you've read the whole thing.  So if I

19   know you read the whole thing, how can I think, despite

20   my wish not to believe it, that you're just

21   mischaracterizing.

22             MR. HERBERT:   Frankly, your Honor, this whole

23   proceeding seems to have sidetracked into a game of

24   gotcha with respect to the government, the government

25   position, the government arguments.  We're not talking

62

1    about the sentencing of defendant Ferrara; we're talking

2    about things that the government had said at various

3    points as if this is entirely about the government and is

4    in fact a sentencing of the government.  It is not.

5         THE COURT:  Nom it's not.  That's enough.

6    That's enough.  The Grasso murder has been discussed

7    enough today.

8         MR. HERBERT:  Well, I do need to make an

9    additional point about that.  The Grasso murder is not

10   being raised at the eleventh hour for the first time.  As

11   we said in our sentencing memo, in the PSR, we

12   specifically described the evidence related to the Grasso

13   murder and the Salemme shooting, and we say it's being

14   proffered to the court as relevant conduct in connection

15   with this sentencing.  So that's not a new position.

16        THE COURT:  Actually, let me look at that.  I

17   mean, I know it's in there.  Where is the discussion of

18   it as relevant conduct?

19        MR. HERBERT:  It's in a footnote in connection

20   --

21        THE COURT:  Hold on.  Let me find it.

22        (Short pause.)

23        MR. HERBERT:  Footnote 18, your Honor, on page

24   87, at least of the version I've got.

25        THE COURT:  87?  All right.

1          MR. HERBERT:    At that time the government said

2     -- this is 1992, before the original sentencing:    At the

3     time of the defendant's plea, the court had ruled

4     preliminarily that evidence concerning the Grasso

5     homicide and the Salemme attempted homicide would not be

6     admissible at trial.    The court, however, agreed to

7     revisit the issue at the time that Castagna (sic) and

8     Johns testified.    Those are the two witnesses that we

9     have present today.

10          The footnote went on to say:    The information is

11     included in the government's statement of facts as part

12     of the "relevant conduct" of the defendant, and it cites

13     the Sentencing Guidelines Manual, section 1B1.3.

14          THE COURT:    All right.    Well, I consider all

15     that too.

16          Probably have to take a break for the court

17     reporter soon, but we've segued into whether I should

18     conduct, notwithstanding Mr. Lang's statements on behalf

19     of the United States on April 1, 2004, an evidentiary

20     hearing regarding Limoli, Corlito, and Defronso.

21          MR. HERBERT:    With respect to the arguments

22     about disparity of the sentences   --

23          THE COURT:    I'm sorry, does this relate to

24     Limoli, Corlito, and Defronso?

25          MR. HERBERT:    It relates to Mr. Weinberg's

1    argument that he just made.

2              THE COURT:   Go ahead.

3              MR. HERBERT:    While it is true that defendants

4    Russo and Carrozza were culpable for the Grasso murder

5    and the Salemme attempt and were sufficiently concerned

6    about --

7              THE COURT:   What about Mercurio?

8              MR. HERBERT:    -- their liability -- Mercurio

9    would have been liable as well.  But Russo and Carrozza

10   and Ferrara were the defendants who were sufficiently

11   concerned about their liability to bargain for a pass on

12   those prosecutions in connection with their plea

13   agreements.  It's a benefit to those defendants that the

14   First Circuit has already taken note of in connection

15   with its review of the sentences imposed on Patriarca and

16   Carrozza.  It was a very significant benefit that they

17   bargained for.  So there can be no suggestion that this

18   was not at the front of the defendants' minds that they

19   might have a significant liability and the significant

20   potential to spend life in prison on a separate

21   prosecution.  That's what they bargained for.  Yes, we

22   think Corlito and Defronso  --

23              THE COURT:   No, stop right there.

24              Is it your position that they have immunity

25   against separate prosecution but not immunity against

1    being punished in this case for Grasso and Salemme?

2            MR. HERBERT:    Absolutely.   It's relevant

3    conduct.   It gets them to life, the same as they agreed.

4    With respect to Ferrara, he agreed his Guidelines were

5    life.   It puts him exactly in that same position, based

6    on a murder that was so much at the forefront of his mind

7    that he bargained for a pass on it in connection with his

8    plea agreement.   There's nothing inequitable about saying

9    at this point, your Guidelines are life based on that

10   murder that you were sufficiently concerned about that

11   you bargained for a pass on it in your plea agreement.

12   So your Guidelines start at life, and then we'll talk

13   about downward departures.

14           THE COURT:   Did the Probation Department find

15   that Grasso was relevant conduct?

16           MR. HERBERT:   It didn't need to, your Honor.

17           THE COURT:   Excuse me, answer the question.

18           MR. HERBERT:    It did not find that.

19           THE COURT:   Did you object to that?

20           MR. HERBERT:    No, we did not object to it.   We

21   didn't need to, as I said at the beginning.   The

22   Probation Department found that his Guidelines were life.

23   He agreed they were life.   He came in and, as this court

24   noted at the outset, admitted under oath that he was

25   responsible for the Limoli homicide.   So there was no

66

1    question about his Guidelines being life at that time

2    and, therefore, there was no need to go on and consider

3    relevant conduct consisting of other murders at that

4    time.

5              THE COURT:  I understand it now.

6              All right.  Now, some of this has been covered.

7              Do you want to argue that I should now conduct

8    an evidentiary hearing, take testimony on Limoli,

9    Corlito, and Defronso?  After relying on Mr. Lang, who

10   Mr. Sullivan sent here to represent the United States, I

11   left Mr. Ferrara in prison while I studied the briefs in

12   this case and the record in the Barone case.

13             MR. HERBERT:   I do want to make argument that

14   the court should hear evidence with respect to it, and I

15   have to confess, I don't understand -- and I'm sure the

16   court will help me to understand that -- but I don't

17   understand at this point how the fact that Grasso is

18   being raised now has delayed anything at this point.  If

19   we raised it before, the court would have needed to

20   consider it then.

