EXHIBIT B
pp. 101 - 150

1          THE COURT:  But that's the way it's not going to

2     work.  It's not going to be that, you know, I proceed

3     based on the affidavit and, if I make some finding you

4     don't like, you say, now we're going to call Mr. Romanso.

5     That's not going to happen.

6          MR. HERBERT:  I'm not saying that.  In this

7     respect it is somewhat akin to a bail hearing where we

8     all can proceed by affidavit, and we can put the affiant

9     on the stand, and that's fine, but we often rely upon

10     affidavits in connection with bail hearings.

11          THE COURT:  And I'm not saying that's

12     unacceptable to me.  I haven't had a chance to look at

13     what's in there.  I'm just trying to do what I thought I

14     had succeeded in doing with Mr. Lang last year, which is

15     figure out what the record is and then decide the

16     implications of the evidence that have been presented.

17          So, while the earlier rulings have been, you

18     know, I'm not going to hear -- so far -- I'm not going to

19     hear the testimony with regard to Mr. Grasso, as I think

20     I said right at the outset this morning, this

21     dangerousness thing might be different.  But at the

22     moment I'm content to accept the affidavit and decide it

23     based on what you want to give it.

24          MR. HERBERT:  And there is one -- for purposes

25     of this hearing today, for illustrative purposes as much

1    as anything, because we also -- we haven't done so

2    already -- we would submit to the court the actual CD of

3    the conversation so that the court has those, and we

4    would seek leave to play one of those conversations,

5    which we believe is illustrative of the danger that is

6    reflected by the defendant's associations with some of

7    these individuals that Mr. Weinberg -- maybe one point

8    I'll agree with Mr. Weinberg on -- it's deeply ironic

9    that the defendant, who's seeking to be released on

10   supervised release, should at the very time that he is

11   anticipating imminent release be having all of these

12   contacts with the very people that he would be barred

13   from associating with under the first condition, I

14   believe, standard condition of supervised release, which

15   this highly intelligent defendant must know about.

16            THE COURT:  Well, he knows about it because I

17   wrote about it.  And I didn't mean to get into this now.

18   But it's a question I was going to ask.  It's not the

19   first condition, but it is one of the conditions,

20   standard conditions of supervised release that a

21   defendant may not associate with anybody involved in

22   criminal activity or a known felon.  And I was wondering

23   whether the Bureau of Prisons for telephone contacts, you

24   know, has something that prohibits those kind of

25   communications.

1          MR. HERBERT:    My understanding from speaking to

2     one official at one of the prisons was that unlike with

3     respect to visits where visits are subjected to closer

4     scrutiny than telephone calls, and I believe the record

5     at one of the exhibits that we submitted attached to

6     special agent Romanso's supplemental affidavit contains

7     some of those visitor records which indicate that some of

8     the people that applied for permission to visit Mr.

9     Ferrara in person were denied because of convictions.

10    But my understanding based on this conversation was there

11    may be a different standard that applies to telephone

12    calls.   I'm sure that's not to suggest the Bureau of

13    Prisons is uninterested in communications between inmates

14    and convicted felons under these circumstances, but it

15    may simply reflect the difficulty of keeping track of all

16    those types of contacts.

17          THE COURT:    I think we'll come back at 2:15, and

18    we'll get as far as we can get this afternoon.    We may

19    need to continue tomorrow morning.    Maybe we can finish

20    this afternoon.

21          And the other issues, as I say, are upward

22    departure based on criminal history, whether that gun

23    offense is really a prior offense, the general 3553A1 and

24    2 factors which I addressed based on the substantial

25    evidence I had in my decision, the particular issue of

1      dangerousness.  And then I don't know how all of this

2      will come out, but if it comes out with an order that Mr.

3      Ferrara is entitled to be released now, I want to hear

4      you today on the stay factors so I can consider that too.

5      Okay?

6                Why don't we resume at 2:15.

7                (Luncheon recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2              THE CLERK:  Court is back in session.  You may

3     be seated.

4              THE COURT:  I've been trying to read quickly the

5     submissions the government made this morning, and that

6     has delayed my return somewhat.

7              We left off with the government's argument that

8     an upward departure under 4A1.3 was justified.

9              Would you like to speak to that briefly?

10             MR. HERBERT:   Just briefly.  I don't really

11    have much to add beyond what's in the sentencing memo,

12    your Honor.  It seems on the plain terms of it this is a

13    situation where you have a defendant who has literally

14    been engaged in criminal activity, serious criminal

15    activity throughout his entire career.  He has one

16    conviction to show for it, which was enough to get him

17    into category 3.  Particularly if he were to prevail on

18    that argument, which we would contend he should not,

19    category 1 would significantly underrepresent the

20    defendant's criminal past or -- and the likelihood of his

21    committing future crimes and, therefore, an upward

22    departure would be appropriate on that basis.

23             This is different than the situation the Court

24    of Appeals addressed briefly in the Patriarca/Carrozza

25    sentencing appeal where I think in that instance the

1    court had initially enhanced Patriarca's sentence under

2    that provision, inadequacy of the criminal history

3    category, but that was based on a particular act that the

4    Court of Appeals decided was eligible to be treated as

5    relevant conduct and, therefore, more appropriately

6    treated in that way.

7           This is not an argument that is based on one

8    particular act which would be eligible to be treated as

9    relevant conduct but, rather, the totality of the

10   defendant's criminal career, which would be

11   underrepresented even in category 3, we would say.  But

12   certainly if it were not back to category 1, you would

13   have something that would be anomalous.

14          MR. WEINBERG:  Very brief.  The government chose

15   to charge Mr. Patriarca (sic) in an enterprise that they

16   allege began in 1975 and ended at the time of the arrest,

17   so a 14-year criminal enterprise.

18          THE COURT:  You're talking about Mr. Ferrara.

19          MR. WEINBERG:  Mr. Ferrara.

20          THE COURT:  Because you said Mr. Patriarca.

21          MR. WEINBERG:  Sorry, Mr. Ferrara.  Just got

22   finished reading US V Patriarca again at the break.

23          But Mr. Ferrara's 14 years, '75 through his

24   arrest in November of 1989, they choose the charge.  They

25   choose to argue relevant conduct within the charge.  They

1    choose to ask for an upward departure because the

2    multiple count analysis doesn't fulfill the scope of

3    criminality.  You can't have upward criminal history

4    departures for offenses or for conduct that are within

5    the crime charged.  That's basic to the Guideline scheme.

6    It's prior criminal conduct.

7            THE COURT:  Is that in the First Circuit's

8    Patriarca decision?

9            MR. WEINBERG:  No, your Honor.

10           THE COURT:  Mr. Herbert just seemed to suggest

11   it was.  I'll look.  I have it here.

12           MR. WEINBERG:  At least I don't recall it to be.

13   I recall it to come from the definition of criminal

14   history, prior sentences, prior to the and not part of

15   the relevant conduct or part of the crimes that are

16   alleged.  And, you know, unless they can show your Honor

17   specific conduct before 1975 that did not result in a

18   criminal history score and, therefore, the criminal

19   history was underrepresented, not only should he not

20   receive an upward departure from the criminal history 3,

21   he shouldn't have a criminal history score at all.

