EXHIBIT B
pp. 151- 183

1    Honor, Mr. Ferrara does want to address the court.

2           THE COURT:  All right.  And, Mr. Ferrara, just

3    to make sure you understand this, you have an opportunity

4    but not an obligation to speak.  That means you have an

5    opportunity to address me, and what you say might or

6    might not affect my analysis on whether you get a

7    reduction for acceptance of responsibility.  It might or

8    might not affect my assessment with regard to the

9    dangerousness issues that are sentencing issues and, if I

10   decide you're entitled to be released, it also relates to

11   the stay.

12          So what that means is if you want to say

13   something, I'm going to give you a chance after the

14   break.  But if you don't want to say anything, you don't

15   have to.  Okay?

16          THE DEFENDANT:  Mm hmm.

17          THE COURT:  We'll take a break to about 4:30.

18          (Short break.)

19          THE CLERK:  Court is back in session.  You may

20   be seated.

21          THE COURT:  Mr. Ferrara, as I said, you now have

22   an opportunity but not an obligation to speak as part of

23   this resentencing.  Is there anything that you would like

24   to say?

25          THE DEFENDANT:  I want to thank you for the

1    opportunity, your Honor.  I just put something together

2    real fast.  Do you mind if I read it?

3            THE COURT:  No, I don't.

4            THE DEFENDANT:  Okay.  I'd like to preface my

5    statement to the court by stating that I have difficulty

6    speaking publicly due to poor allocution and an intrinsic

7    shyness.  It's moments like this, your Honor, I wish I

8    initiated the oratory club at Latin School.  Hopefully, I

9    will not come across as somewhat ribose.

10           You have been imminently fair, and I am most

11   grateful.  Please be assured that I am not intending on

12   revisiting my past.  To do so would qualify me for the

13   Hall of Fame for Idiots and totally embarrass me and my

14   family.

15           If afforded the opportunity, I want to test the

16   other side of my brain with worthwhile projects.  Most

17   certainly, I never want to be separated from my children

18   and family again.  This is my only fear.

19           I am intent on rebonding with my children and

20   family, reorienting myself with the real world and all

21   its changes, and reinventing myself.  This time I will do

22   my family proud.

23           Thank you.

24           THE COURT:  Thank you.  No responses from the

25   public area.  Anybody who does that will have to be

1    removed if it occurs again.

2          Okay.   Section 3553A factors.

3          MR. WEINBERG:   Thank you, your Honor.   I'll try

4    to be concise.

5          Firstly, I would ask the court, consistent with

6    the language of the statute, that the court shall impose

7    a sentence sufficient but not greater than necessary to

8    comply with the purposes set forth in paragraph 2 of this

9    sub-section.   Those are the traditional, the

10   pre-Guideline generic sentencing objectives that were

11   codified in this statute.   It's punishment, deterrence,

12   incapacitation, and language that would have been

13   consistent with the old values of rehabilitation.

14         Let me focus primarily on the court's concern

15   for the dangerousness component.

16         Mr. Herbert has selected one prison tape to play

17   the court out of 21 tapes, which your Honor has and I

18   know will listen to, out of 15 and-a-half years within a

19   prison system that he had not one violation.   What you

20   did not hear from the government today and which I think

21   is the norm for their presentations on dangerousness,

22   which generally requires clear and convincing proof of a

23   future act, a future dangerousness, is any indicia from

24   any of their informants, from any of their Title IIIs,

25   from any of their ongoing criminal investigations, from

1        anywhere except from these 21 prison calls or the one

2        they've highlighted that Mr. Ferrara has ever indicated

3        an intention to go backwards rather than forwards in his

4        life.

5                There's no informant saying, when Ferrara gets

6        out, he's going to do something.  There's no people, no

7        third parties on any of the electronic surveillance in

8        any of the cases that have been brought talking about

9        Ferrara.  In fact, one of the prison tapes, Ferrara is

10       talking to one of his friends about the friend having

11       gone to a wake of the death of Sonny Rizzo, and Ferrara

12       asks him on the tape of February 1, '05:  Did my name

13       come up?  And the answer from the friend was no.  And he

14       said:  I guess that's a good thing.

15               On another prison tape, he's telling his friends

16       about how you would have to live within the rules.  And

17       if you live within the Bureau of Prisons rules for 15

18       and-a-half years, he's going to be able predictably to

19       live within the rules of supervised release for the next

20       five, knowing the catastrophe  --

21               THE COURT:  Do you know which tape he says he's

22       got to live within the rules?

23               MR. WEINBERG:  Yes, your Honor.  It's eight

24       minutes into the second of the two -- of December 2, 2004

25       tapes.  The one that begins at 1958.  And he says:  You

1    can't get in trouble in the system; you must follow the

2    rules.   Talking about the Bureau of Prisons.

