EXHIBIT C
PP 1 - 25

Source: Legal > Cases - U.S. > Federal & State Cases, Combined 🗔
Terms: ferrara (Edit Search | Suggest Terms for My Search)

✒Select for FOCUS™ or Delivery
☐

*2005 U.S. Dist. LEXIS 16466, \**

VINCENT **FERRARA** v. UNITED STATES OF AMERICA

Civ. No. 00-11693-MLW

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2005 U.S. Dist. LEXIS 16466

**April** 12, 2005, Decided

**SUBSEQUENT HISTORY:** Post-conviction relief granted at **Ferrara** v. United States, 372 F. Supp. 2d 108, 2005 U.S. Dist. LEXIS 12930 (D. Mass., 2005)

**PRIOR HISTORY:** United States v. Patriarca, 912 F. Supp. 596, 1995 U.S. Dist. LEXIS 20598 (D. Mass., 1995)

### CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner inmate filed a motion under 28 U.S.C.S. § 2255 to vacate, set aside, or correct his sentence of 22 years in prison following his pleading guilty to violating 18 U.S.C.S. § 1952B(b)(1), (2).

**OVERVIEW:** The inmate, along with his co-defendants, pleaded guilty to conspiring to assault and beat the victim to death with the intent to murder him for the purpose of maintaining and increasing their positions in an organized crime family. Many years after he was convicted and sentenced, the inmate sought relief under 28 U.S.C.S. § 2255, contending that his due process rights were violated because the government failed to disclose that its witness, the only source of direct evidence on the charges, had told the government at least twice that a co-defendant told him that the inmate had not ordered the victim's murder and that he and the co-defendant had to flee the area because the inmate was going to kill them for murdering the victim without his permission. The court held that the government's failure to disclose the important exculpatory information violated his due process rights. If the required disclosures had been made, there was a reasonable probability that the inmate would not have pleaded guilty to the murder charges, would not have been convicted of them or of any other racketeering act involving murder, and would not have been held responsible for any murders at sentencing.

**OUTCOME:** The inmate's motion to vacate, set aside, or correct his 22-year sentence was granted. His sentence was vacated, and he was ordered to be resentenced pursuant to Booker.

**CORE TERMS:** murder, sentence, guideline, guilty plea, memorandum, prison, reasonable probability, sentencing, guilt, recantation, exculpatory, plea agreement, misconduct, pled guilty, intelligent, ceremony, plead guilty, kill, deprived, electronic surveillance, roving, resentencing, exculpatory evidence, downward, convicted, intelligently, permission, codefendant, disclose, credibility

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Criminal Law & Procedure > Guilty Pleas > Appeals

*HN1* A guilty plea generally extinguishes a defendant's right to collaterally attack independent claims of constitutional violations that do not relate to actual guilt. A guilty plea does not deprive a defendant of his right to relief where he demonstrates that misrepresentation or other impermissible conduct by the government deprived him of his ability to decide intelligently whether to plead guilty. More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Habeas Corpus > Cognizable Issues

*HN2* As many Circuit Courts have recognized, in Brady v. United States, the United States Supreme Court has authorized collateral relief for cases in which there is proven government misconduct that creates a reasonable probability that an innocent individual, advised by competent counsel, has falsely pled guilty to avert the risk of a wrongful conviction and a much longer sentence. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials

*HN3* U.S. Dist. Ct., D. Md., R. 42(a)(5) (1986), 116.1(a)(5) (1990) required that the government produce automatically, within 14 days of arraignment, all exculpatory evidence within the meaning of Giles v. Maryland and Brady v. Maryland. In 1963, Brady v. Maryland clearly established that the government has a duty to disclose to a defendant exculpatory evidence that is material to guilt or punishment. More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials

*HN4* See U.S. Dist. Ct., D. Md., R. 116.1(C).

Criminal Law & Procedure > Discovery & Inspection > Brady Materials

*HN5* U.S. Dist. Ct., D. Md., R. 42(c), (1986), 116.1(C) (1990) requires the government to supplement its disclosures if, among other things, it obtained after its initial disclosures material information tending to negate guilt. More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Habeas Corpus > Cognizable Issues
Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence

*HN6* The United States Supreme Court in Brady v. United States has made clear that impermissible conduct by the government can: undermine the reliability of a guilty plea; result in the acceptance of a guilty plea from a defendant who might actually be innocent; and therefore subject that plea to being vacated in a 28 U.S.C.S. § 2255 proceeding. More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials

*HN7* In 1963, the United States Supreme Court held in Brady v. Maryland, that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. It was also then clearly established that suppressed evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Appeals

*HN8* The United States Supreme Court has held that a reasonable probability of a different result includes going to trial rather than pleading guilty. More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Voluntariness

Criminal Law & Procedure > Habeas Corpus > Cognizable Issues

**HN9** It was clearly established by the United States Supreme Court's 1970 decisions in Brady v. United States and its progeny that misrepresentations or other misconduct by the government could render a guilty plea not "intelligent" and, therefore, provide a basis for granting a petitioner relief in a habeas corpus proceeding. More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Habeas Corpus > Cognizable Issues

**HN10** Tollett bars a petitioner from litigating in a habeas proceeding most independent claims of constitutional violations that occurred prior to the entry of his guilty plea. It does not alter the holding of Brady v. United States that a petitioner may on collateral review seek relief for the suppression of material evidence negating his guilt, suppression which deprived him of the ability to decide intelligently whether to plead guilty and deprived the court of the capacity to evaluate the truthfulness of his plea. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Retroactivity of Decisions

**HN11** In Teague, the United States Supreme Court has decided that a new constitutional rule of criminal procedure will not be announced in a case involving collateral review unless that new rule would be applied retroactively. Courts must determine, as a threshold matter, whether granting a petitioner the relief he seeks would create a new rule. However, the Teague rule is not jurisdictional. Rather, it may be waived if it is not properly raised. More Like This Headnote | *Shepardize*: Restrict By Headnote

Criminal Law & Procedure > Habeas Corpus > Retroactivity of Decisions

**HN12** When the 1989 decision in Teague preceded the filing of the habeas petition and the government should have been aware of the purported defense, the appropriate time for arguing that Teague barred consideration of the petitioner's claim is in the answer to the habeas petition. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Retroactivity of Decisions

**HN13** In deciding whether Teague bars a habeas petitioner's claim, the court must focus on the law as it existed when his conviction became final. In general, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. A case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. A result may be "dictated by precedent" even if there is no case precisely on point. More Like This Headnote | *Shepardize*: Restrict By Headnote

Criminal Law & Procedure > Habeas Corpus > Retroactivity of Decisions

**HN14** Stringer v. Black is important in indicating that there need not be a case directly on point to prevent a court from concluding that there is a new rule. The application of a rule to a different circumstance does not create a new rule where the application is a logical and foreseeable extension of the law. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Retroactivity of Decisions

**HN15** Rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule. If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then courts can tolerate a number of specific applications without saying that those applications themselves create a new rule. Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent. More Like This Headnote

Criminal Law & Procedure > Counsel > Effective Assistance > Tests
Criminal Law & Procedure > Discovery & Inspection > Brady Materials

**HN16** Since at least 1984, the United States Supreme Court has treated the "materiality" requirement for Brady v. Maryland claims and the "prejudice" requirement for ineffective assistance of counsel claims as synonymous. To establish "materiality" or "prejudice," a petitioner must prove a reasonable probability that the result of the proceeding would have been different. The Court has held in 1985 that a "different result" includes a reasonable probability that a defendant would not have pleaded guilty and would have insisted on going to trial.  More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Guilty Pleas > Voluntariness

**HN17** The United States Supreme Court has written that waivers of constitutional rights including the right to a trial, not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. The Court has identified as a relevant circumstance the ability to make an intelligent assessment of the relative advantages of pleading guilty. The Court has also recognized that often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted.  More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Guilty Pleas > Voluntariness

**HN18** A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Guilty Pleas > Voluntariness

**HN19** The United States Supreme Court does not intend the general rule of Brady v. United States to apply to cases in which the intelligent character of a guilty plea is undermined by material misrepresentations or other prejudicial misconduct by the government, particularly where the petitioner asserts his actual innocence.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement

**HN20** Where the government withholds material information that negates guilt, even competent counsel cannot adequately advise a defendant and the court cannot properly conclude that there is nothing to question the accuracy and reliability of the defendant's admissions. Thus, there was a compelling reason for the United States Supreme Court to have expressly excepted from the general rule of Brady v. United States in cases that involve misrepresentation or other government misconduct that undermines the ability of a defendant to plead guilty "intelligently" and the ability of the court to evaluate the truthfulness of his plea.  More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Appeals

Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement

HN21 ⋆ When the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.  More Like This Headnote

Criminal Law & Procedure > Grand Juries > Procedures > Impaneling
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Habeas Corpus > Cognizable Issues