21             THE COURT:  But now I've heard the two of you

22   for about 45 minutes on Grasso.  I'm going to take this

23   under advisement.  I'll decide what to do.

24             The question I asked you is, you know, I read

25   you what Mr. Lang said with you sitting by him April 1,

67

1    2004, telling me why I should rely on the Barone trial

2    record.  And that's part of what I did.  Even though I

3    thought it wasn't fair to Mr. Ferrara, I wanted to see

4    where that was going to come out.  And I did just what

5    the government argued.  And that's part of what took the

6    time to do the decision.

7         Do you want to -- are you arguing, as I thought

8    you said in your trial brief, that I should take

9    testimony now on Limoli?

10        MR. HERBERT:  No, we're not arguing that the

11   court should take testimony on Limoli today.  What we are

12   proffering to the court today is the affidavit of

13   Elizabeth DiNunzio, which we've submitted.

14        THE COURT:  It's under seal.

15        MR. HERBERT:  It is.  And we --

16        THE COURT:  I'll look at it.  I didn't have

17   time, since it came at about the outset of the hearing,

18   to read it closely.  But are you arguing that I should

19   take testimony today on Corlito and Defronso?

20        MR. HERBERT:  No, your Honor.

21        THE COURT:  Let's take out the today.  I want to

22   try to finish these hearings.  Are you arguing that I

23   should take testimony on Limoli, Corlito, and Defronso?

24        MR. HERBERT:  No, your Honor.  We do maintain

25   that the court should rely on the transcript from the

1    Barone trial, and I know the court has the paper record

2    of those transcripts, and what we would ask is that the

3    court also mark as an exhibit a compact disk consisting

4    of those trial transcripts scanned in for the benefit of

5    the court should it desire to use that as an aid or --

6            THE COURT:   Well, why didn't you give me that a

7    year ago?  I'm finished with Corlito and Defronso.  I

8    found the facts that I'm going to find.  I haven't had

9    the benefit of that.  Maybe Mr. Ferrara would have got

10   his decision earlier if you had given it to me.

11           MR. HERBERT:   I'm sure the court had the

12   ability to scan them in the same as the government did.

13   But, in any event, we've done it at this point.

14           THE COURT:   That's fine.  You've got it.

15           MR. HERBERT:   We would ask that that be marked

16   as an exhibit.

17           THE COURT:   I'm not marking it as an exhibit.

18           MR. HERBERT:   Well, for the benefit of the

19   Court of Appeals if it does go to the Court of Appeals.

20           THE COURT:   I don't see any reason to mark it as

21   an exhibit.  I've made a decision with regard to Defronso

22   and Corlito.  They may take it from you.  I don't know if

23   they will or they won't.  But it's not going to help me.

24           MR. HERBERT:   Why wouldn't we make it part of

25   the record in this case?

1          THE COURT:   Because it wasn't part of the

2    record.

3          MR. HERBERT:   This is simply an electronic

4    version of what is part of the record, and the Court of

5    Appeals may be called upon to make a decision in this

6    case in fairly short order, and I think it would

7    significantly benefit them to have a copy of a surgical

8    compact disk so they don't have to go through the paper

9    record.

10          THE COURT:   Would have benefited me too.   Then

11    you should give it to them.   I don't know what's on the

12    disk.

13          MR. HERBERT:   We're asking that it be made part

14    of the record for this proceeding.

15          THE COURT:   I'm declining for now.   I might

16    reconsider it.

17          MR. WEINBERG:   If the court is considering

18    reconsidering it, would Mr. Herbert give petitioner

19    Ferrara a copy, which we haven't received?

20          MR. HERBERT:   We would be happy to.

21          So that is what we would rely upon with respect

22    to Limoli, Corlito, and Defronso and, of course, the

23    record of the prior proceedings in this case and the

24    defendant's lack of objection with respect to the

25    representations concerning in the presentence report and

1    the trial brief.

2              THE COURT:  I'm sorry, actually, the defendant

3    wasn't required to object to the trial brief.  Most of

4    the trial brief seems to be in the presentence report.

5              MR. HERBERT:  Yes, your Honor.

6              THE COURT:  Second of all, I mean, I've written

7    about this.  The government didn't have in the addendum

8    an objection with regard to Corlito and Defronso, but he

9    didn't plead guilty to it, and he didn't admit it in the

10   presentence report.  And with regard to objections in the

11   presentence report, the government, you remind me, didn't

12   object to Probation not finding that Grasso and Salemme

13   were relevant conduct.

14             MR. HERBERT:  Now, would like the court like to

15   hear at this point about the proffer of evidence with

16   respect to Grasso?

17             THE COURT:  I thought we were finished with

18   Grasso.

19             MR. HERBERT:  I think if the court has made a

20   determination that it is not going to hear from the

21   witnesses, John Castagna and Jack Johns, then the

22   government would request an opportunity to make an offer

23   of proof.

24             THE COURT:  I think what you can do on that --

25   I'm concerned about time at this moment -- is I may

71

1      either let you do that a little later or in writing.

2                MR. HERBERT:    I'm sorry?

3                THE COURT:    Or possibly in writing.

4                MR. HERBERT:    Yes, your Honor.

5                THE COURT:    Under seal.    Initially, at least.

6           It's 12 o'clock, and there are a number of other

7      issues to go through.    I think the next one is going to

8      be just going through your brief, the four levels for Mr.

9      Ferrara's role in the RICO.

10               But we'll take a break for about ten minutes.

11               Court is in recess.

12               (Short break.)

13               THE CLERK:    Court is back in session.    You may

14     be seated.