22           Secondly, we now have a bit of laboratory

23   between 1992 and 2005.  He's been in jail 15 and-a-half

24   years without a single Bureau of Prison violation.  And

25   on these prison tapes there's at least one call where

108

1    he's telling someone -- and I can get your Honor the

2    specific call -- you know, you've got to live within the

3    system; you can't break the rules.  And, in fact, his

4    conduct has demonstrated he didn't break the rules for 15

5    and-a-half years.  There's no evidence of criminal

6    conduct while in jail.  And your Honor knows examples of

7    people who have violated the criminal law while

8    incarcerated.  And there's not even a violation of Bureau

9    of Prison rules by Mr. Ferrara for 15 and-a-half years.

10        So I would contend strongly that there is not

11   the proffer of uncharged conduct that's not within the

12   crime charged that would be an appropriate predicate for

13   the kind of upward departure Mr. Herbert is recommending.

14        THE COURT:  When I sentenced Mr. Russo, he was

15   treated as if he was a criminal history category 1, as

16   was Mr. Lepore.

17        I don't know if you've just addressed it, but

18   Mr. Ferrara argues that I shouldn't consider new

19   arguments at all, that is, arguments that weren't made in

20   1992.  But if I do, under section 4A1.2, that 1979 gun

21   conviction shouldn't have been counted in his criminal

22   history because it was during the course of the

23   conspiracy.  Do you want to address that?

24        MR. WEINBERG:  Yes, your Honor.  Very briefly,

25   it comes from application note 1 under 4A1.2, which

109

1    defines:   Prior sentence means a sentence imposed prior

2    to sentencing on the instant offense other than a

3    sentence for conduct that is part of the instant offense.

4         The government has charged broadly the

5    racketeering conspiracy from 1975 to 1989, which includes

6    the 1979 date of the gun possession that is the only

7    prior conviction that was relied on by Probation to

8    elevate his criminal history from 1 to 3.

9         The government in its trial brief and in the

10   presentence report talks about his alleged conduct in the

11   late '70s with Barone.  They talk about 1981 when Anguilo

12   is talking about Ferrara and what he's done for the

13   enterprise, meaning before 1981.  And the government, I

14   don't believe, would contradict my representation that

15   it's the government's theory that he was involved in the

16   enterprise in 1979 at the time of the possession of the

17   gun and, therefore, this possession is not some extrinsic

18   act unrelated to the enterprise but, instead, is related

19   to or uncharged conduct or relevant conduct and,

20   therefore, it's just simply not eligible by definition as

21   prior history.

22        MR. HERBERT:   Your Honor, I would say, first of

23   all, I just don't think we have enough information about

24   what that was.  They had a car stop involving a gun.  We

25   don't know what it was in connection with at that point,

110

1    and I don't think Mr. Weinberg has pointed to a case that

2    says any offense that occurs during the time period that

3    he was a member of this enterprise is automatically in

4    furtherance of the enterprise.  If we were trying to

5    establish that as relevant conduct, if it were an offense

6    that would increase his base offense level, for instance,

7    we would need to do more than simply say, well, here's a

8    crime that occurred during this time period.

9         I would like to bring to the court's attention

10    --

11         THE COURT:  But the government's theory for the

12    past 15 years, essentially, has been, you know, if

13    somebody is with the LCN, he can't engage in criminal

14    activity unless it's authorized, and I found the rules

15    weren't always followed.

16         MR. HERBERT:   Particularly by this group, I

17    think, is what the court found.

18         THE COURT:  When Mr. Patriarca was the -- well,

19    when Randy J. Patriarca was the boss.  Who was the boss

20    in 1979?

21         MR. HERBERT:   Probably his father.  I'm sure it

22    was his father.  At that point, Mr. Ferrara wasn't even a

23    made member yet, but that's not to say that he wasn't an

24    associate of the family.  We do contend he was an

25    associate during that time period.

1          I would like to bring to the court's attention a

2     case which one of my colleagues found during the break,

3     actually, which I have not had an opportunity to read

4     carefully, but it -- and the case is called United States

5     versus Marrone, M A R R O N E, and the cite is 48 F 3rd

6     735.   It's a Third Circuit 1995 decision.   And it makes

7     reference to application note 4 to 2E1.1, which is the

8     RICO Guideline, which I'm pretty sure was added after the

9     book that we're using now.   So there would be an issue

10    which we have not researched as to whether that is an

11    explanatory --

12          THE COURT:   Whether it's a clarification.

13          MR. HERBERT:    Thank you.   Whether it's a

14    clarification or whether it's a substantive change.    But

15    that application note provides that certain conduct may

16    be charged in the count of conviction as part of the

17    pattern of racketeering activity even though the

18    defendant has previously been sentenced for that conduct.

19    Where such previously imposed sentence resulted from a

20    conviction prior to the last overt act of the instant

21    offense, treat as a prior sentence under 4A .2A1 and not

22    as part of the instant offense.

23          THE COURT:   Hold on just a second.   I'm going to

24    read on my screen what you just said because it's not so

25    easy to follow.

112

1        (Short pause.)

2        MR. HERBERT:   I'd be happy to hand up my book.

3        THE COURT:   I have it right here.

4        (Short pause.)

5        THE COURT:   Okay.   So that would -- I think your

6    argument based on that case, which I'll have to read, is

7    that even if you had charged that gun offense as a

8    racketeering act and he had been convicted of it, the

9    Guidelines, at least as they were amended, say, don't

10   treat that as a unit, treat it as a prior conviction.

11       MR. HERBERT:   Yes, your Honor.

12       THE COURT:   Okay.

13       MR. HERBERT:   At some point, whenever the court

14   is ready to move on to something else, I just had one

15   additional case which was also found during the break

16   which I'd like to hand up to the court in connection with

17   a prior point.

18       THE COURT:   Okay.

19       MR. HERBERT:   This is a case called United

20   States versus Courtney, C-o-u-r-t-n-e-y, found at 36 F

21   3rd 497.   It's an Eighth Circuit 2004 case that talks

22   about upward departures where the number of units is

23   significantly higher than five, which we were talking

24   about before.   And, again, I haven't had a chance to read

25   this case closely, but it includes a survey of cases from

113

1    other circuits which it says shows how many units are --

2    how many units are significantly more than five and how

3    great of a departure they justify, and it goes on to say

4    cases, and I won't list them here -- they're in the

5    decision -- but ten units justified a two level upward

6    departure, nine units justified a three level upward

7    departure, ten units justified a two level upward

8    departure; another one, ten units justified a one level

9    upward departure; eight units, a one level departure; 15

10   units justified a five level upward departure.

11        So there's a number of cases that seem to have

12   applied that upward departure, which -- and I'll hand up

13   this case -- I'd have to say, contrary to what Mr.

14   Weinberg said before, I think that the plain meaning of

15   that application note would seem to suggest that it is in

16   fact an encouraged departure under circumstances like

17   this.

18        That's all I wanted to point out on that, your

19   Honor.

20        (Short pause.)