3         It would be a catastrophe for him to violate the

4    law, and I say that subjectively because he's seen what

5    the Strike Force can do with a crime he didn't commit.

6    He's certainly not going to give Mr. Herbert and the

7    Strike Force an opportunity to go and reprosecute him for

8    something he did do.  He's not again ever, because he's

9    felt for a decade and-a-half what it means to lose your

10   family, to be -- and he has been in Memphis; he has been

11   in Englewood, Colorado; he's been in Florence, Colorado;

12   he's been in Phoenix, Arizona; he's been in Terminal

13   Island.  He left his youngest daughter when she was four,

14   Bianca.  He left the second youngest daughter when she

15   was five, his son when he was 13, Heather when she was

16   12, Stacy when she's 14.  And they're all here.  And he's

17   coming out to them, and he was to have a sentence of time

18   served, your Honor, which is what I would ask the court

19   to impose, with one daughter, Heather, having his first

20   grandchild next month, in June; second daughter Stacy,

21   where he's asked to live, being married on December 31,

22   '05.  In other words, there are still events in his life

23   that will never ever permit him to undo the 15 years he's

24   been separated, but he's not going to jeopardize the

25   potential to be their father again.

1          His mother is 89 years old, unable to even speak

2     to him, being in a nursing home on oxygen tank with

3     Alzheimer's.  His sister who's a nun for 50 years, also

4     in a rehab center.  His brother had laser surgery for a

5     brain tumor.  He's not going to jeopardize whatever time

6     he has left with his immediate family, his mother and his

7     brother and his sister, the people that he's closest to.

8          He's had medical issues, and although on January

9     2 when he spoke to Cincotti he was feeling well, within

10    months before that, in Allenwood, he was taken out of

11    there on an emergency basis.  He was in a local hospital

12    for three days.  He had a cardiac situation.  And he

13    still anytime he exercises has shortness of breath.  They

14    have not adequately diagnosed that particular medical

15    situation, although the blood tests were off the charts

16    in terms of some of the diagnostic issues.

17         He also, while during these habeas hearings, had

18    severe, shattering headaches.  And every time he

19    exercises and his blood pressure goes up, there's

20    throbbing behind his ear.  They could not at Devens when

21    they did one CT scan and one MRI say anything other than

22    that he had cluster headaches.  But it could in fact be

23    far worse.  He wants to go to real doctors.  He wants to

24    try to get healthy.  He wants to get a job.

25         Mr. Herbert makes the point, well, he didn't ask

1    his friends for a job, what does that mean?  It's this

2    catch 22 world.  If you ask your friends for a job, the

3    government would be saying, you're looking to associate

4    with them.  If you don't ask them for a job, the

5    government says, you're not looking to work.  This man

6    wants to work.

7        THE COURT:  He'd be in trouble if he asked the

8    LCN members for work, because then the argument would be

9    he's looking for somebody to kill.

10       MR. WEINBERG:  It's -- there's nothing Mr.

11   Ferrara can say on tape that when you filter it through,

12   the government's basic position that he's an evil person,

13   that they can't distort into some kind of predicate for

14   an argument that he's not to be trusted.  But the fact

15   is, in 15 and-a-half years he's done nothing wrong, and

16   there is no sound basis to predict he'll be dangerous.

17   It would be catastrophic.  It would be so

18   self-destructive.  He'd know that he'd end up, in

19   essence, with a death certificate, because he'd go back

20   to federal jail, and that would be the end of Vincent

21   Ferrara, and he's too intelligent to give them the

22   opportunity to reprosecute him.  And, again, that's a

23   prediction, but their prediction, and they want you to

24   extinguish his freedom based on a finding of

25   dangerousness, whether it's by asking your Honor to

1    evaluate the 3553 factors that he requires further

2    incapacitation, one of the four factors, or whether it's

3    an argument adhering to their request for a stay, it's a

4    prediction without a foundation other than his reaching

5    out as a person trying to find people who he was friends

6    with 15 years ago.  And the government goes back and

7    says, some of these friends 22 years ago did bad things.

8    He's in jail because he did bad things.  He's in jail

9    because he was in a conspiracy in the 1980s.  We've got

10    to look forward.  And because Cincotti invited him to

11    cook for him doesn't mean that when he is instructed by

12    the United States Probation Department that going to Mr.

13    Cincotti's home for lunch is a violation of supervised

14    release, that the conditions are separate when you're

15    free, that you have to live under the certain rules set

16    by Probation.  Just like Cincotti didn't violate them,

17    Mr. Ferrara is not going to violate them.  He's not a

18    person that wants to give his fate to the government that

19    he's heard would like nothing better than to lock him up

20    again.

21         Let me focus on the other factors in the

22    sentencing issues.