HN22 ⋆ In Tollett, the United States Supreme Court has held that a defendant who had pled guilty is not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected. Rather, the Court has explained, the focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity. The Court has construed Brady v. United States and McMann as holding that when a defendant pleads guilty he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Guilty Pleas > Voluntariness
Criminal Law & Procedure > Habeas Corpus > Cognizable Issues

HN23 ⋆ The United States Supreme Court has reiterated that the bar to litigation of constitutional claims in habeas proceedings imposed by Brady v. United States and Tollett applies only when those claims do not raise questions of whether the defendant actually committed the offense or whether his guilty plea was truly knowing and intelligent. The point of Brady v. United States and Tollett is that a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case. In most cases, factual guilt is a sufficient basis for the State's imposition of punishment. A guilty plea, therefore, simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Appeals
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Guilty Pleas > Voluntariness

HN24 ⋆ It is well established that a person accused of a crime has a due process right to require the prosecution to turn over to him any material exculpatory evidence in its possession. In the absence of special circumstances, the validity of a plea of guilty is determined by reference to whether it was intelligent and voluntary. As a general matter, a plea is deemed "intelligent" if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way; it is deemed "voluntary" if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally. The Brady v. United States Court has made clear,

however, that this test suffices only in the absence of misrepresentation or other impermissible conduct by state agents. Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, and of information that may be available to cast doubt on the fact or degree of his culpability, even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution. More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
HN25 A guilty plea should not be deemed truly "knowing" or "intelligent" if the government has withheld material exculpatory information not known to the defendant and his counsel. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Retroactivity of Decisions
HN26 Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. More Like This Headnote | Shepardize: Restrict By Headnote

Criminal Law & Procedure > Habeas Corpus > Cognizable Issues
HN27 Habeas corpus has always been a collateral remedy. It is not designed as a substitute for direct review. More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Appeals
HN28 In Ruiz the United States Supreme Court has held on a direct appeal of a defendant's sentence that the constitution does not prohibit the government from requiring a defendant to waive his right to impeachment information in return for a "fast-track" plea agreement that will result in a lower sentence. More Like This Headnote

Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
Criminal Law & Procedure > Guilty Pleas > Voluntariness
HN29 The United States Constitution insists, among other things, that the defendant enter a guilty plea that is voluntary and that the defendant must make related waivers knowingly, intelligently, and with sufficient awareness of the relevant circumstances and likely consequences. Impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary (knowing, intelligent, and sufficiently aware.) More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement
HN30 Ruiz reemphasizes the importance of guilty pleas being entered intelligently. It does not alter the United States Supreme Court's ruling in Brady v. United States that misrepresentations or other impermissible conduct by the government can undermine the intelligence of a plea. Nor does it erode the reasoning of Miller that the improper failure of the government to disclose material information tending to negate guilt actually renders unintelligent and invalid a guilty plea. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Standards of Review
HN31 Teague teaches that, apart from the United States Supreme Court, federal habeas courts ought not act as innovators in the field of criminal procedure, thereby upsetting convictions because courts were not prescient and thus failed to comply with federal law that did not exist at the time they ruled. More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
Criminal Law & Procedure > Guilty Pleas > Voluntariness
HN32 If a defendant may not raise a Brady claim after a guilty plea, prosecutors may be

tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas. A defendant challenging the voluntariness of a guilty plea may assert a Brady claim.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials 🗎
Criminal Law & Procedure > Guilty Pleas > Voluntariness 🗎
Criminal Law & Procedure > Habeas Corpus > Standards of Review 🗎
HN33⬇ A petitioner can satisfy his burden by proving that there is a reasonable probability that but for the withholding of the information he would not have entered the guilty plea but would have insisted on going to a full trial.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials 🗎
HN34⬇ The question is not whether the defendant would more likely than not have received a different result with the evidence, but whether in its absence he received a result worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome. The United States Court of Appeals for the First Circuit has regularly reiterated and applied this definition of "reasonable probability."  More Like This Headnote

Criminal Law & Procedure > Counsel > Effective Assistance > Tests 🗎
Criminal Law & Procedure > Discovery & Inspection > Brady Materials 🗎
Criminal Law & Procedure > Habeas Corpus > Standards of Review 🗎
HN35⬇ The test of whether there is a reasonable probability that the defendant would have gone to trial if the prosecution had not withheld the exculpatory evidence is an objective one, depending largely on the likely persuasiveness of the withheld information. It does not involve an "individualized inquiry" regarding the impact on a particular attorney or defendant. Rather, given the nature of the question and the clear direction in Hill and Strickland that the likely outcome of a trial should be assessed objectively, without regard for the idiosyncracies of the particular decisionmaker, the habeas courts should make an objective evaluation of the likely impact that the withheld information would have had.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials 🗎
Criminal Law & Procedure > Habeas Corpus > Standards of Review 🗎
HN36⬇ A court's inquiry must focus on whether, but for the improper suppression of evidence by the government, there is a reasonable probability that the outcome of the proceeding would have been different. That reasonable probability is demonstrated when the suppression of exculpatory evidence undermines confidence in the outcome.  More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy 🗎
HN37⬇ A conspiracy is an agreement to commit a crime. The government must prove that the coconspirators shared a general understanding about the crime.  More Like This Headnote

Criminal Law & Procedure > Accessories > Aiding & Abetting 🗎
Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution 🗎
HN38⬇ Similarly, to aid and abet means intentionally to help someone else commit a crime. This means that the government must prove beyond a reasonable doubt that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials 🗎
Criminal Law & Procedure > Witnesses > Impeachment 🗎
HN39⬇ Impeachment evidence, as well as exculpatory evidence, falls within the Brady rule.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
*HN40* A defendant has a constitutional right to receive Brady information sufficiently before trial to use it effectively.  More Like This Headnote

Governments > Legislation > Interpretation
*HN41* It is axiomatic that a statute is trumped by a constitutional right.  More Like This Headnote

Criminal Law & Procedure > Discovery & Inspection > Brady Materials
*HN42* The government must under Brady v. Maryland disclose material exculpatory evidence that would be admissible at trial or that may itself be inadmissible but is so promising a lead to strong exculpatory evidence that there could have been no justification for withholding it.  More Like This Headnote

Evidence > Hearsay Rule & Exceptions > Spontaneous Statements
*HN43* Hearsay statements are admissible as excited utterances if there was: (1) a startling event; (2) a statement made while the declarant was subject to the influence of that event; and (3) a relation between the statement and the event.  More Like This Headnote

Criminal Law & Procedure > Witnesses > Credibility
*HN44* It is well-known that the testimony of cooperating witnesses is inherently suspect and often not credited by juries because the witnesses are criminals with obvious incentives to lie to help themselves.  More Like This Headnote

Criminal Law & Procedure > Jury Instructions > Cautionary Instructions
Criminal Law & Procedure > Witnesses > Credibility
*HN45* Juries in the United States Court of Appeals for the First Circuit are regularly instructed to consider the testimony of cooperating witnesses "with particular caution." Experience has shown that when a cooperating witness alters his version of events or suffers a lapse of memory, it is very difficult, if not impossible, to obtain a conviction in the absence of strong, corroborating evidence.  More Like This Headnote

Criminal Law & Procedure > Sentencing > Imposition > Factors
*HN46* 18 U.S.C.S. § 3553(a) directs a court to impose a sentence sufficient, but not greater than necessary to comply with specified purposes. Those purposes include: protecting the public from further crimes by the defendant; deterring crimes by him and others; and providing punishment that reflects the seriousness of the offense, provides just punishment for it, and promotes respect for the law. § 3553(a)(2).  More Like This Headnote

Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence
*HN47* See 28 U.S.C.S. § 2255.