15               THE COURT:    If the parties want to look at it

16     during the lunch break, the affidavit to which I was

17     referring is Mr. Sullivan's February 9, 2004 affidavit

18     that told me that there was a delay in acting on the

19     representation that Mr. Durham had made to me in January

20     2003 because the US Attorney's office decided to make the

21     disclosure, and there were discussions within that office

22     as to whether the matter should be assigned to one or

23     more Assistant United States Attorneys outside the Strike

24     Force unit.    Since it appeared that the Strike Force

25     AUSAs might be called as witnesses at some future hearing

72

1    on this matter, the Strike Force chief and the Criminal

2    Division chief agreed that reassignment of the case was

3    appropriate.

4            Are you the chief?

5            MR. HERBERT:   Yes, I am, your Honor, and I did

6    agree at that time that that was appropriate.   Now that

7    the evidentiary hearing has been concluded, I was not

8    called a witness, and the court has decided that the

9    remedy is resentencing, it is appropriate for me to

10   represent the government.

11           THE COURT:   The next issue the government raised

12   on page 10 of the April 27 memorandum.

13           MR. WEINBERG:   If your Honor please, may I be

14   heard for about one minute before we turn to a new issue?

15   I just don't want the record to in any respect   --

16           THE COURT:   Go ahead.

17           MR. WEINBERG:   -- reflect that this is all about

18   Mr. Herbert or the government.   It's about the

19   representations that were made to your Honor and to Mr.

20   Ferrara by the person who was representing the

21   government, and it's about the fact that the court relied

22   on those representations.   Mr. Ferrara relied on them.

23   His counsel relied on them.   And he's been completely

24   misled by relying on representations that year after year

25   were the position of the United States Attorney's office

73

1    until Mr. Herbert's return to the case on April 27.

2              And, secondly, when Mr. Herbert says that this

3    is about waiver, the government every day argues

4    defendants waive rights, they ought to sit in jail

5    forever, because their lawyers didn't raise rights.  Yes,

6    they put a page about Grasso and Salemme in a lengthy

7    government version in the presentence report.  But when

8    it came time to making objections, in 1992, they objected

9    to the failure of Probation to identify an assault and

10   battery in 1969 that they agreed would have no effect on

11   scoring, and they never raised in their eight or seven-

12   or eight-page addendum any quarrel with Probation's not

13   allocating to Mr. Ferrara relevant conduct.  They waived

14   it in '92 and, most importantly, we relied to our

15   detriment on their position in 2004 and 2005.

16              This is not about Mr. Herbert.  It's not about

17   the government.  It's about their representations and the

18   court and the parties' right to rely on the words spoken

19   and the words written by the Assistant US Attorney who

20   has been elected or selected by Mr. Sullivan to represent

21   the office.  And that's precisely what we did year after

22   year, your Honor.

23              THE COURT:  That's it.  That's it.

24              Have a seat.

25              On page 11, the government argues, I believe,

1    for the first time that the Probation Department erred by

2    applying role adjustment only with respect to Ferrara's

3    underlying racketeering activities and not to the overall

4    RICO offense as well.  It cites the Seventh Circuit

5    decision in Domico.

6         I do have a series of questions, particularly

7    whether addressing the merits of this now would be

8    inconsistent with placing Mr. Ferrara in the position he

9    would have been in in 1992 without the government's

10   unconstitutional conduct.  But, generally speaking, the

11   principles have been covered earlier today.

12        Do you want to address the issue, Mr. Herbert?

13        MR. HERBERT:  Yes, your Honor.  I think it is

14   fully covered in our sentencing memo but, in essence, the

15   Seventh Circuit's decision in Domico, I think, has a very

16   careful, thorough, exhaustive, and well reasoned analysis

17   as to why a chapter 3 adjustment such as role in the

18   offense must be applied after the base offense level for

19   the RICO offense is arrived at.

20        The calculation of Mr. Ferrara's role in the

21   offenses that are charged as the underlying racketeering

22   acts, such as the Weinstein and Saganski extortions,

23   simply is part of the process of determining the

24   defendant's base offense level under the Guidelines for

25   his RICO offense.

1            There's nothing in the Guidelines nor in any

2    cases the government has found that suggests that there

3    is a RICO exception to the general application Guidelines

4    -- application instructions in the Guidelines that say,

5    once you've arrived at the base offense level for a

6    particular offense, you then go on to apply the

7    appropriate chapter 3 adjustments.

8            And under these circumstances, as the Domico

9    court points out, that makes perfect sense to do that in

10   a RICO case, because the defendant's role in the overall

11   racketeering offense might well be different than his

12   role with respect to the underlying racketeering acts.

13   And a defendant who might have a leadership role with

14   respect to the enterprise, in this case, the Patriarca

15   family of the Mafia, but who did not have a personal

16   aggravating leadership role with respect to the

17   underlying racketeering acts, would therefore escape any

18   adjustment for role in the offense of RICO.

19           And so under that reasoning it makes perfect

20   sense to go on and apply a separate role adjustment after

21   you've arrived at the defendant's base offense level.   In

22   this case, clearly, that should again be four levels for

23   the defendant's leadership role with respect --

24           THE COURT:   Actually, we'll put the number aside

25   for the moment.   This argument wasn't raised in the 1992

1    presentence report, was it?

2              MR. HERBERT:   No, it was not, and, again, for

3    the same reasons that we discussed before.   The defendant

4    conceded his Guidelines were life.   Part of the benefit

5    --

6              THE COURT:   But it wasn't raised with regard to

7    his codefendants, who didn't have life Guidelines either.

8              MR. HERBERT:   There again, we were agreeing to

9    specific sentences with respect to those defendants.

10    And, as the court pointed out, as a reason for accepting

11    those agreed-upon sentences, one thing we were doing was

12    saving resources.   We were saving the court's time, the

13    parties' time.   Specifically, we were focusing on the

14    time it would take to try the case.   But by entering into

15    an agreed-upon disposition which was provided for under

16    the Federal Rules of Criminal Procedure, we were in

17    effect cutting to the chase, a sentence that the parties

18    could live with and a sentence that ultimately the court

19    decided it could live with.   And for that reason, it made

20    perfect sense for us not to engage in Guideline

21    calculations or arguments that were not material to the

22    sentences we were getting to.