21        THE COURT:  Well, I think at this point we need

22   to decide how to proceed.  I said that the -- that I

23   would afford the parties an opportunity to basically talk

24   about what is a reasonable sentence under the

25   circumstances, depending on how I find the circumstances

1      in the Guidelines, the section 3553A1 and 2 factors.

2              In addition, you need to at some point argue

3      about dangerousness.  And maybe it makes sense to focus

4      on the dangerousness first.  But let me hear from you

5      with regard to how you think we ought to proceed.  Try to

6      make this as coherent and as fair as possible.

7              MR. WEINBERG:  What we'd recommend is that your

8      Honor permit us to, in essence, you know, make an

9      argument to your Honor.  Once the Guidelines have been

10     considered and your Honor will rule on the Guidelines,

11     and we believe that a sentence consistent with 3553

12     factors would be no more than time served, and there's a

13     variety of reasons, including his lack of danger and

14     including the prison tape issue that we would address in

15     a kind of coherent package.

16             THE COURT:  You mean on a different day?

17             MR. WEINBERG:  No, today, now.

18             THE COURT:  I told you this morning that I don't

19     intend to calculate the Guidelines from the bench.  So is

20     it your view that we should go next to whatever the

21     evidence is on dangerousness?

22             MR. WEINBERG:  Yes, your Honor, and I think we

23     should go to the evidence on dangerousness and then go

24     through the factors so that we can represent to you

25     additional factors, some of which might have been

115

1    precluded in a pre-Booker world which your Honor should

2    consider in determining what is an appropriate sentence,

3    and we can do that either coherently with danger

4    interfaced with the other deterrents, punishment,

5    incapacitation issues or not, depending upon whichever

6    way your Honor wants to address it.  But we're prepared

7    to go forward.

8              THE COURT:  Does the government too think it

9    would be appropriate to address dangerousness essentially

10   next?

11             MR. HERBERT:   Yes, your Honor, I think it's

12   appropriate to move on to 3553A factors, and that is one

13   of them, so.

14             THE COURT:  Well, there's this Romanso

15   supplemental affidavit attachment that is under seal, and

16   let me just see if I understand and remember accurately

17   what the government said this morning.

18             You don't propose to have Mr. Romanso testify,

19   but you want to make arguments based on this information

20   and maybe play part of one telephone conversation?

21             MR. HERBERT:   Yes, your Honor, we would propose

22   playing one of the telephone conversations, not an

23   excerpt of it, but one of them.  It's about 15 or 16

24   minutes long.

25             THE COURT:  Has that been identified for the

116

1    defendant?

2            MR. HERBERT:   Yes, I've told them which

3    conversation we wanted to play.

4            Just so I don't neglect at this point, your

5    Honor, I would offer as an exhibit at this sentencing

6    hearing a compact disk that contains all of the prison

7    calls that are summarized in special agent Romanso's

8    affidavit in the summary that's Exhibit 1 to his

9    affidavit and as discussed further in his affidavit.

10           THE COURT:   And how many hours are those tapes

11   or conversations?

12           MR. HERBERT:   In total, the number of hours --

13   there are, I believe, 21 conversations.  Most but not all

14   of them run 16 minutes.

15           THE COURT:   Am I to listen to all of these

16   conversations?

17           MR. HERBERT:   The reason we submitted --

18           THE COURT:   I'm not saying I won't.

19           MR. CHESNOFF:   336 minutes, approximately.

20           THE COURT:   So it's about six hours.

21           MR. CHESNOFF:   It's what I did yesterday.

22           MR. HERBERT:   We all did it, your Honor.  Not

23   all of us, but.

24           THE COURT:   Is there any objection to my taking

25   the CD?

1          MR. CHESNOFF:    Your Honor, if I could, since I

2     listened to the breadth of them, I think it would be

3     important that you do hear them because I don't think the

4     agent's declaration captures the content as much as

5     identifying individuals that the government has selected.

6     So we would like them in the record and, at some point,

7     either Mr. Weinberg or I will highlight some things that

8     we think respond to the danger question.

9          THE COURT:    We'll admit the compact disk, I

10    believe it's exhibit 2.

11          Now, the government filed the original Romanso

12    affidavit under seal, and I sealed it temporarily.  And I

13    haven't thought this all the way through, but there are

14    -- usually like unlitigated Title IIIs are not played in

15    public.  This isn't an unlitigated Title III.  But there

16    are people's names mentioned, and I don't know -- not all

17    of them, as far as I know, are relevant to the

18    government's dangerousness argument.  So my inclination

19    is to keep these things temporarily under seal.  You

20    know, there could be some argument here based on them,

21    but it doesn't put everything in the public record.  But

22    I haven't thought that all the way through because I just

23    got these and looked at them for the first time over

24    lunch.

25          MR. HERBERT:    If I could address that, your

1    Honor.  It's not only true that a number of these
2    conversations, perhaps all of the conversations include
3    some conversation that the government would agree is
4    non-pertinent to the sentencing, in other words, personal
5    material, and the names of individuals that we do not
6    contend are criminally involved.  And for that reason we
7    took -- we made efforts in -- with respect to agent
8    Romanso's summary and the affidavit to focus on what we
9    thought were the pertinent aspects of it and yet, at the
10   same time, not hide the fact that there is personal
11   conversation.  So we tried to refer to the personal
12   conversation by topic or generically, you know, a
13   discussion of, you know, a female friend, or something
14   like that, without using that person's name.  And I think
15   we were scrupulous about that.  Obviously, the recordings
16   themselves are the recordings themselves.

17            THE COURT:  I'm going to say the following.
18   First of all, this indicates to me that exhibit 2 should
19   be under seal.  That's impounded because that has all the
20   conversations.  And I don't know what's on there so --
21   I'll probably listen to all six hours.  So until I do
22   that, I don't think I can properly decide what should be
23   in the public record.  Because one of the proper reasons
24   for sealing something are the privacy interests of third
25   parties.

119

1          MR. HERBERT:   Yes, your Honor.

2          THE COURT:   I wrote about this in my September

3     1997 Salemme decision when the government wanted me to

4     seal the defendants' submission.

5          But I'm also going to keep these two affidavits

6     under seal, because when I would say there were third

7     parties mentioned, I was thinking of people who were in

8     the summaries, not people whose names were omitted from

9     the summaries.

10          And, in fact, before in haste or exhaustion

11     something irreversible happens, I want to see the lawyers

12     and, if he wants to come, Mr. Ferrara in the jury room.

13     And do you have the tape that you want to play set up in

14     a way that you can bring it with you?

15          MR. HERBERT:   Yes, your Honor.

16          THE COURT:   Okay.   Why don't you bring it back

17     there.

18          MR. HERBERT:   Yes, your Honor.

19          THE COURT:   Okay?

20          (Recess.)

21

22

23

24

25

1          THE CLERK:  Court is back in session.  You may

2     be seated.

3          THE COURT:  Okay.  The supplemental Romanso

4     affidavit and attachments remain under seal because of my

5     concern with regard to references to third parties.  I do

6     expect that it's going to be necessary for me to listen

7     to all six hours of the recordings, as was just discussed

8     in the lobby.