23         Deterrence.  I mean, I can't imagine any person

24    who could be deterred, not being deterred if they knew

25    what Mr. Ferrara went through since he was locked up in

1       November of 1989.  You know, he's been away from his

2       family.  He's been in all of these different jails.  He's

3       lost his health.  He has no money.  A decade and-a-half

4       is an enormously long time to a man who is in his 40s and

5       loses the 40s and loses half of the 50s.  And you see

6       what it's done in terms of his appearance physically

7       before you when he was sentenced and his appearance

8       today.

9               THE COURT:  It's very different and much worse.

10              MR. WEINBERG:  Yes.  And the torment he's gone

11      through, it's something out of a nightmare where he's

12      been in jail and, year after year, he's learning that the

13      playing field wasn't fair when he went in.  He learns

14      that the government helps Mercurio be a fugitive.  He

15      learns about the fact that he had a hearing on a Guild

16      Street wiretap believing there was a roving bug and

17      having testimony before your Honor that there was a

18      necessity for a roving bug and that the judge heard all

19      of the material evidence and then others, seven years

20      later on the very same electronic surveillance, get

21      documents from the FBI from the Boston office, the

22      Washington office, and he's learning this while he's in

23      prison learning that his lawyer, Mr. Goodman, didn't have

24      a fair opportunity to litigate the foundation of his

25      prosecution.  And then comes Jordan, and then he learns

160

1   -- he always knew there was perjury because he knew he

2   didn't do it -- but then he learns that the government

3   knew that there was perjury and knew that there was a

4   recantation --

5           THE COURT:  You know, part of the reason we're

6   here, and I don't want you to think I forgot this, he

7   lied to me.  I mean, I'm taking his plea.  He says he's

8   guilty.  Of course, you know, he's a capo in the LCN.  I

9   can be disturbed but not surprised when he lies to me.  I

10  expect something considerably better and so does the

11  public from the government.  But this whole case is

12  disturbing to one who works hard to try to have a fair

13  process, and then guilty people should be convicted and

14  punished, which typically is what happens.

15          MR. WEINBERG:  And there's one difference.  The

16  next day or, metaphorically, the next day he talks to

17  Probation, and he was driven to lie by fear of being

18  prosecuted and convicted for a crime he didn't commit

19  based on evidence that wasn't true, and he tells that to

20  Probation, and the government has still not provided a

21  reliable justification or explanation for the failure to

22  disclose to him year after year the truthful basis of

23  their application for the Guild Street wiretap or the

24  basis by which exhibits 16 and 17 were withheld from his

25  lawyers.  At least he tried to undo a plea that was

161

1    driven by a necessity to plead to all charges and a

2    necessity to try to avoid the risk that he was going to

3    be successfully prosecuted based on untruthful testimony.

4    And I'm not excusing it, but it's -- it doesn't mean he's

5    lying to you now, your Honor. And I do think that when

6    you consider deterrence, he's gone through a uniquely

7    anguishing nightmare during this decade-and-a-half of

8    discovery about the fact that his plea was not based on

9    an intelligent basis, that his lawyer did not have the

10    information he needed to give him competent advice and,

11    most importantly, neither did your Honor.

12        In terms of punishment, if the government agreed

13    because of all the reasons they agreed in January of 1992

14    that a downward departure was warranted because they

15    believed or at least I believe Mr. Herbert believed he's

16    responsible for three murders that were charged, well,

17    those murders are no longer a bases of sentencing. And

18    the government, they want to talk about age, but the fact

19    is that in terms of punishment, some part of that 22-year

20    punishment was directly attributable to the charged

21    allegations of murder. And given the fact that those

22    charges have been extinguished by the discoveries of the

23    last two years as being a trustworthy basis to punish, a

24    punishment less than 22 years is warranted by the 3553A

25    factors, and I would urge your Honor, given what he's

162

1    been through and given all of the lack of evidence that

2    he will ever be back in this courtroom, either through

3    the five-year supervised release or ever again, that a

4    sentence that in essence permits him to go home to his

5    family from whom he's been essentially isolated for a

6    decade and-a-half is warranted.

7        Thank you, your Honor.

8        THE COURT:  Mr. Herbert.

9        MR. HERBERT:    Thank you, your Honor.

10        Your Honor, the simple and inescapable fact is

11    this.  There is no reason whatsoever for this defendant

12    believing he is about to be released to be communicating

13    with people like Johnny Cincotti, people like Albie

14    Sacramone (sic), or Spucky Spagnolo, or Carmen DiNunzio,

15    directly or indirectly.

16        THE COURT:  Is Mr. Spagnolo on one of the

17    telephone calls?