Criminal Law & Procedure > Habeas Corpus > Standards of Review
Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence
*HN48* With regard to 28 U.S.C.S. § 2255, the United States Court of Appeals for the First Circuit has emphasized the broad leeway traditionally afforded district courts in the exercise of their § 2255 authority. The § 2255 remedy is broad and flexible, and entrusts to the courts the power to fashion an appropriate remedy. This is so because a district court's power under § 2255 is derived from the equitable nature of habeas corpus relief.  More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Standards of Review
Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence
*HN49* While the court's discretion to devise an equitable remedy is considerable, it is not

unfettered. Rather, the remedy should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. When part of a sentence is set aside as illegal, the package is "unbundled." After the unbundling the district court is free to put together a new package reflecting its considered judgment as to the punishment the defendant deserves for the crimes of which he is still convicted. More Like This Headnote

Criminal Law & Procedure > Counsel > Effective Assistance > Pleas 🔖
Criminal Law & Procedure > Habeas Corpus > Standards of Review 🔖
Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence 🔖

HN50🔖 Where counsel has been ineffective in failing to recommend that the defendant accept a favorable plea agreement, and a retrial would be both impractical and inequitable because of the length of the sentence already served, it has been deemed proper to maintain the conviction and reduce the sentence. More Like This Headnote

Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence 🔖
Criminal Law & Procedure > Sentencing > Imposition > Factors 🔖
Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally 🔖

HN51🔖 A defendant whose sole claim for relief under 28 U.S.C.S. § 2255 is that his constitutional rights were violated when his sentence was enhanced by facts found by a judge at sentencing may have his claim foreclosed by Teague. However, if the court determines that the petitioner is entitled to resentencing, it will be on the basis of a perceived violation of the petitioner's constitutional due process rights, such violation relating to the government's alleged failure to disclose exculpatory information to him. In the event that the court finds that there was an independent constitutional violation that warrants § 2255 relief in the form of resentencing, it seems clear that the court cannot apply the federal sentencing guidelines in a manner that has now been determined to be unconstitutional. Rather, as the second portion of Booker instructs, the guidelines would be advisory. More Like This Headnote

Criminal Law & Procedure > Sentencing > Imposition > Factors 🔖
Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally 🔖

HN52🔖 The United States Supreme Court's decision in Booker makes the federal sentencing guidelines effectively advisory. It requires a sentencing court to consider guidelines ranges, 18 U.S.C.S. § 3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well. More Like This Headnote

Criminal Law & Procedure > Sentencing > Imposition > Factors 🔖
Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally 🔖

HN53🔖 In the wake of Booker, the discretion of a sentencing court is no longer bound by the range prescribed by the federal sentencing guidelines. Nevertheless, a sentencing court is still required to consult the guidelines and take them into account when sentencing. Consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in 18 U.S.C.S. § 3553(a) before imposing the sentence. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so. More Like This Headnote

Criminal Law & Procedure > Sentencing > Imposition > Factors 🔖

HN54🔖 See 18 U.S.C.S. § 3553(a)(1), (2).

**COUNSEL:** [*1] For Vincent M. **Ferrara**, Plaintiff: David Z. Chesnoff, Goodman & Chesnoff, Las Vegas, NV; David A. Nickerson, San Rafael, CA; Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA; Robert M. Goldstein, Boston, MA.

For USA, Defendant: James D. Herbert, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA; James F. Lang, United States Attorney's Office, Boston, MA; Robert E. Richardson, United States Attorney's Office, Boston, MA.

For Globe Newspaper Company, Interested Party: Jonathan M. Albano, Bingham McCutchen LLP, Boston, MA.

**JUDGES:** MARK L. WOLF, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** MARK L. WOLF

**OPINION:** MEMORANDUM AND ORDER

WOLF, D.J.

| | | |
|---|---|---|
| I. | SUMMARY | 1 |
| II. | FACTS | 8 |
| III. | ANALYSIS | 47 |
| A. | Summary of Analysis | 47 |
| B. | **Ferrara** Has Stated A Claim On Which Relief May Be Granted And That Claim Is Not Barred By The Teague v. Lane Doctrine | 52 |
| C. | The Reasonable Probability Standard Applies | 77 |
| D. | **Ferrara** Was Denied Due Process And Is Entitled To Relief | 80 |
| E. | Remedy | 104 |
| IV. | CONCLUSION | 120 |
| V. | ORDER | 123 |

I. SUMMARY

This is the latest -- and hopefully the last -- in a series of related **[\*2]** cases that have demonstrated extraordinary misconduct by the Department of Justice in its investigation and prosecution of members of the Patriarca Family of La Cosa Nostra (the "LCN"). See, e.g., United States v. Salemme, 91 F. Supp.2d 141 (D. Mass. 1999); United States v. Flemmi, 195 F. Supp. 2d 243 (D. Mass. 2001); United States v. Connolly, 341 F.3d 16 (1st Cir. 2003). In this case, petitioner Vincent **Ferrara** has proven that he was denied Due Process when the government, led by Assistant United States Attorney Jeffrey Auerhahn, violated its clearly established constitutional duty to disclose to him, before trial, important exculpatory information that directly negated his guilt on charges that he had directed his codefendant Pasquale Barone to murder Vincent James Limoli.

More specifically, the government did not disclose that Walter Jordan, the only source of direct evidence on those charges, had told the government at least twice that Barone told him that **Ferrara** had not ordered the Limoli murder, and that Barone and Jordan had to flee Boston because **Ferrara** was going to kill them for murdering Limoli without his permission. **[\*3]** Jordan provided this information to Auerhahn's colleague, Boston Police Detective Martin Coleman, and then repeated it for Coleman and Auerhahn. Jordan's statements were memorialized in a contemporaneous memorandum, handwritten by Coleman, which was given to Auerhahn but not produced to **Ferrara** and his codefendants in connection with their trials and sentencings in 1992, 1993, 1994 and 1995. Rather, the memorandum, and the information it contained, were disclosed for the first time during the evidentiary hearings concerning **Ferrara** and Barone's petitions for habeas corpus that were conducted in September 2003.

In the context of this case, the information that the government improperly withheld was highly material. The government was very interested in proving that Limoli was killed as part of **Ferrara's** racketeering activity on behalf of the Patriarca Family. **Ferrara** was about 40 years old when he was indicted in 1989. If he was convicted of the Limoli murder charges, or held responsible for them as relevant conduct at sentencing, the Guideline range for his sentence would be raised from possibly as little as 151 months to life in prison. In addition, if the Limoli murder could be **[*4]** proved to be an LCN "hit," it had the potential to raise the sentence for the Boss of the Family, **Ferrara's** codefendant Raymond J. Patriarca, from about seven years to life in prison.

In its Trial Brief, the government informed **Ferrara,** Patriarca, Barone, and their codefendants that Jordan would testify that **Ferrara** had directed Barone to murder Limoli. Jordan testified to that effect at Barone's trial. Based almost exclusively on Jordan's testimony, in October 1993, Barone was convicted of conspiring with **Ferrara** to kill Limoli. Barone was sentenced to life in prison for that crime.

In January 1992, after the commencement of their trial, **Ferrara** and his codefendants, except for Patriarca and Barone, entered into linked, binding plea agreements. The plea agreements provided important benefits to the government, including eliminating the need for a lengthy trial, assuring the defendants' convictions, providing long sentences for them, and preserving the confidentiality of fearful witnesses. See <u>United States v. Carrozza, 807 F. Supp. 156, 161 (D. Mass. 1992).</u> In return, the defendants were to be given what were deemed to be significant downward departures. For example, **[*5]** Joseph Russo, the Consigliere of the Patriarca Family who accepted responsibility for murdering Joseph Barboza, was provided a downward departure from life to sixteen years in prison.

**Ferrara** pled guilty to the Limoli murder charges, among others. These charges raised the Guideline range for his sentence to life in prison. His plea agreement provided for a substantial downward departure to a twenty-two year sentence. However, shortly after pleading guilty, **Ferrara** informed the Probation Department that he had not been involved in the Limoli murder, but pled guilty to those charges because he was in an "untenable" position. The court now understands that **Ferrara's** position was "untenable" because he felt compelled to plead guilty to the Limoli murder charges or face a real risk of what he adamantly asserts would have been a wrongful conviction resulting in a life sentence. The court did not address this issue at **Ferrara's** sentencing. In accepting the linked, binding plea agreements, the court sentenced **Ferrara** to serve twenty-two years in prison after finding that sentence was a well-justified and reasonable downward departure.

The discovery in 2003 that the government had withheld **[*6]** Jordan's repeated statements that Barone had asserted that **Ferrara** had not ordered the Limoli murder, and the related ruling that Barone had therefore been denied Due Process, led to Barone's prompt release from prison, pursuant to an agreement with the government. The government has argued, however, that **Ferrara's** guilty plea deprives him of any right to relief for the same serious misconduct the court has found in his case. This contention is incorrect.

*HN1* A guilty plea generally extinguishes a defendant's right to collaterally attack independent claims of constitutional violations that do not relate to actual guilt. See e.g., <u>Tollett v. Henderson, 411 U.S. 258, 266, 36 L. Ed. 2d 235, 93 S. Ct. 1602 (1973).</u> A guilty plea does not deprive a defendant of his right to relief where, as here, he demonstrates that misrepresentation or other impermissible conduct by the government deprived him of his ability to decide intelligently whether to plead guilty. See <u>Brady v. United States, 397 U.S. 742, 757, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970).</u>

*HN2* As many Circuits have recognized, in <u>Brady v. United States, 397 U.S. at 757-58,</u> the Supreme Court authorized collateral relief for cases in which there is proven **[*7]** government misconduct that creates a reasonable probability that an innocent individual, advised by competent counsel, has falsely pled guilty to avert the risk of a wrongful conviction and a much longer sentence. This is such a case.