23              MR. WEINBERG:   May I respond briefly, your

24    Honor?

25              THE COURT:   No, actually, not yet.

1          If I were to grant an adjustment on this basis,

2     why would it be four and not three?  You've been arguing

3     to me probably since -- you personally -- you were in the

4     first case, DiGiacomo -- since 1990:  This is a very

5     hierarchal organization.  You've got, you know, the boss.

6     You've got the -- who was the underboss in this period,

7     Bianco?  You've got Russo who, in my view, having sat

8     with all of you for several years up to these sentences,

9     was the absolute dominant member of the Ferrara faction

10    in the Patriarca family.  Why would it be four and not

11    three?

12          MR. HERBERT:   Well, your Honor, for the same

13    reasons that I argued with respect to the Saganski and

14    Weinstein extortion.  As a matter of law, this

15    enhancement under the Guidelines is not limited to an

16    individual who is at the top of the pyramid.  It applies

17    to anyone who is an organizer or leader.  A capo regime

18    in a Mafia family is by anyone's definition a leader of

19    that enterprise and, in fact, he's one of the highest.

20          THE COURT:  Well, not necessarily by my

21    definition, because you also have managers and

22    supervisors.  In other words, the idea -- I fully

23    understand you can have more than one leader.  You don't

24    have a problem with me on that.  But the idea is that

25    there are different levels of leadership.  And now I have

1    to look at it in terms of the overall enterprise.  We're

2    not looking at the particular racketeering act.  That's

3    your argument.  So what do I have that shows me Mr.

4    Ferrara was not just -- was a leader of the whole

5    Patriarca family as opposed to an organizer or

6    supervisor?  And it's one point.

7              MR. HERBERT:    Yes, your Honor.  I would say an

8    organizer or a supervisor, when you consider the

9    activities of an organized crime family like the

10   Patriarca family, there are people who are merely

11   associates of the family who are managers and supervisors

12   of criminal activity that the family engages in.  You can

13   have people who are managers and supervisors of

14   bookmaking businesses.  You can have people who are

15   managers and supervisors of drug activities.  You go up a

16   step from the associates to the level of a soldier or a

17   made member, and then you've got people who are

18   overseeing the activities of a number of associates.  And

19   then you go up a level from that, and you've got capo

20   regime like defendant Ferrara who have a crew that

21   consists of soldiers, made members, and associates that

22   could be of varying different degrees of managerial

23   responsibilities.

24             So I'd say the record is replete with evidence

25   that defendant Ferrara at that time in connection with

 1    this was exercising a very definite leadership role with

 2    respect to the affairs of the Patriarca family.

 3              THE COURT:  I understand the argument.

 4              MR. WEINBERG:  Firstly, Mr. Herbert was the

 5    trial prosecutor in charge of the remand of the case

 6    against Patriarca, one of the codefendants in the

 7    criminal indictment that we're dealing with today.  That

 8    was not an agreed sentence.  It was the antithesis of an

 9    agreed sentence.  It was probably the most hotly

10    contested sentencing hearing in the history of the

11    district.

12              Mr. Herbert's position regarding Patriarca had

13    nothing to do with acquiescing in some inevitable

14    Guideline calculation.  However, Mr. Herbert never raised

15    this issue, to my memory, and, if he did, the court

16    rejected that issue, because on page 633 of 912 F Supp,

17    which is the court's lengthy opinion on remand, exhibit A

18    reflects that the role adjustment was assessed group by

19    group, predicate by predicate, with the highest predicate

20    being 26, a plus 4 for multiple counts, and no additional

21    addition for role.  I don't recall the government raising

22    this issue for Patriarca.

23              THE COURT:  Mr. Herbert can tell us if he has a

24    different memory.  My memory is that this issue wasn't

25    raised with regard to Patriarca, with regard to Russo,

1    with regard to Carrozza, or in other cases, for example,

2    with regard to Salemme.  I looked at the presentence

3    report this morning.  Nor was it raised with regard to

4    DiGiacomo.  This is the first time this has been raised

5    in any of my cases, isn't it?

6              MR. HERBERT:    I don't know the answer to that,

7    your Honor.  Here again, we're extending it yet a step

8    further, the government has waived something because it

9    didn't make an argument with respect to a different

10   defendant.

11             THE COURT:.  No, this is Mr. Weinberg -- I'm

12   trying to -- if it occurs to you over the lunch break or

13   over the evening break, which we might be getting toward,

14   that you've taken this position in another case, you'll

15   tell me.  But I know it wasn't taken in this case.  It

16   wasn't taken, I'm quite confident, with regard to

17   DiGiacomo or Salemme or, to my memory, Patriarca.  It's

18   not the way the Probation Department here has handled

19   this.

20             MR. WEINBERG:    I raised the point regarding Mr.

21   Herbert to respond to his argument, which suggests that

22   it was a matter of the economy of the administration of

23   justice that he didn't raise it rather than the fact that

24   the government just didn't have this argument in their

25   radar in 1992 when Mr. Ferrara was sentenced.  There was

1    no hint of it in a lengthy trial, in a lengthy

2    presentence report.  Their addendum, as I've said, raised

3    a non-scoreable prior assault and battery as something

4    they felt was material to bring to the attention of the

5    Probation Department.  They talked about whether

6    Weinstein should be 30 or 31, even though there was an

7    agreed C plea.  This simply is waived in 1992.  To the

8    extent that waiver applies to the 2005 resentencing,

9    this, like the Grasso murder, was simply not in their

10   addendum, not objected to, and waived by the government.