9          But we will move to the argument on

10     dangerousness, which is relevant to the 3553A analysis

11     and to any issue of a stay that might prove to be

12     pertinent.

13          Mr. Herbert, what would you like to say?

14          MR. HERBERT:  Yes, your Honor, and I would say,

15     given the lateness of the hour and how long we have been

16     here today and simply the amount of material that there

17     has been amassed in this case with respect to the

18     defendant's criminal activity, what's in a very lengthy

19     trial brief, it would not be possible for me to stand

20     here this afternoon and fully capsulate the defendant's

21     danger to the community.  It has been and remains the

22     government's position that this is an exceptionally

23     dangerous defendant, even among leaders of organized

24     crime.  This is someone who is unusually personally

25     violent, has a record of that, and certainly has --

1          THE COURT:  Has he been involved in any violence

2     in prison?

3          MR. HERBERT:    We do not have a record of any of

4     that, your Honor.  What we do have a record of, as we

5     will get to today, is a record of the types of

6     individuals that the defendant has been in contact with

7     by telephone and, in some cases, in person while he has

8     been in prison.  And the record of those telephone calls

9     -- and that's just the ones that we have here that are

10    described in the supplemental affidavit of Daniel R.

11    Romanso -- certainly, we would contend, demonstrates

12    beyond any dispute that predictions that were made in

13    1992 by, admittedly, the government, by defense counsel,

14    and by the court, that this 22-year sentence was

15    sufficient to remove defendant Ferrara as a factor in New

16    England organized crime were sadly mistaken.  He clearly

17    to this day has not removed himself from the affairs of

18    organized crime in New England, as these conversations

19    indicate.  And I do think that the court was quite right

20    in its opinion when it said it would not exercise its

21    discretion to release the defendant if the government

22    proved that he's a danger to the community.

23          We would submit that on top of everything else

24    that we've put in about the defendant's past, the fact

25    that he remains in contact with individuals such as

122

1    Johnny Cincotti, which is the individual he speaks with

2    in the conversation that we propose to play, the fact

3    that he is in contact with individuals like that to this

4    day from prison when there is no earthly reason for this

5    defendant to be carrying on conversations with convicted

6    felons, convicted Mafia soldiers like Johnny Cincotti

7    demonstrate that this defendant remains dangerous to this

8    day.

9        THE COURT:  Again, we discussed this somewhat

10    this morning, but I want to try to keep it clearly in

11    mind, and I think your word was it was "ironic."  If he's

12    out on supervised release, one of the conditions is he

13    can't associate with people engaged in criminal activity

14    or known felons, but there's not a comparable prohibition

15    with regard to who he can talk to on the telephone.

16        So he's not breaking a prison rule by having a

17    conversation, is he?

18        MR. HERBERT:  I can't say that I know that to

19    be the case.  I can only represent to the court what I

20    was told, which is that there doesn't -- there doesn't

21    seem to be a comparable level of restriction on the

22    people he can call as there are the people he can see in

23    person.

24        But these conversations -- and there are 21

25    recordings that are contained on the compact disk that

1    has been admitted in evidence, and most of those are -- I

2    believe actually all of them are summarized in the 302

3    that's attached as Exhibit 1 to agent Romanso's affidavit

4    -- most of them are discussed in his supplemental

5    affidavit itself, which is an effort to explain who some

6    of these people are.  The summary itself is an effort, I

7    would represent to the court, is an effort to simply

8    summarize objectively as possible the most pertinent

9    aspects of those conversations, while still reflecting

10   the fact that there were non-pertinent and non-criminal

11   aspects of the conversations.  The supplemental affidavit

12   goes on and explains who some of these people are and

13   provides background on them and, for instance, with

14   respect to Johnny Cincotti, the affidavit attaches a

15   number of transcripts of conversations intercepted

16   pursuant to court authorized electronic surveillance at

17   98 Prince Street, Genaro Angiulo's headquarters, and 51

18   North Margin Street, which was the location of the High

19   Stakes poker game that Johnny Cincotti ran for Alario

20   Zannino.

21           But just to cite one example of what those

22   conversations reflected, who Johnny Cincotti is, in a

23   February 4, 1981 conversation, Genaro Anguilo, the

24   underboss of Patriarca family of La Cosa Nostra and

25   effectively the boss for Boston, told an unidentified

 1    male:  "I got Dominic, I got Johnny Cincotti, I got Peter

 2    Limone, Jr, I got Richie, I got my brother Danny, I got

 3    you, and I got four soldiers in East Boston that would

 4    kill any f'ing body."

 5            So that's one part of who Johnny Cincotti is,

 6    the man that this defendant has chosen to use some of his

 7    limited telephone calling time to stay in touch with.

 8            THE COURT:  Was Mr. Anguilo, in your view,

 9    referring to Mr. Ferrara in that conversation?

10            MR. HERBERT:   I can't say that he was in that

11    conversation, but we do attach other transcripts that do

12    refer specifically to Mr. Ferrara.  In fact, there are

13    conversations where he was intercepted at 98 Prince

14    Street, and there's another conversation that is attached

15    to the affidavit where he is being discussed by

16    individuals, including Johnny Cincotti, as someone who's

17    done a lot of work, which I submit, in context, means

18    murders, and somebody who, according to Johnny Cincotti,

19    will do anything you tell him to do.

20            THE COURT:  Back in the 1980s.

21            MR. HERBERT:   Back in the 1980s, yes.  He

22    wasn't referring to the time in prison.

23            THE COURT:  I feel a sentence of 22 years or 19

24    years -- 15 or 16 years for Russo, who was plainly a

25    murderer, killed Barboza -- I mean, he was the real

1    paradigm -- recognized that at the time they were being

2    sentenced, these were dangerous people who committed

3    serious crimes.   There's no confusion among anybody here,

4    I think, about that.

5         With regard to dangerousness, and it's part of

6    the reason that, you know, I will listen to the telephone

7    conversation, it's a question of predicting future

8    conduct and, in part, a capacity to obey the rules.

9         As I wrote in that Carrozza decision in 1992,

10   and my understanding on this has evolved somewhat over

11   the years but, generally speaking, I didn't expect that

12   these prison sentences were going to totally reform

13   character so much as discourage future conduct.

14   Sometimes it does and, on occasion, it doesn't.   But

15   that's part of what I'm going to be focusing on.

16        If we get to a stay, we're going to be under

17   Rule 23C of the Federal Rules of Appellate Procedure, I

18   think.   I think the Hilton factors apply.   As you argue,

19   we're not under section 3143C.   It's probably pertinent

20   to ask now -- or 3143, whatever the provision is --

21   ordinarily, to detain somebody on dangerousness as

22   opposed to flight, there has to be clear and convincing

23   evidence of dangerousness while they're out.   I don't see

24   any standard in Rule 23, but it would either be by a

25   preponderance, I think, or by clear and convincing

126

1    evidence.

2         Do you want to address that?

3         MR. HERBERT:    Well, yes, your Honor, I would

4    say that, as we indicated in our submission, the standard

5    is not clear.  But, in any event, this is a defendant who

6    was detained pending trial in this case, a lengthy

7    pretrial period, on dangerousness grounds.  And this is

8    an individual who, as these prison conversations show, is

9    demonstrating now that he believes his release is

10   imminent, to have the intent to continue to associate

11   with individuals that he knows he would be barred from

12   associating with, specifically, other members and

13   associates of La Cosa Nostra.