18        MR. HERBERT:    There's repeated references to

19    Ferrara in communication with him indirectly, and Ferrara

20    mentions that when he gets out he's going to loosen up

21    Spucky.  So, I mean, direct references  --

22        THE COURT:  What does loosen up mean?

23        MR. HERBERT:    The court's guess is as good as

24    mine on that, but it clearly is a reference to getting

25    together with Spucky Spagnolo.  Or Carmen DiNunzio or

1      Frank Imbruglia.  Or to express interest in how two of

2      the October 1989 Mafia inductees are doing, Richie Faramo

3      (sic) and Vinnie Federico.

4           Why as recently as March 2 of this year is he

5      arranging a visit from convicted bookmakers?  Why is

6      Carmen DiNunzio helping this guy that he doesn't even

7      know?  And what might Carmen DiNunzio, the underboss of

8      the family, want in return from Vinnie Ferrara when he

9      gets out?  Why is this defendant showing such interest in

10     these tapes and where Frank Salemme was arrested?  Why is

11     he asking one of his friends to inquire of a reporter to

12     find out whether Frank Salemme was detained on his most

13     recent charges or is out on bail?

14          THE COURT:  Actually, I'm not sure I understand

15     the inference I'm supposed to draw from that.

16          MR. HERBERT:   I'm saying this defendant is

17     showing interest in the whereabouts of somebody that he

18     tried to have killed as he believes he's about to get out

19     of prison.

20          THE COURT:  You mean you think that -- well,

21     what about -- I was struck by that in this paper.  It

22     said that you were going to be talking about the Salemme

23     shooting and Ferrara's role and Imbruglia's purported

24     role.  Mr. Mercurio is left out.  Did we worry about Mr.

25     Mercurio setting Mr. Salemme up?

164

1          MR. HERBERT:    Your Honor, I don't know how many

2     times I can say it.   We're here to sentence Vincent

3     Ferrara.

4          THE COURT:    Okay, let me see if I can explain it

5     to you a little better, because you're here trying to

6     persuade me that the public needs to be protected from

7     somebody who you say participated in having Salemme shot.

8     Mr. Romanso says he's been here for about five years.

9     Maybe he didn't read page 267 of my 1998 decision.

10          I mean, you have informant information that

11     Mercurio set Salemme up to be shot.   Then the government

12     tips Mercurio off so he can run.   And when he gets caught

13     in Georgia selling drugs, he comes back, and the

14     government misleads me so he gets essentially concurrent

15     time, no time.   And as far as I know, Mr. Mercurio didn't

16     do anything to Mr. Salemme or try to do anything to Mr.

17     Salemme.

18          But even if I accept -- and I've got to be very

19     careful because there may be not just equitable issues

20     but legal issues as to whether I can properly take Grasso

21     and Salemme into account -- not everybody in the

22     government's view, apparently, who was dangerous 20 years

23     ago, deadly dangerous 20 years ago, is dangerous now.

24     And the government has not been even-handed in its

25     arguments with regard to various people.   And so I know

1    you want to focus on Mr. Ferrara, but you also give me

2    what Mr. Milano did.

3           This is -- you know, this is again, you know,

4    sort of -- well, it's irrelevant.  But why do you leave

5    Mercurio out when you file these papers?

6           MR. HERBERT:    Mercurio -- first of all, the

7    chief people who are involved in this, the people who

8    felt the need to bargain for immunity with respect to the

9    Grasso murder, were the three capos.

10          THE COURT:  Mr. Mercurio didn't because the FBI

11   prompted him to take off.

12          MR. HERBERT:    I think it is important to be

13   specific.  The court made a finding, I believe, that it

14   was John Connolly who tipped him off.

15          THE COURT:  Actually, he left after he was

16   talking to Ring.  But, look, it's the government.  I've

17   got Mr. Romanso's affidavit.  The FBI.  Why don't you

18   answer my question.  Why when you write this affidavit

19   with your agent do you leave Mr. Mercurio out?

20          MR. HERBERT:    I don't know -- what are you

21   referring to specifically?

22          THE COURT:  It says:  The government is

23   proffering evidence that Ferrara and his codefendants,

24   Carrozza and Russo, were responsible for the attempted

25   murder of Salemme.

166

1           MR. HERBERT:    Because that is our information

2      is that those were the ones who were driving the

3      takeover, the violent takeover.

4           THE COURT:    Mercurio was not involved?

5           MR. HERBERT:    Mercurio was part of that group.

6           THE COURT:    Now answer the question.    Why did

7      you leave Mercurio's name out?

8           MR. HERBERT:    Simply because those three were

9      the ones who were principally responsible for this.    They

10     were the ones -- John Castagna and his son Jack Johns,

11     after they murder Billy Grasso, come up to Boston and

12     have a meeting at Santarpio's (sic).    The three they meet

13     with are Joe Russo, Vincent Ferrara, and Bobby Carrozza.

14     They don't meet with Sonny Mercurio at that point.

15          THE COURT:    So the government is comfortable

16     with Mercurio.    Go ahead.