The government's failure to disclose Jordan's statements that **Ferrara** had not ordered the Limoli murder utterly undermines the court's confidence in the outcome of **Ferrara's** case. The court now seriously doubts that **Ferrara** ordered Barone to kill Limoli. In any event, if the required disclosures concerning Jordan's statements had been made, there is a reasonable probability that **Ferrara** would not have pled guilty to the Limoli murder charges, would not have been convicted of them or of any other racketeering act involving murder, and would not have been held responsible for any murders at sentencing. n1 In view of the compelling reasons for the linked, binding plea agreements providing for downward departures for **Ferrara** and his codefendants, there is also a reasonable probability that the government and **Ferrara** would have resolved his case by agreeing to a sentence of much less than twenty-two years if the required disclosures concerning Jordan had **[*8]** been made. Therefore, **Ferrara** is entitled to appropriate, equitable relief.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 As RICO racketeering acts, but not as separate substantive crimes, **Ferrara** was also accused of participating in the 1977 murder of Giacomo DiFronzo and the 1979 murder of Anthony Corlito. **Ferrara** did not plead guilty to committing either of these crimes. The government's evidence concerning them was sparse and weak. Its case against **Ferrara** on these murder charges depended heavily on Jordan's credibility. If it had been disclosed that Jordan had claimed to have committed perjury in testifying to the grand jury that Barone had said **Ferrara** ordered the Limoli murder, Jordan's already limited credibility would have been destroyed. Therefore, there is a reasonable probability that **Ferrara** would not have been convicted of the racketeering acts relating to the DiFronzo and Corlito murders or held responsible for them at sentencing. Accordingly, those crimes cannot be relied upon to calculate the advisory Guideline range for **Ferrara's** sentence and, more specifically, to raise it to life in prison.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*9]**

This conclusion is not altered by the fact that collateral relief cannot be granted in a case announcing a new constitutional rule. See Teague v. Lane, 489 U.S. 288, 299-300, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989). **Ferrara's** right to relief is based on rules rooted in Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and Brady v. United States, supra, which were long and clearly established in 1992, when **Ferrara's** conviction became final.

As the parties agree, a retrial is not now feasible. Rather, **Ferrara** must be resentenced. As the parties also agree, the resentencing is governed by the law that now exists after United States v. Booker, 160 L. Ed. 2d 621, 125 S.Ct. 738 (2005), which rendered the Guidelines advisory. The court finds that the evidence is insufficient to hold **Ferrara** responsible for the Limoli murder, or any other murder, in calculating the advisory Guideline range for his sentence.

**Ferrara** contends that, absent the murder charges, the Guideline range for his sentence is 151-188 months. The government argues that, without the murders, the Guidelines suggest a sentence of 210-262 months. In view of the reasons for the substantial downward departures agreed **[*10]** to and granted in 1992 for **Ferrara** and the defendants on trial with him, it seems clear that, at most, a sentence at the low-end of the range as calculated by the government would now be appropriate.

**Ferrara** has earned all available "good time" credits, which entitle him to a 15% reduction in his sentence. If he had been sentenced to 188 months in prison, he would have been released in July 2003. If he had been sentenced to 210 months in prison, he would have been released in February 2005. In either case, **Ferrara** has evidently now served extra time in prison because of the government's unconstitutional conduct. Therefore, **Ferrara** will be resentenced

promptly.

## II. FACTS

The following facts have been proven, pursuant to the Federal Rules of Evidence, by a preponderance of the evidence.

On March 22, 1990, **Ferrara** was indicted on racketeering and related charges with six other alleged members and an alleged associate of the Patriarca Family of La Cosa Nostra. More specifically, **Ferrara**, Raymond J. Patriarca, Joseph Russo, Robert Carrozza, Dennis Lepore, Carmen Tortora, Pasquale Barone, and Angelo Mercurio, who was, significantly, a fugitive, were charged with violating the RICO **[*11]** statute, 18 U.S.C. § 1961 et seq., by conspiring to participate in the affairs of a racketeering enterprise, and doing so, through a pattern of racketeering acts that included murder, extortion, and other crimes, some of which were also charged as separate substantive offenses.

**Ferrara** was charged in thirty-five counts. The RICO violations were alleged in Counts 1 and 2. Racketeering Act A-3 alleged that in 1985, "Vincent M. **Ferrara** and Pasquale Barone did wilfully and unlawfully conspire together with each other and with others known and unknown to the Grand Jury to assault and beat Vincent James Limoli, Jr. a/k/a "Jimmy," with intent to murder him. . . ." Count 3 charged **Ferrara** with conspiring with Barone to murder Limoli for the purpose of maintaining and increasing their positions in the Patriarca Family. Count 4 charged **Ferrara** with aiding and abetting the murder of Limoli in order to maintain and increase his position in the Patriarca Family.

Proving the Limoli murder charges was very important to the government. If **Ferrara,** who was about forty years old when he was indicted, was not held responsible for a murder, the Guideline range for his sentence **[*12]** might have been as little as 151 to 188 months. n2 However, if convicted of the charges relating to the Limoli murder, or another murder, the Guideline range for **Ferrara's** sentence would be raised to life in prison.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The issues relating to the calculation of the possible Guideline ranges for **Ferrara's** sentence are discussed in § III.D infra.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In addition, the government wanted to obtain a lengthy sentence for Patriarca, the Boss of the Family. The Guidelines prescribed a sentence of about seven years for his own charged criminal activity. See United States v. Patriarca, 807 F. Supp. 165, 178 (D. Mass. 1992), rev. sub nom. United States v. Carrozza, 4 F.3d 70, 72-84 (1st Cir. 1993), cert. denied, United States v. Patriarca, 511 U.S. 1069, 128 L. Ed. 2d 365, 114 S. Ct. 1644 (1994); United States v. Patriarca, 912 F. Supp. 596, 599-600 (D. Mass. 1995). However, if the Limoli murder could be proved at sentencing as a racketeering act committed on behalf of the Family, in furtherance **[*13]** of Patriarca's jointly undertaken activity and reasonably foreseeable to him, the government believed that the Guidelines would require that he receive either a thirty-year sentence or a sixty-five year sentence. See Patriarca, 807 F. Supp. at 178; Patriarca, 912 F. Supp. at 602.

**Ferrara** was also charged with Racketeering Acts involving the murder of Giacomo DiFronzo in 1977 (R.A. A-1), and the murder of Anthony Corlito in 1979 (R.A. A-2). **Ferrara** was not charged in a separate count with substantive crimes concerning those murders. As described infra, the government's evidence concerning **Ferrara's** involvement in them was sparse and weak. Moreover, the government did not contend that the DiFronzo or Corlito murders were relevant conduct for which Patriarca should be held responsible. See Patriarca, 807 F. Supp. at 185-86; Patriarca, 912 F. Supp. at 600. Therefore, proving that **Ferrara** conspired with

Barone to murder Limoli on behalf of the Patriarca Family was especially important to the government's goal of incapacitating **Ferrara** and Patriarca for life. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 In addition, the government attempted in another case to use the Limoli homicide to obtain the pretrial detention of Anthony "Spucky" Spagnolo, who was also a member of the Patriarca Family. This effort was unsuccessful because, the evidence showed, the government was wrong in asserting that Spagnolo participated in killing Limoli. See United States v. DiGiacomo, 746 F. Supp. 1176, 1189 (D. Mass. 1990); Patriarca, 912 F. Supp. at 623.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*14]**

The Limoli murder, however, was not central to the extensive pretrial litigation in **Ferrara's** case. While many issues were presented, the most consuming related to the defendants' motion to suppress the electronic surveillance evidence of an LCN induction ceremony conducted on October 29, 1987, at 34 Guild Street, Medford, Massachusetts. The defendants claimed that the "roving" intercept provision of the statute ("Title III") authorizing the electronic surveillance, 18 U.S.C. § 2518(11) (a), was unconstitutional and, in any event, that the intercepted evidence should have been suppressed because the government deliberately presented materially misleading information to the judge who issued the warrant for the electronic surveillance. See United States v. **Ferrara**, 771 F. Supp. 1266, 1271 (D. Mass. 1991).

To obtain an order authorizing roving electronic surveillance, which could be used at various locations at which named targets were conversing, the government was required to make a "full and complete statement" to the judge that demonstrated that it was not practical to specify the place or places to be bugged. See 18 U.S.C. § 2518 (11) (a) (ii) **[*15]** ; **Ferrara**, 771 F. Supp. at 1307. This court held the roving intercept provisions were constitutional. See **Ferrara**, 771 F. Supp. at 1272, 1282-96.

The roving warrant that was obtained did not specify a particular place to be bugged because the government had represented that it was not practical to describe in advance the place at which **Ferrara** and other targets would be intercepted. Therefore, it was important for the motion to suppress that the defendants and the court know when the government had identified 34 Guild Street as the likely location of the LCN induction ceremony and, particularly, whether that location had been identified before the order authorizing the roving electronic surveillance had been issued on October 27, 1989. Id. at 1307.