11        Second of all, it's underpinnings are double

12   counting.  They argue to your Honor about an hour ago

13   that the reason that Ferrara should get a leadership

14   enhancement plus four for a predicate was because of his

15   role in the enterprise.  And now they're asking for there

16   to be an eight level increase in his offense level and

17   his ultimate Guideline, four levels because his role in

18   the enterprise made him a leader on a predicate and then

19   four more levels because of their theory that you double

20   count the role.

21        THE COURT:  Well, the argument or, I think, the

22   reasoning is that an individual extortion is dangerous,

23   but that danger is magnified if it's a racketeering act

24   on behalf of an enterprise that's engaged in a pattern of

25   racketeering activity.  And it's reasonable to punish

1    that more severely.

2         MR. WEINBERG:  And I think that if the principle

3    would meet the facts more, if their argument is, let's

4    look at the underlying activity, if it's an activity that

5    the chapter 2 offense conduct exceeds 19, then that

6    should be the dynamic or driving force in a Guideline

7    calculation.  Since this is a RICO, then you superimpose

8    a role adjustment to the underlying activity.  But to

9    have the identical argument that he has a role in the

10   enterprise, therefore, we, you know, allocate to him a

11   role in the predicate, without any evidence within the

12   predicate for the Weinstein extortion that he exercised

13   some hierarchal authority, instead, it's replete with

14   references to group decision-making and to an even

15   division of the benefits, it's simple double counting

16   which should not be sanctioned, particularly absent some

17   clear Guideline mandate or some Guideline commission

18   mandate that this is what was contemplated in terms of

19   RICO.

20        With the exception of one case cited by Mr.

21   Herbert, I know of no other occasion where this Guideline

22   enhancement has been requested, where it's been scored,

23   or where it's been imposed on anyone.  And, certainly,

24   back in 1992, Mr. Ferrara -- this was simply off the

25   government's radar, off the court's radar, off

1    Probation's radar.  And he simply should not be subject

2    to an additional four levels because of the double

3    counting of roles.

4            MR. HERBERT:   May I respond just briefly, your

5    Honor?

6            THE COURT:  Go ahead.

7            MR. HERBERT:   First of all, Mr. Weinberg can't

8    have it both ways.  He cannot say that on one hand the

9    defendant here did not waive his objection to deeming

10   Corlito and Defronso as relevant conduct and Grasso as

11   relevant conduct on the presentence report, but the

12   government has waived any argument that it didn't make in

13   1992.

14           THE COURT:  But there's not an argument with

15   regard to Corlito and DeFronso.  I've analyzed Corlito

16   and DeFronso.

17           MR. HERBERT:   In any event -- and, first of

18   all, for the record, I don't think we're talking about

19   waiver specifically.  I think the concept is forfeiture.

20   And I believe they're distinct concepts.  And I believe

21   the First Circuit in connection with possibly the

22   Carrozza sentencing opinion raised a significant question

23   concerning the applicability of that in the Guideline

24   context.  I'm not positive about that.

25           But, in any event, I don't think Mr. Weinberg

84

1    has a case that stands for the proposition that if the

2    government doesn't make an argument with respect to a

3    different defendant in 1992, it's forever barred from

4    making that argument.  I don't think there's a case that

5    says that.

6         But with respect to the double counting, the

7    government doesn't dispute that in these what are

8    necessarily very fact specific inquiries under the

9    Guidelines, doesn't dispute that there could conceivably

10   be a double counting issue if, for instance,

11   hypothetically, a defendant was only given a role

12   adjustment with respect to a racketeering act based on

13   their hierarchal position in the organization.  That's

14   not what we're talking about here.  There is specific

15   evidence that we've referred to as to defendant Ferrara's

16   leadership role with respect to the Saganski and

17   Weinstein extortion.  His role in the Patriarca family,

18   as the court has rightly pointed out, was vastly larger

19   than his role with respect to that particular extortion

20   in terms of its significance.  It's true factually, and

21   it's true legally.  So it's not a double counting issue

22   here at all.

23        THE COURT:  Okay.  I hate to do this, but I

24   realize there's one of your Limoli arguments that I

25   didn't give you a chance to argue if you want to maintain

85

1    it and, that is, even assuming that Mr. Ferrara didn't

2    agree to or authorize the Limoli murder, it's relevant

3    conduct.

4           Mr. Lang did tell me on behalf of the United

5    States on April 1, 2004 that if I found what I now have

6    found on Limoli, I'd be focusing on Corlito and DeFronso.

7    And this is very different argument.

8           Is that an argument you want to maintain?

9           MR. HERBERT:    Yes, your Honor, and it was my

10   understanding that we were not waiving or forfeiting any

11   arguments in our sentencing memo simply because they

12   weren't addressed at this hearing.

13          THE COURT:    No, I'm not saying because they're

14   not spoken to.

15          MR. HERBERT:    Yes, your Honor.    But, yes, we

16   definitely --

17          THE COURT:    But your position on some things has

18   evolved.  You told me you didn't want an evidentiary

19   hearing on Corlito, DeFronso, Limoli.  So I thought maybe

20   if I pointed out to you what Mr. Lang had said to me so

21   specifically a year ago, your thinking on this one would

22   have evolved too.  But go ahead.

23          MR. HERBERT:    Yes, that is our position, as we

24   articulated in the sentencing memo.  And I believe the

25   court, in raising it with respect to Mr. Patriarca,

1    identified the correct legal principles under the

2    Guidelines and the application of relevant conduct.  I do

3    believe, do submit that the evidence establishes that the

4    drug dealing activity that led up to the Limoli homicide,

5    as clearly established by the electronic surveillance

6    evidence, which we've discussed in the presentence

7    report, in the trial brief, and which is -- some of those

8    transcripts which are attached to the supplemental

9    affidavit of special agent Romanso, it is clear from that

10   that drug dealing was within the scope of defendant

11   Ferrara's conspiratorial agreement, and it is foreseeable

12   that people could get hurt when somebody does something

13   -- when a drug deal goes bad, if even that is what

14   happened here.  But those transcripts do show clearly,

15   and I urge the court, as I know it will, to look

16   specifically at those transcripts on this issue because

17   --

18            THE COURT:  You're going to have to point me to

19   where.  I was just looking at them over the break.