14        So, if anything, if these conversations show

15   anything, they show by clear and convincing evidence that

16   the defendant remains a danger to the community.  And I

17   would note that if we're talking about comparison to the

18   bail statute, danger to the community is, in effect, a

19   defined term, which means a danger to commit any crimes

20   upon his release.  And --

21        THE COURT:    And that's how I interpret it.

22        MR. HERBERT:    Yes, your Honor.  But I think to

23   go back to what the court relied upon in focusing on

24   deterrence as opposed to rehabilitational reform, which I

25   think is echoed in the court's most recent opinion,

127

1   particularly at page 118, the court pointed to the

2   defendant's age.

3          Actually, let me digress just for a moment

4   because we have had some mention both from the defense

5   and the court about comparisons to Mr. Russo and Mr.

6   Carrozza.  It has to be kept in mind, at the time these

7   sentences were agreed upon, Joe Russo was 57 years old.

8   He didn't survive his 16-year sentence.  Bobby Carrozza

9   was 52 years old, I believe.  At 52, he was nine years

10  older than defendant Ferrara, who was 43 at the time of

11  sentencing.  He was nine years older, and he agreed to a

12  sentence that was three years below defendant Ferrara's,

13  19 versus 22.

14          So when you're considering danger to the

15  community and the need to incapacitate dangerous

16  defendants, as the court pointed to in justifying a

17  downward departure, you certainly have to look to the age

18  they would be when they're released to the community.

19          THE COURT:  How old is Mr. Ferrara now?

20          MR. HERBERT:    56, your Honor, I believe.

21          So under those agreed-upon sentences, even

22  though the government clearly throughout those

23  negotiations maintained that Ferrara needed to have the

24  longest sentence of that group -- and that was based on

25  the fact that he was the youngest.  In the government's

1    view, he was the most violent.  He was at least among the

2    most ambitious in terms of future leadership in the

3    organization, was an individual who posed the greatest

4    danger upon his release.  And being out at, I don't know,

5    an age that is perhaps early 60s was certainly quite

6    different than what Joe Russo would have been when he got

7    out.

8              THE COURT:  I recall that age was a difference.

9    Perhaps we have different perceptions.  But my vivid

10   feeling is that the most dangerous of that group was Mr.

11   Russo and the one who everybody, including Mr. Ferrara,

12   took direction from, including, you may recall, for

13   example, I was concerned that we couldn't possibly try

14   the case to a conclusion with Mr. Russo representing

15   himself, so you all had some discussion about whether the

16   case would be jury waived in the hope of minimizing the

17   risk of a mistrial before the jury, and my memory is the

18   defendants were inclined to do that until Mr. Russo said

19   no.

20             MR. HERBERT:  Well, there's no question that

21   Joe Russo continued to maintain sway over these

22   defendants, even during the pretrial proceedings.  He was

23   definitely an individual who was older, respected and, we

24   would submit, in part, for some of the work he did,

25   including what he pled guilty to, albeit on an Alford

129

1    plea, which was the murder of government cooperating

2    witness, Joseph Barboza.  And one of the tapes that we

3    have attached to special agent Romanso's affidavit is a

4    conversation in which Alario Zannino says, we clipped

5    Barboza.  We meaning the LCN.  So there are reasons why

6    he was protected.  Nevertheless, Joe Russo was charged

7    with one murder.  This defendant was charged with three.

8          THE COURT:  You didn't believe that Joe Russo

9    murdered only one person?

10          MR. HERBERT:  Absolutely not.  What I am saying

11    is what they were charged with had an effect on -- age

12    was not the only factor.  What they were charged with had

13    an effect on what we thought we could reasonably get them

14    to agree to do on a C plea.

15          THE COURT:  And now we're back into April 12,

16    because what Mr. Ferrara was charged with were murders

17    relating to Limoli, Corlito, and DeFronso, which the

18    government deprived him of due process on and didn't

19    prove, even by the preponderance of the evidence, lest we

20    forget.

21          Do you want to play your tape?

22          MR. HERBERT:  I do in just one moment.  I

23    wanted to point out, though, to go back to the factors

24    that the court was relying on -- it made observations

25    about the defendant's age and health -- it referred to

1    comments of his counsel back in 1992 about how he wanted

2    to lead a decent and stable and legitimate and

3    responsible life -- the court again, as it did in 1992,

4    relied on the fact that the defendant was graduate of

5    Boston College and, therefore, presumably intelligent

6    enough to recognize that it would not only be wrong, it

7    would be very unwise for him to return to a life of crime

8    when he was released.

9            The court indicated the Patriarca family has

10   been decimated.  I would say that these conversations

11   would --

12           THE COURT:  Mr. Romanso seems to have a

13   different view.

14           MR. HERBERT:  Yes, your Honor.

15           THE COURT:  Do we have any Russian organized

16   crime in New England?

17           MR. HERBERT:  Do we have Russian organized

18   crime in New England?  Yes, I would say we do.

19           THE COURT:  Do we have Eastern European

20   organized crime, do you think?

21           MR. HERBERT:  I would say so.

22           THE COURT:  How about Asian?

23           MR. HERBERT:  Yes, your Honor.

24           THE COURT:  I mean, I don't ever see any of

25   this.  I can't decide cases based on what's in the

1    newspapers.  But you can pick up the New York Times about

2    every other month and hear about these, you know, really

3    dangerous people doing terrible things right now, and I

4    take the cases you bring to me, and I'm spending 15 years

5    on Mr. Ferrara.

6         MR. HERBERT:    Yes.

7         THE COURT:   If there are really other dangerous

8    organized criminals out there, my perception -- I've

9    written it over and over, and it's a compliment to the US

10   Attorney's office, to the FBI, to some degree to Mr.

11   Flemmi -- particularly, I see the LCN in New England as

12   having been substantially decimated.  And I'm sure you

13   know a lot of things that I don't know because I only see

14   the cases you bring.  But I'm just concerned that, you

15   know -- I'll decide the case, but go ahead.

16        MR. HERBERT:   We would submit that the

17   defendant is certainly in terms of his dangerousness as

18   an organized crime figure perhaps unsurpassed in

19   prosecutions that we have brought and, therefore, I would

20   submit that the efforts in this case have been worthwhile

21   to that extent.

22        I would take issue with the characterization

23   that the Patriarca family has been decimated.

24        As special agent Romanso does indicate in his

25   supplemental affidavit, the Patriarca family, now

1    referred to as the New England family of La Cosa Nostra,

2    continues to exist as an ongoing criminal organization

3    and, in many ways, at this time, there are important

4    similarities between the state of that family today and

5    the state of the family at the time defendant Ferrara was

6    incarcerated, including the fact that  --

7                THE COURT:  Who's the boss of the family now?

8                MR. HERBERT:  He's identified in the affidavit

9    as Louis Manachio (sic) from Providence.

10               THE COURT:  Who's the local underboss?

11               MR. HERBERT:  It's identified in the affidavit

12   as Carmen DiNunzio.