17          MR. HERBERT:    Yes, your Honor.    To the court's

18     point that not everyone who was violent years ago remains

19     violent or dangerous years ago remains dangerous, I come

20     back to the simple fact that there is no reason for a

21     defendant who wanted to prove that predictions in 1992

22     were in fact prophetic to be in communication with all of

23     these LCN members and associates.    He doesn't have to use

24     his precious minutes to be in contact with these people

25     to run down with one call after another a who's who of

1    the LCN in the Boston area.  He doesn't need to ask who's

2    where.  He doesn't need to ask how people are doing.

3        I would submit, as we indicated in the

4    sentencing memo, that the defendants -- the nature and

5    circumstances of the offense and the history and

6    characteristics of the defendant are relevant here.  And

7    the very information on which this court relies in

8    granting the defendant relief on this petition

9    demonstrate that fact.

10       As we indicated in that submission, the

11   information was not that Barone and Jordan had to leave

12   Boston because defendant Ferrara was angry with them for

13   killing Limoli.  The information was not that they had to

14   leave Boston because defendant Ferrara was going to call

15   the police because they killed Limoli.  The information

16   was that Barone and Jordan had to leave Boston because

17   defendant Ferrara was going to kill them both.  Not

18   because they killed Limoli, but because they did not get

19   his permission to kill Limoli.  And that tells you that

20   not only is the defendant a killer and someone who

21   authorized killings, but it was understood that there was

22   a rule, if you believe this information, and the court

23   has credited it, there was a rule that Barone can't kill

24   someone like Limoli without defendant Ferrara's

25   permission, and the penalty for violating that rule is

168

1    death for himself.  That indicates that the very

2    information on which the court relies demonstrates how

3    dangerous this defendant is.

4         With respect to the argument that he can't be

5    asking these individuals to help him find legitimate

6    employment, frankly, your Honor, that's nonsense.  He

7    could be asking Ray Mondello to be searching the want ads

8    for employment with car dealerships.  There's no reason

9    why this defendant who, as far as we can tell, has had

10   essentially no legitimate employment, this BC grad, who

11   has had essentially no legitimate employment for his

12   entire adult life, can't be asking a friend to find him

13   legitimate employment.  And the fact that there's no

14   indication on these that he is doing that is, I think, a

15   telling indication of what his plans are for making

16   money, which he says he has none of when he gets out.

17   And there are indications on these calls that he is in

18   fact receiving money in prison from individuals who are

19   engaged in illegal activity such as bookmaking.  People

20   like Albie Sacramone are getting him money.

21        THE COURT:  Am I going to hear that on the tape?

22        MR. HERBERT:  Absolutely.  Absolutely.  He's

23   doing that to this day, believing his release is imminent

24   and making plans, obviously, to see people, knowing that

25   that's going to be a violation of the conditions of his

169

1    release.

2            In sum, your Honor, we would submit that the

3    only reasonable sentence that can be imposed in this case

4    is the sentence that the defendant bargained so long and

5    hard for in exchange for the extraordinary benefits that

6    he received, as recognized by the Court of Appeals and,

7    that is, the sentence of 264 months.

8            MR. WEINBERG:  Very briefly, your Honor.  The

9    money is commissary money.

10           THE COURT:  What's that?

11           MR. WEINBERG:  The money they're talking about

12   is someone sends him commissary money occasionally.

13           Second of all, you heard 21 calls.  Most of them

14   are with his friend Ray, who he's known since he's eight

15   years old.  He's an Air Force veteran.  He got almost no

16   record.  He got caught with a pound of marijuana

17   recently, not before Mr. Ferrara went away, but recently,

18   having nothing to do with Mr. Ferrara.

19           And, thirdly, the government argument that he

20   was dangerous has all been factored into his past

21   sentence.  The question now is will he be dangerous?  He

22   is going to get a job.  He's going to go back to see his

23   mother, brother, and sister.  He's going to see his kids

24   and be a father.  If your Honor wants to have an

25   employment condition, if that's not a normal condition of

1    supervised release, it's certainly one that Mr. Ferrara

2    would embrace.

3                THE COURT:  Well, actually, that leads to

4    something else I intended to ask you.  Did you say that

5    he has a place to live if he's released?

6                MR. WEINBERG:  He does, your Honor.  His

7    daughter is here.  His daughter lives in Marlborough,

8    Mass.  Stacy is his oldest daughter, who's getting

9    married on December 31 of this coming year.  And we've

10   told Probation regarding the location that we think he

11   would go to.

12               THE COURT:  Because one of the issues -- it

13   hasn't come up -- but, conceivably, either in connection

14   with a stay or a release, at some point, is the potential

15   for some home confinement, and I don't know if that would

16   be necessary.  I don't know if it would be appropriate.