The government did not initially inform the defendants and the court that it had identified the likely location of the ceremony, and therefore the place it intended to surveil electronically, before the roving order was issued. Id. at 1271, 1308. In a memorandum signed by the lead prosecutor, Jeffrey Auerhahn, on behalf of Assistant United States Attorneys **[*16]** Gregg Sullivan, James Herbert, and himself, the government argued that it was not required to apply for a standard, rather than roving, "Title III order if, after issuance of a roving order, but before its implementation, the government learns, less than twenty-four hours in advance of the meeting, the intended probable location." Id. at 1308 n. 16; Gov. Response to Defendants Patriarca's and **Ferrara's** Motions to Suppress All Evidence Derived from Oral Intercept Order in M.B.D. 89-1015 and to Dismiss Indictment (Docket No. 404). Only after inquiry by the court did the government reveal that it had actually learned that the induction ceremony would be held at 34 Guild Street two days in advance, on October 27, 1989, before the roving order had been issued in reliance upon the representation that it would be impractical to identify the place to be electronically surveilled. Id. at 1271, 1277-79, 1308.

Thus, the court wrote:

The government not only failed to inform Judge Nelson [who issued the order authorizing the roving electronic surveillance] of the information it had received regarding 34 Guild Street prior to his issuance of the Warrant, **[*17]** it also did not initially inform the defendants or this court that it had such information. The government's initial memorandum opposing the motion to suppress addressed the issue whether the court should have been furnished with information concerning 34 Guild Street acquired after the warrant issued, but did not disclose all of the relevant facts in this case. Although the government corrected and completed the record when invited by the court to file affidavits concerning when it first learned of 34 Guild Street as the possible location for the ceremony, the government's initial lack of candor was -- and remains -- disturbing to this court.

Id. at 1308 (emphasis in original) (citation omitted).

As discussed infra, as a result of lengthy hearings conducted in 1998, in Salemme, this court discovered that the government had not in 1991 completed or fully corrected the record in **Ferrara's** case. See Salemme, 91 F. Supp. 2d at 269-89. Rather, as this court wrote in 1999:

At all times prior to October 29, 1989, the FBI, personified by [Supervisory Special Agent James] Ring, knew that there would be at least one informant, Mercurio, at **[*18]** the ceremony. The FBI sought a warrant for a "roving" bug that could be used at multiple, unidentified locations, rather than authorization to conduct electronic surveillance at 34 Guild Street alone, in order to protect the identity of its sources. The FBI had no intention of using that warrant to intercept conversations more than once [as it had represented in its application]. Rather, at the time the application was drafted, the FBI intended to arrest the participants immediately after the ceremony. The FBI had substantial, corroborated "rock solid" information that the ceremony would be held at 34 Guild Street several hours before [the applicants] met with the judge to obtain the warrant authorizing roving surveillance based upon the representation that it was then "impractical" to identify the location to be bugged.

Id. at 270 (footnote omitted).

In addition, after the ceremony, the FBI alerted Mercurio to his forthcoming indictment so that he could flee, and did not attempt to apprehend him. Id. at 263-93. Permitting him to flee unlawfully rewarded Mercurio for his assistance to the government, and reduced the risk that it would be discovered that the government **[*19]** had improperly withheld information from the judge who issued the order authorizing the roving electronic surveillance. Id.

However, based on the incomplete information presented in **Ferrara's** case, the court did not suppress the electronic surveillance of the LCN induction ceremony. Rather, the court erroneously found that the government did not deliberately mislead the judge who issued the roving order. **Ferrara, 771 F. Supp. at 1274, 1306-11.** Moreover, the court concluded that an order authorizing interceptions at 34 Guild Street would have been issued if the judge had been fully informed. Id.

In 1991, Barone, who was an alleged "associate" of the Patriarca Family, was serving a state sentence for participating in the Limoli murder. Barone fled following that crime. This court

ordered the suppression of certain statements made after Barone was apprehended. See United States v. Barone, 968 F.2d 1378, 1379 (1st Cir. 1992). The government appealed that decision, which was affirmed in 1992. Id. However, the court severed the charges against Barone, and initially scheduled the trial of **Ferrara** and his other codefendants to begin in September [*20] 1991.

Walter Jordan, Barone's brother-in-law, was the crucial witness for the government with regard to the Limoli murder charges against Barone, **Ferrara** and, by implication, Patriarca. With regard to Racketeering Act A-3, the government was required to prove that **Ferrara** conspired with Barone to murder Limoli. With regard to Counts 3 and 4, the government was required to prove that the purpose of that conspiracy was to maintain or increase **Ferrara** and Barone's positions in the Patriarca Family. Jordan was the only witness who presented direct evidence that **Ferrara** conspired with Barone to murder Limoli.

Like Barone, Jordan had fled following the Limoli murder. When captured, Jordan agreed to cooperate with the government in exchange for immunity and protection. On July 27, 1988, Jordan testified to the grand jury that Limoli had been working under **Ferrara** in the LCN and had "gotten the X'" because he had stolen drugs and cash that belonged to another member of the LCN. See July 27, 1988 Transcript of Grand Jury Testimony of Walter Jordan, attached as Exhibit A to Petitioner's First Amended Motion Pursuant to 28 U.S.C. § 2255 to Vacate and Set Aside Sentence, [*21] at 11-12. Jordan also told the grand jury that **Ferrara** had "ordered, or told [Barone] that he had to clip [Limoli]." Id. at 16; see also id. at 15. Jordan stated that he helped arrange a purported drug deal with Limoli, after which Barone shot Limoli in the head. Id. at 17-33. Jordan informed the government that Barone had said that **Ferrara** ordered him to kill Limoli. As the court stated at Barone's trial, "Walter Jordan's credibility [was] essential" to proving that Barone killed Limoli at **Ferrara's** direction. United States v. Barone, 89-00289-MLW, Oct. 18, 1993 Tr. at 50-51 ("Barone Tr.    "). n4

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 Cited Transcripts from proceedings in United States v. **Ferrara**, Cr. No. 89-289-MLW, and from the proceedings concerning **Ferrara's** § 2255 petition are identified only by date.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Jordan was in the Witness Security Program. To prepare for the trial of **Ferrara** and his codefendants, Auerhahn, Sullivan, FBI Special Agent Michael Buckley, and Boston Police Detective Martin Coleman, who was [*22] serving as a member of the federal Organized Crime Task Force, met with Jordan in Salt Lake City, Utah, in July 1991. Coleman was the member of the prosecution team who was closest to Jordan.

On their last evening in Salt Lake City, Jordan told Coleman that Barone had not obtained **Ferrara's** permission to murder Limoli and had never said that **Ferrara** had ordered that Limoli be killed. Coleman knew that this recantation was very important.

When he returned to Boston, Coleman told Auerhahn about his conversation with Jordan. Auerhahn and Coleman then had a telephone conversation with Jordan, who reiterated what he had told Coleman in Salt Lake City.

Coleman told his partner, Boston Police Detective William Dickinson, what Jordan had said. Neither Coleman nor Auerhahn told Sullivan.

Coleman rarely wrote memoranda. However, he recognized that Jordan's recantation was extraordinary and important. Therefore, he promptly prepared a handwritten memorandum to the file, which was, on September 5, 2003, admitted as Exhibit 17 in the evidentiary hearings on **Ferrara** and Barone's petitions for habeas corpus. n5 The memorandum stated:

To: file

From DET. MARTIN E. COLEMAN

SUBJECT **[*23]** LIMOLI MURDER

ON WEDNESDAY, JULY 24, 1991 AT ABOUT 11:30 P.M. MT [Mountain Time], WHILE HAVING A CONVERSATION WITH TONY JORDAN, A GOVERNMENT WITNESS, MR. JORDAN STATED TO ME THAT PATTY'S n6 BARONE HAD FUCKED UP AND DID NOT GET PERMISSION TO KILL JIMMY LIMOLI.

ON THURSDAY, JULY 25, 1991, WE TRAVELED BACK TO BOSTON, AND I TOLD AUSA MR. AUERHAHN THAT I HAD TO SEE HIM ON FRIDAY ABOUT TONY JORDAN.

ON FRIDAY, JULY 26, 1991, I TALKED TO AUSA AUERHAHN AND TOLD HIM WHAT MR. JORDAN HAD SAID TO ME.

ON MONDAY, JULY 29, 1991 AT ABOUT 10:30 AM, MR. JORDAN RETURNED A CALL TO MR. AUERHAHN'S OFFICE, AND I ASK HIM TO REPEAT TO AUSA AUERHAHN WHAT HE HAD SAID TO ME ON JULY 24.

AT THIS TIME, MR. JORDAN STATED THAT HE KNEW THAT PATTSIE BARONE HAD NOT GOTTEN PERMISSION TO KILL JIMMY LIMOLI. HE FOUND THIS OUT AFTER JIMMY'S WAKE PATTY'S AND HE GOT INTO A CAR WITH VINNY **FERRARA** AND A JOE THE JEWELER.

VINNY SAID TO PATTY'S "WHO'S NEXT ME."