20            MR. HERBERT:   Yes, your Honor.  These

21   transcripts in particular are at tab 2, exhibit 2 of the

22   supplemental affidavit of special agent Romanso.

23            THE COURT:  And is Mr. Ferrara intercepted on

24   any of these transcripts?

25            MR. HERBERT:   He is -- on these transcripts

1    that we've submitted, I don't believe he's intercepted

2    speaking.  He's certainly -- there are interceptions of

3    his codefendants and coconspirators speaking about him,

4    including his role and presence with Spucky Spagnolo in

5    confronting Limoli and getting him to confess under

6    extreme pressure to his theft of the drugs from Spagnolo,

7    a confession which I would note led, when this was

8    described -- after Spagnolo describes it in a

9    conversation to Carrozza, Carrozza then calls his drug

10   coconspirator, Frank Imbruglia (sic) and relates what

11   happened to him, and it's very significant that in that

12   conversation, which I believe is the September 18, 1985

13   conversation, look at Imbruglia's reaction to that.  He

14   immediately asks if the guy was wacked, and there's a

15   misunderstanding, and he eventually realizes that

16   Carrozza is talking about something else.  But Carrozza

17   on page 2 says, it's funny how some things happened.  And

18   Frank Imbruglia:  You mean you wacked him?  Robert

19   Corrozza:  You know what things need  --

20          THE COURT:  We went through this.  I'll read it

21   again.

22          MR. HERBERT:    It clearly shows that Imbruglia

23   understood that the penalty for doing what Limoli had

24   confessed to doing was death.

25          THE COURT:  And there were many years in which,

88

1    I believe, in Patriarca's case, found that Mr. Ferrara,

2    you know, behaved in that fashion.  Now, as I've written,

3    I seriously doubt that.  You haven't proven it.

4            But, you see, the fact that Imbruglia says, "oh,

5    did Mr. Ferrara kill him for doing drugs?", it may

6    suggest that doing drugs was outside of the agreement

7    between them.

8            MR. HERBERT:  But, your Honor, in context, it

9    wasn't suggestion that he got wacked for dealing drugs.

10   The suggestion was that the offense that could lead to

11   his death was stealing drugs from a made member, Spucky

12   Spagnolo.

13           THE COURT:  What is it that shows that an

14   agreement -- first of all, let's do the following.  It

15   has to be activity that's either within the conspiracy

16   charged in the indictment or a reasonably foreseeable

17   consequence of it, right?

18           MR. HERBERT:  Yes, your Honor.  Well, it has to

19   be -- in the First Circuit's -- the court laid out the

20   analysis.

21           THE COURT:  In 1995.

22           MR. HERBERT:  On the amended.

23           THE COURT:  Right.  That's the analysis I need

24   to apply?

25           MR. HERBERT:  Correct.

89

1      THE COURT:  But the conspiracy charged here, I

2   think, is the RICO conspiracy that includes Mr.

3   Patriarca.  In other words, it has to be in furtherance

4   of that conspiracy, doesn't it?

5      MR. HERBERT:  Well, it has to be within the

6   scope of the defendant's RICO conspiratorial agreement.

7      THE COURT:  As charged in the indictment.

8      MR. HERBERT:  Well, the reason I'm having

9   difficulty with it is because, clearly, the First Circuit

10   didn't limit relevant conduct to what's charged in the

11   indictment with respect to underlying racketeering acts.

12   That's why I'm hesitating.

13      THE COURT:  But it has to be -- it has to be the

14   particular conspiracy in the indictment that it's -- even

15   if it's an uncharged racketeering act.  It can't be a

16   foreseeable consequence of some other conspiracy.

17      MR. HERBERT:  Well, and I just want to make

18   sure I'm understanding the court.  I'm talking about the

19   overall RICO conspiracy.  The defendant Carrozza pled

20   guilty to drug dealing in furtherance of the affairs of

21   the Patriarca family, La Cosa Nostra.  That was charged

22   in the indictment as being part of what this enterprise

23   is.  Now, the court made a factual finding at defendant

24   Patriarca's resentencing that Patriarca himself had not

25   agreed to drug dealing on behalf of the Boston faction,

1    and that was not within the scope of Patriarca's

2    conspiratorial agreement, but the court was

3    distinguishing that from the Boston faction and what they

4    were doing up there, you know, including by people like

5    Limoli, who was part of defendant Ferrara's crew, as was

6    Barone, whether he was involved in drug dealing as well.

7            THE COURT:  Do you want to respond to this?

8            MR. WEINBERG:  I do, your Honor.  We heard

9    testimony from Mr. Jordan that Mr. Ferrara was

10   aggressively against drug use or drug dealing.  We heard

11   testimony that people --

12           THE COURT:  What testimony was that?

13           MR. WEINBERG:  When Jordan testified.  That was

14   one of the questions that I recall on cross-examination.

15           We know that people were Xed out of his group

16   for this kind of conduct.

17           THE COURT:  Not necessarily for dealing drugs.

18   The government argues for stealing drugs from another

19   made member and then lying about it.

20           MR. WEINBERG:  He was not charged with drugs,

21   whereas Carrozza was.  They had enormous amounts of

22   electronic surveillance.  There was no interception that

23   Mr. Ferrara engaged at all in drug trafficking.

24           This -- if you hypothesize as to what's

25   foreseeable to him -- there's two different grounds that

1    this does not fit within 1B1.3.  One, it's not simply

2    part of his scope of agreement that people are going to

3    be trafficking drugs as they allegedly were in connection

4    to the Limoli-Barone relationship.  And, second of all,

5    it's not foreseeable to him that his friend Mr. Limoli is

6    going to be killed without his knowledge.  And the proof

7    of that, you know, is eloquently spread over the record

8    of the habeas proceedings.  I mean, by itself, that

9    extinguishes any kind of cogency to the government

10   argument that he's responsible when the whole Coleman

11   exhibit 17, it's his outrage and anger that a friend was

12   killed without his knowing it and without his permission.