13               THE COURT:  Is that a person related to

14   Elizabeth DiNunzio?

15               MR. HERBERT:  No, your Honor, not to my

16   knowledge.  But it is an individual that the defendant,

17   according to the supplemental affidavit, is intercepted

18   talking about repeatedly, asking an intermediary that he

19   speaks to frequently to send his love to Carmen, to tell

20   him about his respect for him, the fact that Carmen

21   DiNunzio doesn't even know me and still he tried to help

22   me.

23               THE COURT:  Gee, I didn't see some of that in

24   here, but I'm going to listen to all six hours.

25               MR. HERBERT:  He asks the individual that he's

1    speaking to to see if Carmen can help find a job for one

2    of his relatives.

3              THE COURT:  So he doesn't have to work

4    construction?

5              MR. HERBERT:    Correct, your Honor.  But it's

6    notable in these conversations -- and there are many of

7    them -- and this court has pointed out that there's six

8    hours of them -- in which the defendant talks about

9    anticipating his imminent release and talks about seeing

10   if he can line up a job for a relative.  But absent from

11   these conversations is any effort by the defendant to

12   line up a legitimate job for himself when he gets out.

13             THE COURT:  Well, actually, I don't think these

14   are the people he'd be talking to about a legitimate job.

15             MR. HERBERT:    That may be exactly my point,

16   your Honor.

17             THE COURT:  Well, I don't think you or I have

18   listened -- look, these are six hours of conversations.

19   They're only a fraction of all of his conversations,

20   right?

21             MR. HERBERT:    Yes.

22             THE COURT:  So there's that.  Is there anything

23   on the conversations that you've listened to and I'm

24   going to listen to where he's threatening to harm anybody

25   else when he gets out?

134

1          MR. HERBERT:    No, not directly, your Honor.    I

2    would say there are conversations about people who have

3    been accused of being informants, and one of them is on

4    their conversation that we'll play now.

5          THE COURT:    On that one, he said that he

6    intervened to make sure that nothing happened to that

7    person?

8          MR. HERBERT:    Right, because he didn't believe

9    the reports.    That he and Cincotti talk about how it was

10    a terrible thing that happened to that guy.    And the

11    terrible thing in context is the fact that other

12    defendants accused him of being a confidential informant.

13    Why is that a terrible thing in the mind of people like

14    defendant Ferrara and Johnny Cincotti?    Well, that's

15    obvious based on the Mafia induction ceremony that was

16    intercepted in October of 1989.    It's a terrible thing

17    because every member of this organization swears an oath

18    to kill confidential informants.    And so what was going

19    on here in their mind was the very substantial risk that

20    this friend of theirs would be killed for something that

21    wasn't true.    And that's why he's intervening.

22          So I would say that that certainly goes to the

23    fact that he remains part of this organization, not only

24    in letter, but in spirit.

25          I do want to -- I will play this conversation,

135

1      your Honor, but I do want to tender to the court in

2      connection with dangerousness, before I forget, the copy

3      of the sentencing transcript for one of the defendants in

4      the Connecticut case, the Bianco case, and that is

5      Guytano Milano who, as the court may recall, stood up at

6      his sentencing and renounced his membership in what he

7      called this evil organization and, in the context of it,

8      admitted his role in the murder of Billy Grasso.

9              THE COURT:  And I will trade you, now that I

10     have to postpone it, but I assume you signed off on this,

11     I'm scheduled to sentence, not for revocation of his

12     supervised release, which he completed successfully, Mr.

13     Gioacchini and also Mr. Simone.  They both declined to

14     admit the existence of the LCN, and the government has

15     agreed that they should get credit for acceptance of

16     responsibility.  And, in fact, the government in those

17     two plea agreements has promised the defendant not to

18     give me evidence of their relevant conduct.

19              So I'll look at Milano, and then everybody

20     should look at the two local folks two.

21              MR. HERBERT:  I'll hand that up and ask that it

22     be marked as an exhibit.

23              THE COURT:  Is there any objection to my taking

24     this?

25              MR. WEINBERG:  No, your Honor.

136

1          THE COURT:    That's exhibit 3.

2          Hold on a second.

3          (Short pause.)

4          THE COURT:    We'll make exhibit 4 Simone's March

5     24, 2005 Rule 11 hearing, and the plea agreement we'll

6     make exhibit 5, the Simone plea agreement; exhibit 6, the

7     Gioacchini plea agreement.    I don't think the Gioacchini

8     plea has yet been transcribed, but it includes his

9     declining to acknowledge the existence of the LCN.

10          (Documents passed.)

11          THE COURT:    As I said, the government agreed

12     they can get acceptance of responsibility and agreed not

13     to give me any evidence on relevant conduct.

14          MR. HERBERT:    Just for the record, your Honor,

15     as we've said before, we do believe it's important to

16     focus on the differences between defendant Ferrara and

17     some of the other individuals who have been mentioned

18     today, and I would say in that context you will find a

19     very marked contrast between defendant Milano's

20     renunciation of membership in this organization and

21     defendant Ferrara's lack thereof.

22          With the court's permission, I would play this.

23          THE COURT:    Hold on just a minute.

24          (Short pause.)

25          THE COURT:    Why don't you identify what you're

137

1    playing.

2            MR. HERBERT:    What I'm playing, your Honor, is

3    a recording of a January 2, 2005 telephone conversation.

4    It's a call from defendant Ferrara while he was

5    incarcerated at FCI Allenwood, a federal prison.  The

6    call is to John Cincotti.  As I indicated, John Cincotti

7    is a convicted soldier in the Patriarca family of the

8    LCN, personally close to Genaro Anguilo and consigliere

9    Alario Zannino.  He's an individual that  --

10           THE COURT:  It's Cincotti.  I know Mr. Cincotti.

11   I know of Mr. Cincotti.

12           MR. HERBERT:    All right.  I think I've made

13   reference to some of the other transcripts that are

14   attached.

15           THE COURT:  Play the tape.

16           MR. HERBERT:    Yes, your Honor.

17           THE COURT:  The 22 years will be up before we

18   finish the hearing.

19           (Tape played.)

20           MR. WEINBERG:    That's the number of years since

21   Cincotti, Anguilo, and Zanino got arrested, your Honor.

22   22 years ago is what Mr. Herbert is referring to.

23           MR. HERBERT:    After all that lead, I think I'm

24   having some audio difficulties on this.  I may need a

25   short break to have our technical experts come in.

138

1          THE COURT:  We'll take a five-minute break.

2          MR. HERBERT:    Thank you, your Honor.

3          THE COURT:  You can get your technician.

4          (Short break.)

5          THE CLERK:  Court is back in session.  You may

6     be seated.

7          THE COURT:  Okay, you may play the tape.

8          (Tape played.)

9          THE COURT:  Turn that off for a moment.  I'm the

10    primary target for this, and I can't hear Mr. Ferrara

11    clearly.  I thought you had it hooked up on the --

12          MR. HERBERT:    It wasn't coming through the

13    court sound system, your Honor.  It's a difficult -- the

14    audibility with respect to Mr. Ferrara is more difficult

15    than with Cincotti.