17   I don't know -- you know, I'd have to decide if

18   dangerousness is arguably an issue.  I don't know if

19   you've thought about that at all.

20               MR. WEINBERG:  I've thought about it in terms of

21   an interim bail situation.  If there's going to be, you

22   know, additional time that's required by the court to

23   make all of the legal determinations, in the court's

24   opinion, if it's wrong for him to remain in jail, if

25   there are conditions in this exceptional circumstance,

1    and that's the criteria for habeas bail, well, habeas has

2    been granted, and I don't believe the government will,

3    can, through the other 20 tapes, will satisfy the court

4    of any dangerousness.  But if the court can see fit to

5    entrust Mr. Ferrara to home confinement for purposes of

6    the interim period until he is finally, you know, finally

7    sentenced, you know, that would be the location where

8    that would be requested.

9         But in terms of the overall effect, we're urging

10   the court to impose a sentence that in effect is time

11   served.  We believe that either under the Guidelines or

12   the factors, he has served more than enough time.

13        THE COURT:  That would be time served with no

14   home confinement as a condition of supervised release?

15        MR. WEINBERG:  That would be our request.  Of

16   course, the court has the discretion in terms of

17   supervised release to impose whatever conditions the

18   court feels are required.  But I don't think that there's

19   the basis to believe that home arrest is required.  I

20   think, instead, you know, that this man will be under the

21   strict supervision of Probation.  He'll be under the

22   careful watched eye of the Strike Force and all of their

23   resources.  And I think when your Honor considers the

24   stay issue where I think your Honor does have to make

25   determinations that are separate from the determinations

1    of what is an appropriate sentence, I would contend that

2    there's simply no probability that your Honor's habeas

3    decision is going to be reversed and, if there is no

4    probability of reversal, the government must show the

5    most compelling equities that would favor a stay and, in

6    this case, the irreparable injury all goes to the citizen

7    who would be in jail, you know, awaiting an appellate

8    decision, rather than to the government. And I would

9    just urge that the court consider ending his nightmare by

10   releasing him, as anyone else would, who was sentenced to

11   18 rather than 22 years, which I believe is the sentence

12   that would be roughly the equivalent to what someone not

13   facing any charged murders faced in January of 1992.  And

14   I used -- Russo pled to a murder.  Yes, he's older.

15   Carrozza is not appreciably older.  He pled to a

16   narcotics conspiracy where the First Circuit said he

17   managed five persons.  Mr. Ferrara was not charged with

18   nor did he plead to anything to do with drugs.  The drugs

19   drove Carrozza's sentence higher.  And if he was not

20   charged with Limoli, Corlito, and DeFronso in 2002, if

21   those cases were properly dismissed because the

22   government knew the recantation of their only witness,

23   the calculus facing him, Mr. Goodman, and the court would

24   have been far different.  And I know your Honor focused

25   on a case out of Michigan where the government recognized

1    that there were certain infirmities, grave infirmities in

2    their prosecution of a recent terrorist case.  I go to

3    the California case where they dismissed --

4              THE COURT:  Which one?

5              MR. WEINBERG:  United States versus I think it's

6    L A U N G.  Having trouble in the blizzard of paper --

7    here it is -- it's US V L E U N G, which is -- it's the

8    FBI -- part of the FBI agent Miller, and he was

9    discouraged or prohibited from speaking to counsel for

10   the defendant in the court in California, 351 F Supp 2nd

11   992 at 995.  Dismissed the case, and they quoted from

12   Judge Kazinski (sic) of the Ninth Circuit where the judge

13   in essence said anyone can make a mistake and that even

14   government prosecutors can make a mistake, but in

15   determining the proper remedy in that case, we must

16   consider the government's willfulness in committing the

17   misconduct and its willingness to own up to it.

18             THE COURT:  Judge Kazinski said that?

19             MR. WEINBERG:  Yeah.  It's in United States

20   versus --

21             THE COURT:  I'll look at it.  As I said -- I'd

22   have to know the context.  In other words, I don't -- one

23   of the statutory purposes of sentencing is to promote

24   respect for the law.  As I said earlier, whether perjury

25   has been committed by a prosecutor, whether there should

174

1    be administrative or bar sanctions for violations of

2    ethical rules, I think, is generally separate from what

3    the remedy should be with regard to Mr. Ferrara's

4    sentence.

5    You're right, the Department of Justice hasn't

6    expressed the same concern about the misconduct in this

7    case that was expressed in the Michigan purported

8    terrorist case, but that's up to the Department of

9    Justice.

10    MR. WEINBERG:  And I say it for two reasons.

11    One is that one of the most sin que non, according to

12    most cases when determining whether or not the effect of

13    a habeas will be stayed, is the probability of success on

14    appeal.  And your Honor's 124- or 126-page opinion

15    creates an insurmountably defensible legal position, both

16    legally and factually.