JORDAN FURTHER STATED THAT SOME TIME LATER THAT WEEK THAT PATTY'S GOT CALLED OVER TO FRANCHESCO'S n7 AND VINNY TOLD HIM HE WAS DEAD. AT THIS TIME PATTY'S RAN OUT OF FRANCHESCO'S A REST. ON N. WASH ST. AND OVER TO HIS APARTMENT WERE JORDAN **[*24]** WAS AND TOLD JORDAN THAT THEY HAD TO GET OUT OF TOWN BECAUSE VINNY WAS GOING TO KILL THEM. JORDAN THEN SAID WHY IS HE GOING TO KILL US AND PATTY'S SAID BECAUSE I DID NOT GET PERMISSION TO KILL JIMMY.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 Because Coleman did not recall everything that was said in the telephone conversation that occurred about twelve years before his testimony, the memorandum was admitted as past recollection recorded pursuant to Federal Rule of Evidence 803(5).

n6 Barone was generally known as "Patsy."

n7 Franchesca's was a restaurant in the North End of Boston, near Barone's home.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Coleman gave a copy of this memorandum to Auerhahn. Auerhahn recognized that Coleman's memorandum memorialized exculpatory information that was very damaging to the government's case. The prosecutor asked Coleman if he, Auerhahn, could "clean it up." September 24, 2003 Tr. at 19. Coleman thought that Auerhahn merely wanted to correct the

spelling and grammar, so he did not object. Id. at 25.

As a [*25] result of the telephone conversation, Auerhahn arranged another meeting with Jordan. That meeting was held in Minneapolis, Minnesota, in August 1991. Auerhahn did not bring Sullivan to the meeting. However, Buckley and Coleman were there.

As the meeting involved further trial preparation, Auerhahn knew that, pursuant to standard operating procedure, Buckley would not take any notes or prepare an FBI report, known as a "302." Auerhahn also correctly expected that Coleman would not take any notes or write a report.

It had been Auerhahn's consistent practice to take detailed notes when he was preparing a witness for trial. He departed from that standard practice and took no notes, other than possibly writing on his pre-existing trial outline, during the Minneapolis meeting. Auerhahn did not want to create a record of the changes in Jordan's testimony.

In Minneapolis, Jordan began to recant his grand jury testimony that **Ferrara** instructed Barone to kill Limoli. Buckley became upset, and Jordan was sent to the hallway. Coleman was soon sent to speak with Jordan and "straighten him out." Sept. 4, 2003 Tr. at 28-9, 86, 107, 180-81.

Jordan then had a well-founded fear of losing the protection [*26] of the government. At that time he was in the Witness Security Program because there was a legitimate concern that he would be murdered if he were not protected. Jordan was also concerned about losing his immunity. He had told the prosecutors about his participation in the Limoli homicide. His cooperation agreement with the government required that he be truthful. If the government decided he was not being truthful, it could use his statements to prosecute him for the Limoli murder. After his discussion with Coleman, Jordan returned to the hotel room. He was repeatedly urged to give a story that would conform to his prior testimony and statements, and Jordan reversed his recantation.

After the Minneapolis hearing, Auerhahn prepared a typed memorandum that was purportedly written by Coleman. It stated:

TO: FILE

FROM: MARTIN F. COLEMAN BOSTON POLICE DEPARTMENT

SPEC. DEPUTY U.S. MARSHAL

RE: STATEMENTS OF WALTER A. JORDAN

DATE: SEPTEMBER 4, 1991

On July 24, 1991, I concluded several days of debriefing of Walter Jordan with Assistant U.S. Attorneys Jeffrey Auerhahn and Gregg Sullivan and Special Agent Michael J. Buckley of the FBI at a neutral and secure [*27] location outside the Boston area. At approximately 11:30 p.m. on that date, Jordan told me that some things he told us during the debriefing were not true. He told me that at one point Barone told him that the Limoli homicide was not ordered by Vincent **Ferrara**. He further told me that when Barone returned from Franchesca's the night before they fled the Boston area, Barone told him that they had to leave right away because **Ferrara** would kill them because Barone had "fucked up".

On Thursday, July 25, 1991, we returned to the Boston area and I told Attorney Auerhahn that I needed to talk with him concerning Walter Jordan. On Friday, July 26, I told AUSA Auerhahn of my conversation with Mr. Jordan.

On Monday, July 29, 1991, Mr. Jordan, pursuant to a request that was transmitted

to him through the Marshals Service, called AUSA Auerhahn and myself. Jordan repeated what he had told me the previous Wednesday night. Jordan was informed that we would make arrangements to meet with him again to discuss the facts surrounding the Limoli homicide and his conversations with Barone both before and after the murder.

On Tuesday, August 27 and Wednesday, August 28, 1991, AUSA Auerhahn **[*28]** and SA Buckley and I met with Walter Jordan at a neutral and secure location outside the Boston area. The relevant statements made by Jordan during these meetings will be memorialized in a 302 report by SA Buckley.

Exhibit 16 (Sept. 5, 2003). n8

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Exhibit 16 was not admitted for the truth of the information it included and, therefore, was not hearsay. See Fed. R. Ev. 801(c).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Auerhahn testified that he did not recall ever seeing this document. See Sept. 5, 2003 Tr. at 185. The court is persuaded, however, that Auerhahn not only saw the document, he prepared it. n9

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

N9 Coleman did not write or type Exhibit 16, even though it states that it is a memorandum from him. It does not sound as if it was written by the same person who wrote the handwritten memorandum, Exhibit 17. Rather, it is written in an entirely different style and employs distinct diction, using such phrases as "neutral and secure location" and "will be memorialized." Moreover, Coleman credibly testified that if he had written Exhibit 16, he would have signed it after it was typed. See Sept. 5, 2003 Tr. at 275.

Coleman did not have a word processor or typewriter. Kathleen Reilly, who generally typed any memoranda Coleman wrote, did not write the memorandum, nor did she type it from any handwritten document given to her by Coleman. The format of this memorandum does not match the format that she invariably used when typing memoranda.

Contrary to a suggestion by the government, Dickinson did not write this memorandum. Sullivan could not have written this memorandum because he was not informed of the changes in Jordan's testimony, or included in the Minneapolis meeting.

Thus, the credible evidence convinces the court that Auerhahn wrote and typed Exhibit 16.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*29]**

This memorandum was Auerhahn's effort to "clean up" Coleman's handwritten memorandum - - to "sanitize" it to be less damaging to the government than Coleman's handwritten memorandum if it were produced to the defendants. It was intended to tone down what Coleman had written in Exhibit 17 and to explain why Coleman was not making a record of what was said in Minneapolis. The memorandum states that Buckley was going to prepare a 302 report. This was false and was known by Auerhahn to be false. As each witness in the evidentiary hearings testified, it was well known that if an attorney was conducting a trial

preparation session, an FBI agent would never take notes or prepare a 302.

If it had been disclosed, the typewritten memorandum would not have been nearly as harmful to the government's case as the handwritten memorandum, which is much more specific and directly refutes the charges that **Ferrara** ordered Barone to murder Limoli. However, neither the typed nor handwritten memorandum, nor the information that they contained, was disclosed to **Ferrara,** Barone, or their codefendants in connection with their trials or sentencings. Rather, they were only disclosed after Coleman testified **[*30]** in the hearings in this § 2255 case on September 5, 2003.

The failure of the government to disclose the information contained in the two documents, particularly the accurate and complete information in the handwritten memorandum prepared by Coleman, violated the government's duty to **Ferrara** and, as described infra, deprived him of Due Process. The Local Rules of the United States District Court for the District of Massachusetts provided for automatic discovery. Although slightly revised in 1990,*HN3* they at all times relevant to **Ferrara's** case required that the government produce automatically, within fourteen days of arraignment, "all exculpatory evidence within the meaning of Giles v. Maryland, 386 U.S. 66, 17 L. Ed. 2d 737, 87 S. Ct. 793 (1967), and Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)." Local Rule 42(a) (5) (1986 version); Local Rule 116.1 (A) (5) (1990 version). In 1963, Brady v. Maryland, 373 U.S. at 87, clearly established that the government has a duty to disclose to a defendant exculpatory evidence that is material to guilt or punishment. Coleman's memorandum contained such information.

In addition, the Local Rules explicitly provided that, *HN4*"any duty **[*31]** of disclosure and discovery set forth herein is continuing." Local Rule 42 (c) (1986 version); Local Rule 116.1(C) (1990 version). *HN5*This continuing duty required the government to supplement its disclosures if, among other things, it obtained after its initial disclosures material information tending to negate guilt.

As discussed infra, the government acknowledges that if, as the court finds, Jordan's recantation is material evidence that directly negates guilt on certain charges, the government was constitutionally required to disclose it to him before trial. See Apr. 1, 2004 Tr. at 53-4. Cf. footnote 11, infra.