13   So it's simply not foreseeable that Barone is going to do

14   that.  But when you go one step farther and remember the

15   facts of this case, Barone and Jordan go and use

16   Qualudes, and then they go and kill Limoli.  They want to

17   steal something.  They find out after a number of

18   gunshots that whatever they want to steal is not in the

19   bag.  They go back and return and shoot a number of other

20   times.  This is simply the antithesis of the kind of

21   criminal conduct that is in furtherance of the

22   government's charged enterprise.  This is a private

23   dispute, a spontaneous drug-ridden act.  He had nothing

24   to do with it.  He never had anything to do with it.  He

25   didn't know of it; he didn't agree to it; it wasn't

1    foreseeable to him; and it wasn't a logical consequence

2    of anything he did know or agree to.  It wasn't even part

3    or in furtherance of a federal crime.

4         All of the federal connection to this crime is

5    based on the mythology that the government allowed to

6    exist in this court for 12 years until a Boston police

7    officer, thank God, memorialized reality, and it was

8    exposed by Mr. Lang in 2003 -- or 2003, I think it was.

9         This is simply -- you know, for the government

10   to get up in the context of the history of the last 13

11   years and argue that he should be punished as if he

12   ordered it, it's simply Alice in Wonderland.  It's a

13   reversal of reality.  If he didn't order it, he didn't do

14   it.  He didn't agree to it.  He didn't know it.  He

15   didn't foresee it.  He was angry when he learned it

16   happened.  How can that be relevant conduct in Mr.

17   Herbert's mind?

18        MR. HERBERT:    I'd be happy to explain, your

19   Honor, if I could respond briefly.

20        If you look at these transcripts, some of the

21   people that defendant Ferrara was closest to then and

22   remains close to, Bobby Carrozza, Spucky Spagnolo, they

23   all know Jimmy Limoli is a drug dealer.  Look at the

24   conversations that are occurring at that point.  Jimmy

25   Limoli wasn't in their crew; he was in defendant

1    Ferrara's crew.  It's inconceivable that these other

2    people, Carrozza, Ferrara, Imbruglia, all of Mr.

3    Ferrara's closest associates, they happen to know Jimmy

4    Limoli is dealing drugs, but defendant Ferrara doesn't

5    know it?  And they go to the induction ceremony where all

6    of the new inductees are told in no uncertain terms, all

7    business deals, legal and illegal, get brought to the

8    table.  In other words, they all profit from it.

9    Obviously, defendant Ferrara knew that drug dealing was

10   going on as part of this enterprise that he was clearly a

11   leader of.  So that's not an argument.  I mean, he knew

12   what was going on, and he knew what the foreseeable

13   consequences were from that type of drug dealing.

14            THE COURT:  All right.

15            (Short pause.)

16            THE COURT:  The next of the government's

17   arguments, I believe, is on page 13 of its memorandum,

18   that an upward departure is warranted because there's

19   significantly more than five units for the purposes of

20   multiple count calculation in section 3D1.4.

21            This too was not raised in 1992.

22            Do you want to speak to this?

23            MR. HERBERT:    This was raised by the Probation

24   Department itself, noting that portion of the Guidelines.

25            THE COURT:  Where is that?

1          MR. HERBERT:    In the memorandum that the court

2     distributed on April 12, at the same time.

3          THE COURT:    Noting the number of units.

4          MR. HERBERT:    Noting in a footnote that the

5     Guidelines specifically provide that where the number of

6     units significantly exceeds five, an upward departure

7     would be warranted.

8          THE COURT:    But in 1992, this wasn't an issue.

9          MR. HERBERT:    Again, because the defendant

10    conceded his Guidelines were life, there wasn't a need to

11    go through and exhaustively determine what parts of the

12    Guidelines would be eligible for increasing it.    You

13    can't get higher than life under the Guidelines.

14         THE COURT:    What was the top of Mr. Carrozza's

15    Guidelines from which the departure was -- I can tell

16    you.    Look at my decision.    They weren't life.

17         MR. HERBERT:    I don't think so.    I'm not sure.

18         THE COURT:    Is there anything you want to say

19    about this?

20         MR. HERBERT:    I would rely on what's in our

21    sentencing memo, your Honor.    The number of units does --

22    I think it's 11 units which, obviously, is significantly

23    higher than five.    The way the number of units in the

24    multiple count calculation affects the number of levels

25    on the sentencing table, you start out with one to one

95

1    correspondence and, as you get higher -- I can't remember

2    whether it was four to five units gets you an additional

3    point.  But it suggests that the commission believes that

4    as you get higher, there isn't necessarily one to one

5    correspondence, but it's more like a two to one

6    correspondence.

7         So, under that reasoning and going with what the

8    commission said, using the word, I believe, would be

9    warranted, not may be warranted, would say that it

10   applies.

11        THE COURT:  Have you found any case where that

12   upward departure has been applied?

13        MR. HERBERT:   I don't know if I looked for

14   cases.  It seemed like it was so plain on the language of

15   the Guidelines.

16        THE COURT:  If it's so plain, has the government

17   ever argued it?

18        MR. HERBERT:   I can't say whether the

19   government has ever argued that or not.

20        THE COURT:  I mean, in any of these cases?

21        MR. HERBERT:   No, I don't think so, not in

22   connection with these cases.  Again, they were -- this

23   particular case, except for Patriarca, who didn't, I'm

24   sure, did not have over five units as part of his, he was

25   charged with significantly fewer racketeering acts.  With

96

1    respect to the other defendants, they were all

2    agreed-upon dispositions, and my memory is defendant

3    Ferrara had, I think, something like 33 racketeering

4    acts, was probably, if not at, toward the high end of

5    numbers of racketeering acts for the defendants in this

6    case.  So I'm not sure it applied with respect to the

7    others.