16          MR. CHESNOFF:  I can tell you this, your Honor,

17    it doesn't really get better on this particular --

18          THE COURT:  I mean, I'm going to listen to the

19    conversation, but  --

20          MR. HERBERT:    The court will definitely be able

21    to hear it when it listens to it.

22          THE COURT:  I just don't think this is a

23    profitable use of limited court time.  It's now five of

24    four.  I will listen to it, and I'm going to listen to

25    all six hours.

139

1           MR. HERBERT:   Could I just be permitted to

2    summarize the pertinent portions of it as set forth in

3    agent Romanso's affidavit?

4           THE COURT:   Let's see.   What is it, about ten

5    minutes more?

6           MR. CHESNOFF:   Yes.

7           MR. HERBERT:   12 minutes, your Honor.

8           THE COURT:   I think it's going to take less time

9    -- I've read the summary.

10          Play your tape.

11          Hold on a second.   Maybe if I turn the mike up a

12   little.

13          MR. HERBERT:   Should I proceed, your Honor?

14          THE COURT:   You think this will play through?

15          FROM THE FLOOR:   It should play a little louder.

16   We can test it.

17          THE COURT:   Why don't you test it.

18          MR. HERBERT:   I'll take it back to where we

19   were.

20          THE COURT:   The gentleman should identify

21   himself for the record.   He's probably earned the

22   Attorney General's Distinguished Service Award.

23          MR. HERBERT:   Eric Furrow (sic) from our

24   office.

25          THE COURT:   Good job.   I don't know where he was

140

1    when I took the ten-minute break to accomplish this.  But

2    go ahead.

3            You can just pick up where we left off.

4            MR. HERBERT:   That's what I'm trying to do,

5    your Honor.

6            (Tape played.)

7            THE COURT:  Okay.

8            MR. HERBERT:   Again, with respect to that

9    conversation, just a few of the individuals they were

10   talking about.

11           THE COURT:  I've got it.  Thank you.

12           MR. CHESNOFF:   Your Honor.

13           THE COURT:  Hold on just one second.  Let me --

14   with regard to these six hours of conversations in this

15   summary, I see that Frank Imbruglia is mentioned with

16   regard to the -- to matters going way back.  Are there

17   any telephone calls with Mr. Imbruglia?

18           MR. HERBERT:   We don't have any recordings or

19   calls with him, but he was listed on the defendant's

20   approved caller list, and there's conversations about him

21   during these, and the defendant asking to have people

22   send his regards and ask if people have seen him, and

23   that sort of thing.

24           As we indicated in here, we have evidence not

25   only about Frank Imbruglia's involvement in the drug

141

1    dealing that led up to the Limoli homicide, but also his

2    involvement in the plot to kill Frank Salemme.

3           THE COURT:  I have that evidence too.  I wrote

4    about it in 1990 in yet another case.

5           MR. HERBERT:  And he's one of the individuals

6    that the defendant is apparently keeping in touch with.

7           THE COURT:  My memory is they were very close.

8           MR. HERBERT:  Yes.

9           THE COURT:  My memory is that when Mr. Ferrara

10   was arrested, Mr. Imbruglia tried to get arrested too

11   because he was afraid that Mr. Salemme was going to get

12   off his bed and find him.

13          MR. HERBERT:  And what does that tell you,

14   given who Mr. Imbruglia is and what he did, what does

15   that tell you about whether drug dealing was part of the

16   defendant's conspiratorial agreement?

17          THE COURT:  The point, the immediate point is

18   there's no phone calls that you have between Mr. Ferrara

19   and Mr. Imbruglia.

20          MR. HERBERT:  Not from Allenwood, which is the

21   only place we were able to get them from.  He was at

22   Devens.  Devens doesn't keep them that long.

23          THE COURT:  So this is the evidence on which I

24   should rely with regard to dangerousness?

25          MR. HERBERT:  Yes, your Honor.  I mean, not

1    exclusively what's in here, but this in combination with

2    everything that's in the trial brief and the presentence

3    report and all that.

4         If I didn't say it before, I'd say clearly it's

5    our contention that what these calls represent

6    individually and collectively to any reasonable observer

7    is an effort by the defendant to start laying the ground

8    work for his imminent return with LCN members and

9    associates, including Carmen DiNunzio.

10        THE COURT:  Let me ask you this.  During the

11   period of these 2255 proceedings, the government has had

12   electronic surveillance that led to the indictment of

13   Gugliametti (sic) and others in Rhode Island?

14        MR. HERBERT:  Well, the Gugliametti indictment,

15   as I understand it, was a product of a drug deal that he

16   was involved in.  I'm not aware that that was directly

17   the product of electronic surveillance.  I can check but,

18   obviously, there was an investigation that led to Matti

19   Gugliametti being indicted on charges of trafficking and

20   over five kilograms of cocaine.

21        THE COURT:  I thought I had reason to think that

22   there was an electronic surveillance.

23        MR. HERBERT:  There may well have been.

24        THE COURT:  But I don't have anything from that

25   electronic surveillance about Mr. Ferrara?

1          MR. HERBERT:   No, we haven't submitted anything

2     from any of the Rhode Island investigation.

3          THE COURT:   And then there was electronic

4     surveillance of Simone and Gioacchini that led to the

5     cases I was -- I'm planning to sentence soon, and I

6     haven't been given anything regarding Ferrara from those

7     wiretaps and bugs, right?

8          MR. HERBERT:   Correct, your Honor.

9          THE COURT:   All right.

10          MR. CHESNOFF:   Just briefly, your Honor.   With

11     respect to this call in particular and putting it in

12     context, your Honor, the prison system allows 300 minutes

13     a month, which comes out to 3600 minutes per year.   The

14     six hours represent less than ten percent of all the

15     calls that Mr. Ferrara would have made during a

16     particular year.   And this is roughly a year span that

17     we're talking about.

18          In addition, your Honor, these are recorded

19     calls, and every inmate knows that they're recorded and

20     that they're monitored.   It was most important, your

21     Honor, an approved call.   No one from Allenwood is

22     allowed to call a phone number that isn't on the approved

23     list.

24          I would point out to your Honor that Mr. Ferrara

25     did not even realize that Mr. Cincotti had been out of

144

1    jail for an extended period of time, which I think is

2    very telling in relation to the government's contention

3    that somehow Mr. Ferrara is very interested in what's

4    been going on here.  I think that this call reflects

5    exactly what it is, a person who has limited contact with

6    the outside.  He's told you in the conversation that the

7    circumstances in Allenwood are very difficult in terms of

8    social activity because of the fact that he's reasonably

9    isolated as a result of it being an INS facility.

10         I think what also is important, your Honor, is

11   apparently Mr. Cincotti completed his jail time without

12   incident and apparently was on supervised release for an

13   extended period of time, during which he had no contact

14   with law enforcement, wasn't violated, no new arrests, no

15   new charges.  So it seems to me, your Honor, that

16   although at a point in time when you're on supervised

17   release, you are directed that you can't have contact

18   with known felons.  Number 1, there are exceptions made

19   to that, as long as you talk to your Probation officer

20   about it.  But more importantly, your Honor, this

21   gentleman that he had contact with apparently is not

22   involved because he didn't get violated and got

23   discharged.  That's a point that the government fails to

24   remind you of.  It's not as though we're talking about

25   somebody that they can suggest as a result of his time on

1    supervision was actively involved.