17    And second of all is when your Honor thinks

18    about irreparable injury, given the history of his

19    prosecution, given the ends justify the means theory of

20    law enforcement that led to all of the misconduct that I

21    will not repeat that's contained and documented in this

22    court's findings in United States versus Salemme, in

23    United States versus Ferrara, and United States --

24    THE COURT:  It started back -- I don't know when

25    it started -- but in 1991 when we were litigating the

1    roving tap.  It's 5:15.  I hate to reopen this.  But I

2    wrote about it.  I mean, it's the kind of candor that my

3    colleagues and I -- and, of course, we discussed this --

4    expect from the Department of Justice that has been more

5    than sadly lacking in this case.

6            MR. WEINBERG:  In part, the common ground for

7    much of this misconduct has been keep Vincent Ferrara in

8    jail, whether it's the protection of Flemmi and Bulger,

9    whether it's the Guild Street, the failure to give him

10   the discovery that others got later, whether it's a

11   Mercurio misconduct.  And I don't think that the public

12   interest is served if your Honor sees fit on a separate

13   issue, which is sentencing, and I agree there needs to be

14   a separation of the misconduct issue and the sentencing

15   issue, but when you bring them back and the government

16   asks this court to stay its order and essentially not to

17   give him relief from all of the misconduct that in part

18   was addressed so dispositively in the April memorandum

19   and order, they don't have a probability of success on

20   appeal, and he's the one --

21           THE COURT:  You think they don't.  I know that

22   Mr. Herbert thinks they do.  And my decision is my

23   decision.  Somebody else will review it.

24           Okay.  I think I've got the point.

25           MR. WEINBERG:  Thank you, your Honor.

176

1          THE COURT:  Mr. Herbert, what would you like to

2     say further, if anything, regarding the stay?

3          MR. HERBERT:  Simply this, your Honor.  As we

4     indicated, the standard is not crystal clear, and that's

5     because there aren't a lot of cases that deal with this

6     type of situation.  As we pointed out in the brief,

7     that's because under the new 2255 law, they have to be

8     brought within one year of the conviction and, therefore,

9     most individuals are probably still serving a substantial

10    portion of their sentence.  So there isn't a lot of law

11    on it.

12         But even if we assume that the Federal Rule of

13    Appellate Procedure 23 were applicable and that the

14    standards articulated in Hilton versus Bronskill are

15    applicable, we do believe that we can show special

16    reasons for overcoming any presumption of correctness to

17    a release order.  We do believe that we can make a

18    showing -- I don't believe we can persuade this court

19    that we have a likelihood of success on the merits, but

20    we do believe we could persuade the Court of Appeals of

21    that.

22         With respect to irreparable injury, injury to

23    other parties interested in proceeding in the public

24    interest, I would submit that when we're talking about a

25    defendant who was detained for a substantial period of

1    time pretrial based on dangerousness grounds and when we

2    have a record of these kinds of contacts by the

3    defendant, believing his release to be imminent, there

4    is, I'd say, an overwhelming public interest in keeping

5    him detained until such time as the court's release order

6    might be upheld.

7        Essentially, what we would be asking the court

8    to do here is what we would be asking the court to do in

9    connection with a detention motion.  If the court were

10   inclined to deny the detention motion, as we have done

11   before, we would ask this court to grant a stay of its

12   order long enough for us to get to the Court of Appeals

13   and ask the Court of Appeals to extend that stay.

14        THE COURT:  Well, and, in fact, I just don't

15   know where the Guideline calculation is going to come

16   out.  I don't know where I'm going to decide these

17   matters.  But my inclination, and I have done it in

18   detention cases, is essentially -- it's now going to take

19   me longer than I hoped because I have to, among other

20   things, listen to six hours of tapes -- write a decision

21   on sentencing, write a decision on stay; if the two of

22   those would result in the defendant's release, give you a

23   day or two to file a motion for a stay at the Court of

24   Appeals and give the Court of Appeals a week or something

25   to decide whether to extend it because there's a lot to

1    read.

2            That's essentially what you're advocating.

3            MR. HERBERT:   Yes, your Honor, although we'd

4    ask for a little bit more than a day or two, simply

5    because, as the court is aware, there's approvals that

6    have to be obtained within the department.  That's not to

7    say that we can't start that process conditionally at

8    this point.

9            THE COURT:  Do there have to be approvals to go

10   for a stay in the Court of Appeals?

11           MR. HERBERT:   Yes, your Honor.

12           THE COURT:  Has the Solicitor General authorized

13   an appeal of my decision?

14           MR. HERBERT:   No, it hasn't reached that issue

15   at this point, your Honor.  We've had communications with

16   people in Washington, but we really -- we can't take that

17   step at this point.  So there are some things that would

18   need to be done, so we would ask for -- I mean, ideally,

19   what we would like would be a stay from this court

20   pending a determination on the stay from the Court of

21   Appeals with the understanding that, assuming we get the

22   approval, we would move for that stay on as expedited a

23   basis as possible.