The trial of **Ferrara** and his codefendants was rescheduled to begin in January 1992. Prior to that trial, Patriarca pled guilty without any agreement with the government.

On October 16, 1991, as ordered in response to defendants' motion for a bill of particulars, the government filed a 254-page Trial Brief that was signed by Auerhahn. The Trial Brief identified Jordan as a cooperating witness and described his anticipated testimony concerning the Limoli murder. See Trial Brief of the United States (Docket No. 683) (hereinafter "Trial Brief") at 207-11. Among **[*32]** other things, the government stated that Jordan would "testify to Barone's statement that Limoli was killed on the orders of Vincent **Ferrara.**" Id. at 208. The government did not in the Trial Brief, or in any other way, disclose that Jordan had recanted this contention before reverting to his earlier version of events. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 In September 2003, Auerhahn testified that he did not recall Jordan ever telling him that, upon returning from Franchesca's, Barone said that **Ferrara** was going to kill them because he, Barone, did not get **Ferrara's** permission to murder Limoli. See Sept. 5, 2003 Tr. at 162, 164. As described earlier, Auerhahn also testified that he did not recall seeing the typed memorandum, Exhibit 16. See Sept. 5, 2003 Tr. at 185. A witness who falsely testifies that he does not recall a material fact has committed perjury. See United States v. Collatos, 798 F.2d 18, 19 (1st Cir. 1986).

Regardless of whether in 2003 Auerhahn recalled Jordan's recantation, he recognized that it

was directly inconsistent with the charges in the Superceding Indictment which in effect alleged that **Ferrara** had ordered Barone to kill Limoli. See Sept. 5, 2003 Tr. at 164. He testified that he also knew that this information had to be disclosed to the defendants "at some point." Id. at 163. The court finds that Auerhahn was, in late 1991 and 1992, well-aware of Jordan's important recantation and intentionally did not disclose it to **Ferrara.** In addition, the court finds that Auerhahn would not have disclosed this information to **Ferrara** even if his case had been tried to a verdict, in part because Auerhahn did not disclose it to Barone before or during his eleven-week trial in 1993, or in connection with Barone's sentencing.

For the purposes of determining whether **Ferrara** has been denied Due Process, however, it does not matter whether the government's failure to produce the material exculpatory evidence was deliberate or inadvertent. See Brady v. Maryland, 373 U.S. at 87; United States v. Agurs, 427 U.S. 97, 110, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - **[*33]**

The Trial Brief made it clear that the government's case concerning the Limoli murder depended heavily, if not exclusively, on Jordan's testimony. He was the only witness concerning Limoli identified in the Trial Brief. Pretrial discovery revealed that there was no electronic surveillance implicating **Ferrara** in the Limoli murder. Nor was there any scientific evidence that would be used against him.

It would have been evident to competent counsel that Limoli's sister, Elizabeth DiNunzio, was on the witness list to testify about his murder. It would also have been clear, however, that she was not likely to have any personal knowledge of the events at issue, and that getting statements of Limoli admitted through her would be a challenging task. As discussed infra, the accuracy of such an assessment of the evidence concerning the Limoli murder was demonstrated at Barone's trial.

The Trial Brief also indicated that the government had little evidence to prove that **Ferrara** had participated in the murders of DiFronzo or Corlito. Id. at 211-14. DiFronzo was murdered in 1977 and Corlito was killed in 1979. No one had ever been prosecuted, let alone convicted, for those crimes. Each **[*34]** was charged only as a racketeering act, rather than as a substantive offense. No witness to either murder was mentioned in the Trial Brief. Nor was there any scientific or electronic surveillance evidence concerning those crimes.

Therefore, the Trial Brief would have indicated to competent counsel that Jordan was the key witness concerning the DiFronzo and Corlito killings, as well as the Limoli murder. It would also have been evident that Jordan's credibility would be critical to the government's effort to prove all of the murder charges at any trial or sentencing, and that any information that tended to negate **Ferrara's** guilt and/or impeach Jordan's credibility was important to **Ferrara.**

In January 1992, the trial of **Ferrara** and his codefendants, except for Patriarca and Barone, began. See Carrozza, 807 F. Supp. at 157. After the impanelment of a jury, on January 22, 1992, all five of the defendants entered into linked, binding plea agreements with the government.

The plea agreements provided, among other things, that each defendant would: (1) remain silent with regard to the factual basis for his plea and, particularly, not say anything with regard to the **[*35]** existence of, or his membership in, the LCN; (2) plead guilty to all, or virtually all, of the charges against him; (3) be required to serve a substantial term of incarceration; (4) be placed on Supervised Release for three to five years after serving his sentence; and (5) except for Tortora, forfeit a substantial sum of money. Some of the plea agreements provided for sentences constituting a downward departure from the otherwise applicable Sentencing Guidelines. Each plea agreement was contingent upon acceptance by the court of all four of the other agreements, reflecting the government's view that eliminating the need for any trial was a major purpose and benefit of each

agreement.

Id. (footnote omitted).

Four of the five agreements provided for what were understood to be significant downward departures. More specifically, they provided for downward departures from life (for the murder of Barboza) to sixteen years for Russo; from up to 293 months to 228 months for Carrozza; from more than seventeen years to thirteen years for Tortora; and from life to twenty-two years for **Ferrara.** Id. at 158-59.

Just before the court began the plea colloquy, Russo insisted **[*36]** on making a public statement that he was not acknowledging the existence of the LCN. To secure the global pleas, the government promptly renegotiated its agreement with Russo and permitted him to make that statement in return for his agreeing to serve an additional year in prison. Id. at 157 n.2; Patriarca, 807 F. Supp. at 178.

**Ferrara's** trial counsel, Oscar Goodman, Esq., now states that **Ferrara** at all times told him that he had not ordered the Limoli murder. See **Ferrara's** Post Hearing Memorandum in Support of Amended Motion to Vacate Judgment (Docket No. 103), Appendix B, Declaration of Oscar Goodman, P 10. If **Ferrara** were not held responsible for the Limoli, Corlito, or DiFronzo murders, his lawyers assert that the Guideline range for his sentence would have been 151-188 months (or about twelve to sixteen years) in prison. See **Ferrara's** Post Hearing Memoranda in Support of Amended Motion to Vacate Judgment (Docket No. 103) at 10 and Appendix A; Apr. 1, 2004 Tr. at 58, 91-92, 97.

Nevertheless, **Ferrara** agreed to plead guilty to the RICO charges, the racketeering acts involving the Limoli murder, and the related substantive charges in Counts **[*37]** 3 and 4, among others. Id. at 158; Jan. 22, 1992 Tr. at 61-2. He did not, however, agree to plead guilty to the racketeering acts concerning the DiFronzo and Corlito killings. See Jan. 22, 1992 Tr. at 61-2. **Ferrara's** guilty plea on the Limoli murder charges generated a Guideline sentence of life imprisonment absent a downward departure. See Carrozza, 807 F. Supp. at 158-159. Thus, the alleged racketeering acts concerning the DiFronzo and Corlito murders were not material to calculating the Guideline range for **Ferrara's** sentence. The parties agreed to what was described as a significant downward departure to a sentence of twenty-two years in prison for **Ferrara.** Id. This was, however, a sentence of six to ten years longer than the sentence **Ferrara's** counsel believed the Guidelines would prescribe if he were not held responsible for the Limoli murder and received credit for acceptance of responsibility.

Although he in effect pled guilty to ordering Barone to kill Limoli, **Ferrara** promptly asserted his actual innocence by informing the Probation Department that he had not done so. He also did not admit to participating in the Corlito or DiFronzo murders. Rather, **[*38] Ferrara's** Presentence Report stated, in pertinent part, that:

> Acceptance of Responsibility
>
> (3) To most of the acts charged in the counts in which he is named in the indictment, the defendant takes little exception in terms of accepting responsibility.
>
> (4) He does however take issue with the allegation that he is ultimately responsible for the murders of the three individuals named in Racketeering Acts A-1(a)(b); A-2 (a) (b); A-3 (a) (b). To preserve his position on these matters, the defendant insists that the following be incorporated into the report and that the distinctions therein are made with certainty:
>
> James DiFonzo [sic] and Anthony Corlito were "despicable human beings. They

were heroin addicts, killers, and James DiFonzo [sic] was a rapist." They were in short "low lifes." Without conceding any responsibility for their deaths, the defendant "does not care, if people think that (he) did it."

(5) His admission (in terms of a guilty plea) to having contracted for the death of James Limoli, is particularly troubling to the defendant. In fact, prior to entering the plea, he spoke with the decedent's father, and explained the untenable position **[*39]** he was in and why he found it necessary to acknowledge his involvement in James Limoli's death, even though he disavows any planning or participation in the killing.

Presentence Report at 105-106 (emphasis added).