8         THE COURT:  Do you recall that Carrozza had more

9    units than Ferrara?

10        MR. HERBERT:   I don't recall.  If I recalled, I

11   would have said.  That's what I say  --

12        THE COURT:  He did.  I mean, here's the -- I'll

13   give you an excerpt from Mr. Carrozza's presentence

14   report.  We'll make it Exhibit 1.

15        MR. HERBERT:   And if defendant Carrozza were

16   here, we'd be arguing that the court should impose his

17   agreed-upon sentence, as we're arguing the court should

18   do with respect to defendant Ferrara.

19        THE COURT:  Carrozza had 11 and-a-half, and he

20   didn't have Guidelines of life.  I mean, I had an

21   obligation, which I now understand better than I think

22   any of us did in 1992, that I had to calculate the

23   Guidelines and then determine whether departure was

24   reasonable after calculating the Guidelines.  In that

25   case, I made a mistake in relying on what Mr. Carrozza

1    and Mr. Bolero told me in 1992.  But I thought I was

2    resolving all the Guideline issues I had to resolve.

3    Okay.

4            Mr. Weinberg, do you want to be heard?

5            MR. WEINBERG:  Yes, your Honor.  And if I can

6    just backtrack for just ten seconds, I omitted to inform

7    the court that, consistent with Mr. Ferrara's statement

8    to Probation and consistent with Jordan's testimony --

9    and I'll cite it to pages when we have an opportunity to

10   brief the issue -- Limoli was Xed out of the group

11   because of his drug-related stuff.  He wasn't part of Mr.

12   Ferrara's group at the time of the homicide.  This

13   appears on pages 106 and 107.

14           THE COURT:  Well, I'm not looking for -- 106 and

15   107 of what?

16           MR. WEINBERG:  The presentence report, your

17   Honor.

18           Directing myself to the government's request for

19   upward departure, one, again, it was waived in '92.  They

20   raised other issues in the addendum.  They didn't raise

21   this.

22           Second of all, it's discretionary, as all

23   requests for upward or downward departures are.

24           Third, it's not an encouraged departure, at

25   least in the list of departures in the 5K section of the

1    Guidelines.

2         Four, I know of no precedent. I'm not

3    representing there is none. But upward departures are

4    rare. They're rare in this district. They're rare in

5    this circuit. They're rare nationally. Most courts feel

6    that the Guidelines are more than sufficient without

7    upward departures for additional multiple count units.

8    The commission had a choice to say anything over X number

9    of units gets plus six or seven. They didn't.

10        Finally, in a RICO case, by its definition,

11   because of the government's obligation to allege and

12   proof a pattern of racketeering, a series of acts, a

13   series of related acts, there's going to be lots of

14   units. And in this case there were lots of units of

15   similar conduct, all of -- much of which fell within the

16   rents extortion conspiracy. There's nothing so, you

17   know, egregious or atypical in this case to warrant an

18   upward departure.

19        THE COURT: It's one o'clock. Let me talk to

20   you about how we ought to proceed. I think there are two

21   more discrete issues. The government argues there should

22   be an upward departure based on 4A1.3 because criminal

23   history category 3 underrepresents the seriousness of the

24   criminal history and the risk that Mr. Ferrara will

25   commit crimes in the future. And then there's Mr.

99

1    Ferrara's point that I don't accept the argument that I

2    shouldn't be considering new issues now.  He shouldn't

3    have been a 3 to begin with because the 1979 gun

4    conviction was relevant conduct rather than something

5    that preceded this offense, which would drop him down to

6    a 1.

7         And then there's questions of more general 3553A

8    1 and 2 factors that need to be argued.  It's possible

9    for all of this to get lost in technicality.  I want to

10   give you a chance to each remind me of the bigger

11   picture.

12        And one of those factors is danger to the

13   community.  The government wants to rely on Mr. Romanso's

14   affidavit and the attachments.

15        Do you also propose to have Mr. Romanso testify?

16        MR. HERBERT:  We're not going to propose that

17   he testify live, your Honor.  We were going to simply

18   rely upon his affidavit and the attachments to it.

19        THE COURT:  Has the defendant had an opportunity

20   to consider whether Mr. Romanso should testify?

21        MR. WEINBERG:  We have not discussed it

22   specifically with Mr. Ferrara, although Mr. Chesnoff and

23   I have divided the prison tapes and are prepared to make

24   representations that in terms of -- their reference

25   points are no different than the FBI agent who has no

1    personal knowledge of Mr. Ferrara.  He's simply listening

2    to tapes and identifying people, none of which we will

3    contend indicates in the slightest a danger to the

4    community if Mr. Ferrara is released on supervised

5    release which, ironically, would have as a condition that

6    he couldn't talk to or associate with some of the various

7    people the prison people let him talk to.  And he knows

8    the stakes.  He's well aware of what could happen if he

9    violates supervised release.  And I think that that's the

10   condition that ultimately that negates any suggestion or

11   scent of danger in order to permit his being sentenced

12   consistent with the analysis back in your Honor's

13   memorandum and opinion.

14           THE COURT:  Well, you just got these -- here's

15   essentially where I am.  And I want to try to figure out

16   how to proceed.

17           There's a court meeting today so, usually, I'm

18   not in court on the first Tuesday of each month.  But I

19   really feel a responsibility to proceed with this, so I

20   think we ought to continue this afternoon.

21           This danger point -- and the government tells me

22   they don't want to call Mr. Romanso, but --

23           MR. HERBERT:  I didn't say we don't want to

24   call him.  I simply said that we believed that the

25   affidavit is sufficient.