2        There's holiday greetings extended.  It's right

3    after the new year.  It's very clear that's what's

4    discussed.  It's interesting, he talks to him about

5    whether he's opening a new restaurant and, of course, Mr.

6    Ferrara's immediate response is to see if he can do

7    something for his daughter which, when you listen to the

8    six hours of calls, you will hear almost a constant

9    refrain from Mr. Ferrara to either help his daughter or

10   his son, and it's all work-related.

11       In fact, the one conversation that you'll hear

12   referencing Frank Imbruglia is to thank Frank for giving

13   his daughter a hundred dollar bill when he saw her,

14   because Mr. Ferrara's entire tone throughout all these

15   conversations is deep love and affection for his children

16   and his desire to get back to his family, his mother, his

17   sister.  And you'll see that yourself when you go through

18   the rest of them, your Honor.

19       I'm trying to see if there's anything else from

20   that particular call.

21       I think that's it, your Honor.  But I think it's

22   important to note that this gentleman completed his

23   responsibilities both in terms of his jail time and his

24   supervision.

25       THE COURT:  Is there anything more you'd like to

1    say about these tapes?

2         MR. CHESNOFF:    There's quite a bit, your Honor,

3    actually, because -- but I will try to -- I'll try to

4    limit it. I've used the FBI 302 that we were provided.

5    He talks -- see, I don't want to step over and start

6    talking about the things that the court might think are

7    sealed issues. But I'm going to go through a couple of

8    notes that I made that I think would be helpful.

9         THE COURT:    I mean, I permitted the government

10   to talk about some of this.

11        MR. CHESNOFF:    For example, in November 20,

12   2004, Mr. Ferrara talks about understanding that this

13   2255 is a slow process. But he makes the comment:  My

14   steps are getting lighter as I get closer to freedom.

15        And I think I want you to focus on that, your

16   Honor, because I think when you listen to these calls,

17   you're going to hear someone who's become very

18   reflective, someone who understands his circumstance, and

19   I think that's an important thing for you to consider

20   when you decide whether or not he's a danger. We don't

21   have somebody that is irrational or is the scourge that

22   the government seems to want to suggest. You listen to

23   these conversations, and you're hearing somebody who's

24   very thoughtful and reflective. In fact, he says in that

25   call, he says nightly prayers, your Honor, and it's not a

1    gratuitous statement.

2          February 7, 2005, most of the conversation deals

3    with the Super Bowl victory of the Patriots.  A lot of

4    these conversations are very sports oriented, either

5    discusses the Red Sox, the Patriots, or his favorite,

6    which is Boston College and, as you know, he's an

7    alumnae.  He talks about them being in the Bean Pot.

8    He's critical of the Boston College football coach on a

9    regular basis in these conversations.  And he's talking

10   to his friends, particularly one gentlemen, Ray Mondello

11   (sic), who has been his friend since I think they were

12   eight years old.  Mr. Mondello had gone through his

13   entire life without any kind of criminal problem except

14   for recently a marijuana conviction.

15         And in January of '05 he talks about how he has

16   no money, and he hasn't earned.  So that would suggest,

17   most respectfully, your Honor, that during the 15-year

18   period that he has been incarcerated, he has not

19   participated in the activities or the benefits of the

20   LCN, if such a thing exists.

21         He says he wants to spend time with his mother,

22   his sister, his brother, his kids.  That's at 13 minutes

23   and 28 seconds into that January 8 conversation.

24              THE COURT:  January 8?

25              MR. CHESNOFF:   '05.

1          This is a particularly enlightening conversation

2     on March 1, '05, your Honor.  Vinnie asks, how are the

3     guys in the club?  And I believe that reference is a

4     social club in the North End.  Ray says to him:  I hardly

5     go there.  Vinnie says:  Who needs that nonsense?  In

6     other words, he's encouraging his friend to stay out of

7     the club.

8          He makes references repeatedly to having trouble

9     with his stomach.  He talks about that in the context of

10    the US Attorney having forced people to lie.

11         He says at three minutes and 13 seconds into

12    that conversation:  When I get out, I want to learn more

13    about my daughter.  I want to -- basically suggesting he

14    wants to rebond with his daughter and find out about her

15    life, because he's missed out on most of it.

16         He describes having trouble with both his heart

17    and his stomach.  He acknowledges that stress is a

18    factor.

19         And these are interesting, left out of -- the

20    reference to the club is left out of the 302, which the

21    FBI agent prepared for you.

22         I've just described the issue with respect to

23    Mr. Cincotti.  He says he'll be lost when he comes home.

24    The suggestion that he recognizes that he has to find his

25    way back is completely contrary to the government's

1    position that somehow he's integrated into an

2    organization and just raring to go.  He acknowledges his

3    own concern that the whole city will have changed.

4             I could keep going, your Honor.

5             THE COURT:  When I listened to that, I thought

6    he meant physically lost.  You know, we've got the Big

7    Dig, things like that.

8             MR. CHESNOFF:  I read it slightly differently,

9    your Honor, but maybe that's because I've spoken to him.

10            THE COURT:  I'll listen to it.

11            MR. CHESNOFF:  I don't -- now that I know

12   you're going to listen to all six --

13            THE COURT:  No, this would be helpful.  In fact,

14   I'll say the following.  The government's -- the record's

15   got to be complete.  But I don't even know what I have to

16   listen to that -- I suppose on my computer -- and I don't

17   know if it will show me minutes and seconds the way

18   you've just described.

19            If you want, I'll give the defendant a brief

20   opportunity to give me the counterpart of what the

21   government gave me.  The government points me to certain

22   parts in its summary.  You didn't -- you just got these

23   relatively recently.  If you want to do the same thing

24   tomorrow or something --

25            MR. CHESNOFF:  Sure, I'll prepare a submission

150

1    for you, your Honor.

2         THE COURT:  The record has got to end, but I

3    think, to make this symmetrical, if you want to give me

4    some aid to listening, I'll take it.  And the faster I

5    get it, the better.

6         MR. CHESNOFF:   I'll convert my notes tonight,

7    your Honor.

8         THE COURT:  Okay.

9         MR. WEINBERG:  If I may speak a little more

10   generally towards the dangerousness issue and, to some

11   extent, the 3553 factors.

12        First of all --

13        THE COURT:  Actually, hold on just one second.

14   It's now 4:20, and I was hoping to complete all this

15   today, and I think we probably can, unless everybody is

16   exhausted.

17        But at some point, as I said, I want to give Mr.

18   Ferrara an opportunity to speak.

19        MR. WEINBERG:  He wants to.

20        THE COURT:  And it may be that you want to --

21   maybe that should be last.  Maybe that should be now.

22   Because I could take a short break and give Mr. Ferrara

23   an opportunity to speak, and then I can listen to counsel

24   and, hopefully, we'll be concluded.

25        MR. WEINBERG:  If we can have five minutes, your