24           THE COURT:  How fast would that be?

25           MR. HERBERT:   I can't make a prediction as to

1    how fast we could get that approval.  I can represent to

2    the court that we will do so as expeditiously as we

3    possibly can.

4        THE COURT:  Well, I would say the following.

5    You should be laying the ground work, you know, for the

6    worst case contingency from your perspective.  I mean,

7    the Supreme Court has held in Elrod versus Burns that,

8    you know, the loss of First Amendment freedom of speech

9    for even a day is a form of irreparable harm.

10        If the analysis that I did in my 124-page

11    decision isn't materially altered, the government's

12    illegal conduct -- that's what a violation of

13    Constitution is, illegal conduct -- is inflicting

14    irreparable harm on Mr. Ferrara, and maybe I was trying

15    to assuage some guilty conscience of my own.  I

16    calculated how much extra time he might be serving in

17    prison from the upper end of what he says is the

18    Guideline range, 188 months.  It wasn't lost on him.  The

19    lower end of that is about 150, and he might now have

20    done five extra years in prison based on the

21    conscientious findings of fact that I made.  And this is

22    part of what I need to wrestle with.

23        So I genuinely don't know how the sentencing

24    issue is going to come out.  I don't know how the stay

25    issue is going to come out.  But as I say, you should be,

1    you know, prepared to proceed promptly.  It's not you,

2    Assistant United States Attorney Herbert; it's you, the

3    United States of America.  Okay?

4             MR. HERBERT:    Yes, your Honor.

5             MR. WEINBERG:  We would just ask your Honor one

6    last thing, that if your Honor is going to deny the

7    government's motion for a stay, hypothetically, but give

8    the government time, whether it's two days or if Mr.

9    Herbert needs more than two days, we would ask during

10   that interim or even ask starting today or tomorrow that

11   Mr. Ferrara be permitted to be under house detention and

12   --

13            THE COURT:  This keeps coming up.  I cancelled

14   everything I have for the rest of this week in the hope

15   that I could finish this this week.  I now wonder.  But

16   it's 5:25.  We've been going since ten this morning.  I

17   can't -- I'm not willing to conduct a bail hearing.  If

18   this comes out in a posture where you want to move for

19   bail pending something, you'll do it, and I'll focus on

20   it.

21            MR. WEINBERG:  Thank you, your Honor.

22            THE COURT:  Mr. Herbert, has the government

23   found any cases relating to the stay beyond those that

24   you cited to me?

25            MR. HERBERT:  No, your Honor.

181

1        THE COURT:  All right.  So now the record is

2   complete except that Mr. Ferrara is going to file

3   tomorrow his summary of the telephone calls to facilitate

4   my listening to that six hours, right?

5        MR. WEINBERG:  Yes, your Honor.

6        MR. HERBERT:  Well, and, your Honor, we had a

7   matter earlier about a proffer of (sic) testimony as

8   well.

9        THE COURT:  Why don't you make that -- you said

10  it was going to be brief, is that right?

11       MR. HERBERT:  Yes, your Honor.

12       THE COURT:  You were going to tell me orally.

13       MR. HERBERT:  Yes, your Honor.

14       THE COURT:  Why don't you just file it in

15  writing tomorrow.  Is it derived from the public record?

16       MR. HERBERT:  Yes, your Honor, I would say from

17  their public testimony.  I mean, if we could have two

18  days  --

19       THE COURT:  No, tomorrow.

20       MR. HERBERT:  That's fine.

21       THE COURT:  Tomorrow.  I'm working on this.

22       MR. HERBERT:  I understand, your Honor.

23       THE COURT:  I'm not sentencing Mr. Simone and

24  Mr. Gioacchini tomorrow, so I don't get to raise why

25  they're getting acceptance of responsibility, and it

182

1    can't be considered for Mr. Ferrara, and I'm not getting

2    to raise why the government agreed that in their case I

3    can't consider relevant conduct because it would be a

4    violation of their plea agreement.

5         Four PM tomorrow, those two filings need to be

6    made, and that's it.  I have to have a record that's

7    complete to address, and that will complete the record of

8    this matter before this court unless I order you to do

9    something else.  Okay?

10        Court is in recess.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


I, JUDITH A. TWOMEY, RPR, Official Court
Reporter for the United States District Court, District
of Massachusetts, do hereby certify that the foregoing
transcript, pages 1 through 182 inclusive, was taken by
me stenographically and thereafter by me reduced to
transcription and is a true record of the proceedings in
the above-entitled matter to the best of my ability.


                         JUDITH A. TWOMEY, RPR
                         Official Court Reporter