The court now realizes that **Ferrara** was asserting that he was in the "untenable position" of having to risk a jury verdict based on false testimony by Jordan that could result in a sentence of life in prison or plead guilty to a crime that **Ferrara** was claiming that he did not commit, and accept a twenty-two year sentence, in order to avert that risk. **Ferrara** also offered the Probation Department "an historical account" of his association with Limoli. Presentence Report at 106. Among other things, **Ferrara** stated that he "disclaims any complicity in this murder; it was a spontaneous act the culmination of an argument between Limoli and Barone." Id. at 107. Nevertheless, **Ferrara** did not object to the recommendation in the Presentence Report that the Guideline range for his sentence be calculated as if he were responsible for the Limoli murder. See Addendum to Presentence Report.

**Ferrara,** Russo, Carrozza, Lepore, and Tortora were sentenced on April 29, 1992. The **[*40]** issue of **Ferrara's** responsibility for the Limoli homicide was not discussed at the sentencing hearing. See Apr. 29, 1992 Tr. at 1-69. The court did not focus on this issue.

The court did note that a benefit of the pleas to the government was the fact that they eliminated the risk that guilty individuals might be acquitted. Id. at 40. Referencing particularly Russo's acceptance of responsibility for the Barboza murder, the court stated that it was "fully satisfied there was a proper basis for the guilty pleas, and . . . satisfied that the defendants are guilty of the offenses they pled to." Id. The court would not have made this statement with regard to **Ferrara's** responsibility for the Limoli murder if the government had disclosed Jordan's statements that Barone had told him that he had not received permission from **Ferrara** to murder Limoli. The court now seriously doubts that **Ferrara** ordered the Limoli murder. The court also has no confidence that, if Jordan's recantation had been disclosed, **Ferrara** would have attempted to plead guilty to the Limoli charges or that the court would have accepted such a plea. Moreover, the court is persuaded that the government would **[*41]** not have been able to prove fairly **Ferrara's** involvement in Limoli's murder even by a preponderance of the evidence.

However, in 1992, the court accepted the binding, global plea agreements. Id. at 35-43; Carrozza, 807 F. Supp. at 159-65. The court found that significant downward departures for **Ferrara** and other defendants were justified and reasonable in part because they assured convictions and substantial sentences, protected the confidentiality of fearful witnesses, and allowed limited prosecutorial and judicial resources to be devoted to other important matters. See Carrozza, 807 F. Supp. 159-61.

Patriarca was sentenced on June 16, 1992. The government sought to have him held responsible for the Limoli murder as relevant conduct. See Patriarca, 807 F. Supp. at 178. The government initially argued that if the Limoli homicide was relevant conduct of Patriarca, the Guideline range for his sentence would be raised from about seven years to thirty years in prison. Id. The government's theory was that: **Ferrara** had ordered Barone to kill Limoli; an LCN murder could not be committed without the approval of the Boss; and, therefore, **[*42]** Patriarca authorized the Limoli murder. Id. at 201. Thus, the government's theory required that it prove that **Ferrara** ordered Barone to kill Limoli.

As indicated earlier, in 1992 it had been long and clearly established that the government must disclose exculpatory evidence that is material to punishment as well as guilt. See Brady v. Maryland, 373 U.S. at 87. However, the government, led by Auerhahn, did not disclose to Patriarca the highly material Coleman handwritten memorandum, Auerhahn's own sanitized version of it, or the information that they contained in connection with his initial sentencing in 1992. n11 This important information was also not revealed by Auerhahn in connection with the 1995 hearings relating to the resentencing of Patriarca in which the government unsuccessfully contended that the court was required to sentence Patriarca to sixty-five years in prison because the Limoli murder constituted relevant conduct for which he was responsible. See Patriarca, 912 F. Supp. at 602.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 In anticipation of Patriarca's original sentencing, on May 8, 1992, Auerhahn did write to Patriarca's counsel that:

> On several occasions prior to the murder of Vincent James Limoli, Jr., Pasquale G. Barone explained, in some detail, to Walter A. Jordan, or to another in Jordan's presence, the motive for the Limoli homicide. Shortly after the murder, Jordan fled Boston at the direction of Barone. (Barone fled as well.) Some time later, Jordan learned the reason why he and Barone were forced to flee. Jordan learned that Barone was supposed to use Jordan to set up Limoli and then kill Limoli and Jordan on the night of October 28, 1985. For failing to follow the order from Vincent M. **Ferrara**, and for sparing the life of his brother-in-law, Barone had incurred the wrath of **Ferrara** and proven to be unreliable. Therefore, both Barone and Jordan were in jeopardy if they remained in Boston. On one occasion, however, Barone provided a different reason which compelled Barone and Jordan's flight from Boston. Prior to learning that he too was to be killed, Jordan was told by Barone that they had to leave Boston because Barone did not get permission to kill Limoli. When Jordan pressed Barone on this, Barone immediately retracted the statement, and reiterated that the murder was at **Ferrara's** direction. Thereafter, Barone never again stated that the murder was anything but a sanctioned hit.

Ex. 14 (Sept. 5, 2003), May 8, 1992 letter from Assistant U.S. Attorney Jeffrey Auerhahn to Martin Weinberg, Esq.

This statement to Patriarca's counsel was false and misleading in many respects. It refers to a statement that Jordan made to the government in North or South Carolina, not to the statements Jordan made to Coleman in Salt Lake City or by telephone to Auerhahn and Coleman following the Salt Lake City meeting. The conversation in North or South Carolina preceded the meeting in Salt Lake City and the telephone conversation. Auerhahn's notes do not reflect that Jordan said in North or South Carolina that Barone retracted his statement that they had to leave Boston because he had not received **Ferrara's** permission to kill Limoli.

In any event, even the false and misleading information provided to Patriarca in the May 8, 1992 letter was not disclosed to **Ferrara,** who was sentenced on April 29, 1992.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*43]**

In 1993, the court conducted an eleven week trial of the charges against Barone. Once again, neither Coleman's memorandum regarding Jordan's recantation, Auerhahn's sanitized version of it, nor the highly material information that they contained was disclosed to Barone.

The government fully understood that it would be both essential and challenging for it to prove that **Ferrara** ordered Barone to kill Limoli. As Auerhahn stated at Barone's trial: "One of the potential defenses in this case is that . . . maybe Patsy Barone killed Limoli, but not for **Ferrara.** So, it's very important to establish that Barone did commit murder for **Ferrara.**" Sept. 7, 1993 Barone Tr. at 665. It was equally obvious to the government that it was vital to its case that the jury find Jordan to be a credible witness.

During the trial, it was discovered that Auerhahn had repeatedly improperly failed to disclose exculpatory evidence to Barone. Seven or eight of the discovery violations concerned the failure to disclose exculpatory information relating to Jordan's testimony. See Oct. 18, 1993 Barone Tr. at 35-6. Auerhahn was responsible for each of them. Id. at 48-9. The court informed the jury of the discovery **[*44]** violations that had been discerned. See Oct. 18, 1993 Barone Tr. at 51.

In addition, the court explained to the prosecutors, who were strenuously resisting an in camera review by the court of their notes, why exculpatory information might be discoverable even if it were not in an agent's report. See Sept. 28, 1993 Tr. at 133. More specifically, the court stated to Auerhahn:

> if Jordan had said to you on this [hypothetical] walk in the woods . . . I've made up half of what I told Mike Buckley because I don't want to get prosecuted for the Limoli murder, that would be exculpatory even though it was in your notes and not in Buckley's notes.

Id. However, even this description of his duty to produce exculpatory information did not prompt Auerhahn to disclose Jordan's recantation, Coleman's handwritten memorandum, or Auerhahn's sanitized version of it.

The testimony at Barone's trial disclosed that there had been a trial preparation meeting with Jordan in Salt Lake City. Jordan's subsequent telephone call with Coleman and Auerhahn and the Minneapolis meeting were not divulged. Nevertheless, the court ordered Auerhahn and Sullivan to review their notes and **[*45]** was later told that they did not contain any exculpatory information. See, Sept. 30, 1993 Barone Tr. at 3-4.

Despite the fact that the government had improperly withheld Jordan's statements that Barone had said that he did not get **Ferrara's** permission to murder Limoli, Jordan was vigorously cross-examined for at least five days. See Oct. 18, 1993 Barone Tr. at 51. n12 The court repeatedly characterized Jordan's credibility as "important" and, indeed, as "essential" to the government's case. See, e.g., Oct. 18, 1993 Barone Tr. at 35-6, 50-1.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 After concluding his trial testimony, Jordan told another individual that he had lied and blamed the government for coercing him to do so. See August 12, 2003 Order (Under Seal) (Docket No. 60).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

As the end of the trial approached, the government recognized that its evidence concerning the Limoli murder was weak. Thus, it for the first time argued that the charges did not require that it prove that **Ferrara** ordered the Limoli murder in order to convict Barone. **[*46]** See Oct. 19, 1993 Barone Tr. at 2-6. The court rejected this contention. Id.

The court also denied Barone's motion to acquit concerning the Corlito murder and another