charge relating to the robbery of a credit union. This court rarely grants such motions. However, it found the evidence concerning the Corlito murder to be barely sufficient to survive even under the very deferential Rule 29 standard, which required the court to assume that the jury would believe Jordan's testimony. See, e.g., United States v. Serrano, 70 F.3d 1, 5 (1st Cir. 1989). As the court stated:

> The motion to acquit is genuinely competitive on both the Corlito murder and the credit union robbery. I have to look at the evidence in the light most favorable to the government and, basically, Walter Jordan, if believed, says things which I believe are sufficient for those two predicate acts to remain in the case; that is, taking that as a part of all the evidence, if the jury believed it, the jury could find beyond a reasonable doubt that the events occurred and had a sufficient nexus with the alleged RICO enterprise.

Oct. 7, 1993 Barone Tr. at 6-7.

The jury had great difficulty [*47] in deciding the Barone case. The court received a question from the jury on the Limoli murder charges. The jury twice reported that it was deadlocked. The court gave two modified "Allen charges," urging the jury to resume its deliberations. The jury ultimately convicted Barone of the RICO charges and of conspiring with **Ferrara** to murder Limoli. It did not, however, return a verdict on the charge that Barone actually killed Limoli, indicating that the jury did not fully believe Jordan's testimony. All of Jordan's testimony would have been substantially undermined if his recantation had been divulged.

On appeal the First Circuit found that this court improperly admitted some of DiNunzio's testimony, but that the errors were harmless in part because Jordan had said the same things. See United States v. Barone, 114 F.3d 1284, 1299 (1st Cir. 1997). Barone's conviction was affirmed. Id. at 1309. Thus, Barone was required to serve the sentence of life in prison that had been imposed.

As described earlier, in 1989 Mercurio was the informant who told the government that the LCN induction ceremony was planned for October 29, 1989, at 34 Guild Street, before [*48] the government filed its application for a roving order by representing that it was impractical to identify the place to be bugged. The FBI later alerted Mercurio to his forthcoming indictment in order to prompt and permit him to flee, and did not attempt to apprehend him.

However, in 1994, Mercurio was arrested in Georgia and sentenced there on state drug charges. In 1995, after Mercurio was returned to Boston, Auerhahn, who represented the government in Mercurio's case:

> informed Magistrate Judge Lawrence Cohen, who was handling pretrial discovery matters, that Mercurio had served as an FBI informant and requested authority to disclose certain statements previously made by Mercurio to him directly, rather than through his lawyers. Salemme, 978 F.Supp. at 357 n. 9. The magistrate judge granted the request, and impounded the motion and Order. Id. Neither the magistrate judge nor the government informed this court, to which Mercurio's case was assigned, of these matters or of Mercurio's status as an informant. Id.

\* \* \*

> When Mercurio fled in 1989, he believed that if he were ever apprehended, he would be dealt with more leniently than if he had [*49] been arrested with his codefendants. Mercurio Aug. 5, 1998 [United States v. Salemme] Tr. at 137-38. Mercurio was correct. Russo, **Ferrara,** Carrozza, Lepore, and Tortora received

sentences of between thirteen and twenty-two years in prison. Carrozza, 807 F.Supp. at 158-59. The government [represented by Auerhahn], however, entered into a binding plea agreement with Mercurio, pursuant to Fed.R.Crim.P. 11 (e) (1) (C), and persuaded the court to depart downward and impose the agreed-upon 110-month sentence, which in accordance with the government's plea agreement was to be served concurrently with Mercurio's Georgia sentence. Salemme, 978 F.Supp. at 357. Thus, in 1996, Mercurio received little, if any, punishment for his federal offenses, while his role as an informant, and its implications for the legality of the bugging of 34 Guild Street, remained masked from this court.

Salemme, 91 F. Supp. 2d at 293.

Mercurio's status as an FBI informant was eventually revealed in the course of the prosecution of Frank Salemme, Stephen Flemmi and others. In that case, this court ordered the **[*50]** government to disclose whether James "Whitey" Bulger, Flemmi, and Mercurio were informants because their status was relevant to pending motions to suppress electronic surveillance evidence, including the evidence of the October 29, 1989 LCN induction ceremony. See Salemme, 978 F. Supp. at 347-58; Salemme, 91 F. Supp. 2d at 309-10. The Acting Deputy Attorney General refused to obey that order with regard to Mercurio. Mercurio, however, testified that he was cooperating with the government in connection with the LCN induction ceremony. See United States v. Salemme, 978 F. Supp 379, 381 (D. Mass. 1997); Salemme, 91 F. Supp. 2d at 310.

In 1998, this court conducted lengthy evidentiary hearings regarding the motion to suppress the evidence of the LCN induction ceremony intercepted at 34 Guild Street, among other things. In those proceedings, the court discovered that important information had not been disclosed to the judge who issued the roving order or in connection with the 1991 hearings on the motion to suppress that evidence in **Ferrara's** case. For example, in Salemme, the government belatedly produced an October 25, 1989 FBI memorandum, which **[*51]** stated that the roving order was being sought in part because, "such authorization will [] help to protect the identity of any confidential sources, who otherwise might be revealed if singular information (in this case, the location of a sensitive LCN meeting) provided by the source was incorporated into the affidavit of a traditional Title III application." Salemme, 91 F. Supp. 2d at 282.

This memorandum makes explicit that, contrary to this court's finding in **Ferrara, 771 F.Supp. at 1279**, one motive, if not the sole motive, for seeking authorization for a roving bug was a determination not to risk revealing the FBI's sources of information concerning the induction ceremony. Although this memorandum was maintained in the files of the FBI's Boston Office, it was not produced during the **Ferrara** litigation. Nor was it produced in this case [Salemme] until after the court issued its May 22, 1997 decision granting defendants' motion for an evidentiary hearing on the motion to suppress the electronic surveillance of 34 Guild Street, and noted its prior finding that the failure of the government to make the full and complete statement **[*52]** required by § 2518(11) (a) "was not motivated by the desire to protect the identity of any informant." Salemme, 978 F.Supp. at 356 (citing **Ferrara, 771 F.Supp. at 1279**). Rather, the government produced the October 25, 1989 Walthers memorandum on June 3, 1997 and acknowledged that it should have been disclosed in 1991, in the **Ferrara** litigation. June 3, 1997 [Salemme] Tr. at 10; June 19, 1997 [Salemme] Order at 8 n.4.

Id.

Because of the more accurate and complete information developed in the Salemme hearings, the court's findings of fact differed significantly from those found in **Ferrara's** case. As described earlier, among other things, the court found in Salemme that:

> At all times prior to October 29, 1989, the FBI, personified by Ring, knew that there would be at least one informant, Mercurio, at the ceremony. The FBI sought a warrant for a roving bug that could be used at multiple, unidentified locations, rather than authorization to conduct electronic surveillance at 34 Guild Street alone, in order to protect the identity of its sources. The FBI had no intention of using that warrant to intercept conversations **[*53]** more than once. Rather, at the time the application was drafted the FBI intended to arrest the participants immediately after the ceremony. The FBI had substantial, corroborated "rock solid" information that the ceremony would be held at 34 Guild Street several hours before [the applicants] met with the judge to obtain the warrant authorizing roving surveillance based upon the representation that it was then "impractical" to identify the location to be bugged.

Id. at 270 (footnote omitted).

However, the court also found in Salemme that defendant Robert DeLuca lacked the Fourth Amendment interest in 34 Guild Street necessary to give him "standing" to move to suppress the evidence of the LCN induction ceremony in view of the then recent decision of the Supreme Court in Minnesota v. Carter, 525 U.S. 83, 142 L. Ed. 2d 373, 119 S. Ct. 469 (1998). Id. at 270 n.50; 384-400.

The 661 -- page Salemme decision that included the foregoing findings of fact concerning the interception of the LCN induction ceremony was issued on September 15, 1999. On June 29, 2000, **Ferrara** filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person **[*54]** in Federal Custody. He contended that facts that emerged from the proceedings in Salemme provided a basis for him to withdraw his guilty plea or, alternatively, for the court to reduce his sentence.

More specifically, **Ferrara** argued that the facts revealed in Salemme prove that the government's application and affidavits in support of the electronic surveillance in his case contained intentional false statements and material omissions which, if they had been corrected and included, would likely have negated any showing of probable cause and necessity for the electronic surveillance generally, as well as any showing of necessity for the roving order used to bug 34 Guild Street. Had he and the court in 1991 been aware of the facts found in Salemme, **Ferrara** contended, there is a reasonable probability that the motions to suppress electronic surveillance evidence would have been granted and, as a result, many of the charges against him would have been dismissed by the government for lack of evidence. **Ferrara** also asserted that he would not have pled guilty if proper disclosure had been made or would have obtained a more favorable plea agreement. **Ferrara** also claimed that even **[*55]** if no evidence had been suppressed and no charges dismissed, if he had known of the government's misconduct he would not have entered a guilty plea that foreclosed his right to appeal the denial of his motion to suppress the evidence of the induction ceremony.

Barone, Carrozza, Lepore, and Tortora filed similar § 2255 petitions. All of the petitions presented complex questions, including whether the law with regard to Fourth Amendment "standing" as it existed in 1991 or as it had been clarified by Minnesota v. Carter governed. These issues were briefed and argued at hearings on October 28, 2002 and March 6, 2003.

In June 2002, John Connolly, the former FBI Special Agent who had been the informant

"handler" for Bulger, Flemmi, and Mercurio, was convicted of RICO and other offenses, including attempting to obstruct justice in the Salemme case. See Connolly, supra. Connolly was prosecuted by a specially constituted Department of Justice Task Force led by John Durham, a federal prosecutor based in Connecticut. Following Connolly's conviction, the Task Force continued to investigate other possible crimes by Connolly and his colleagues. It was well known that [*56] this investigation was continuing.

Soon after Connolly's conviction, Jordan contacted a member of the Task Force. He stated that he had committed perjury in the Barone trial when he testified that **Ferrara** had ordered Barone to murder Limoli. Jordan also said that Auerhahn and the investigators knew that he had committed perjury. Jordan expressed fear that the Task Force would soon discover that he had lied under oath and said that he wanted to reveal this information himself.

Durham promptly began an investigation of Jordan's allegations. In August 2002, Jordan told a polygraph examiner that Barone never said that **Ferrara** ordered the Limoli murder and that he had told the government that he had lied about **Ferrara's** involvement in the Limoli killing. The polygrapher found that there was no deception indicated by Jordan's statement. See M.B.D. No. 0210235, Aug. 28, 2002 Tr. at 9-10. n13 Knowing that Barone and **Ferrara** had pending § 2255 petitions, to which Jordan's allegations might be important, in August 2002 Durham informed the court of them and of his investigation.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 The results of a polygraph examination may not ordinarily be admissible. United States v. Black, 78 F.3d 1, 7 (1st Cir. 1996), citing United States v. Scarborough, 43 F.3d 1021, 1026 (6th Cir. 1994). However, in this case the government agreed that the court could consider the polygraph examiner's report. See Gov. Report to Court Pursuant to Court's Order of August 14, 2003 (Docket No. 68) at 2; Aug. 26, 2003 Tr. at 3; Sept. 3, 2003 Tr. at 6. While the results of the polygraph examination of Jordan are consistent with the facts found by the court, they are not material to those findings. Rather, the results of the polygraph examination merely reinforce the conclusions that the court has reached independently, on the other evidence presented.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*57]

In January 2003, Durham informed this court that he intended to disclose to Barone and **Ferrara** Jordan's allegations, and related information generated by his investigation. The United States Attorney for the District of Massachusetts later told Durham that his Office, which was representing the government in connection with the § 2255 petitions of **Ferrara** and his former codefendants, would do so instead. The anticipated disclosures to petitioners were not promptly made.

Nevertheless, **Ferrara** and Barone learned of Jordan's allegations. They were allowed to amend their § 2255 petitions to allege that they were entitled to relief in part because the government improperly failed to provide them with material exculpatory information and knowingly used perjured testimony against them.

Among other things, **Ferrara** asserted that he is actually innocent of the charges arising out of the Limoli murder to which he pled guilty. He also contended that the government's failure to disclose the very important exculpatory information that Jordan's recantation represents induced him to plead guilty to offenses that he did not commit.

In a series of conferences, it became clear to the court that [*58] if **Ferrara** and/or Barone were entitled to relief on their apparently strongest respective claims that they were denied Due Process because the government had withheld material exculpatory information, their other claims would have no practical significance. Therefore, it was agreed that the parties and the court would focus on Jordan's contention that he had told the government he had falsely

claimed that **Ferrara** ordered Barone to murder Limoli.

The court conducted evidentiary hearings in September 2003. The witnesses included Jordan, Coleman, Buckley, Sullivan, and Auerhahn. The court sequestered the witnesses and, over the government's objection, insisted on a certain order of the witnesses in an effort to obtain spontaneous testimony to the maximum extent possible.

As indicated earlier, after Coleman testified that he had prepared a memorandum concerning Jordan's recantation, the government found it and produced it for the first time. The evidentiary hearings resulted in the findings of fact described earlier, including the court's conclusion that Jordan did tell the government that Barone had not said that **Ferrara** ordered the Limoli murder, but rather had asserted that he did [*59] not obtain permission for the killing. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n14 With regard to the findings of facts, the court has applied the Federal Rules of Evidence as required by Federal Rule of Evidence 1101. Its factual findings required determinations of credibility. These were made in the manner that the court instructs juries to decide questions of credibility. The court considered the demeanor of the witnesses, which it had an opportunity to scrutinize. It considered the extent to which a witness's testimony was corroborated or contradicted by the testimony of other witnesses. It considered the extent to which what the witness said made sense or did not make sense. The court considered the motive that any witness might have to lie.

The court has found it appropriate to credit some but not all of what some of the witnesses said. In doing so, it considered whether differences in the evidence are explained by innocent differences in perception or memory, or by contrivance.

The court found that some witnesses were right about some things and wrong about others. Jordan, for example testified that the meeting in Minnesota occurred before the meeting in Salt Lake City. The records indicate this was incorrect. However, on a number of important points, the court has found that his testimony was corroborated by the testimony of other witnesses and, in any event, correct.

The court has also found that Coleman was an honest and able law enforcement officer. As every witness testified, he was dedicated to combating the LCN. There is no reason that he would write a false report concerning Jordan's recantation. By September 2003, Coleman was an older man, who was taking medication for a heart condition that affected his memory. While some of his testimony was inaccurate, the court is persuaded that his handwritten memorandum is a reliable account of what Jordan told Auerhahn and Coleman in 1991.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*60]

In 2003, the court decided, orally, that the government's failure to disclose Jordan's very important exculpatory information had denied Barone Due Process and that he was entitled to a new trial if the case were not otherwise resolved. See Oct. 3, 2003 Tr.; Oct. 8, 2003 Order. Shortly before that decision, the government discovered and disclosed that in contributing to the Presentence Report, Auerhahn had erroneously informed this Probation Department that the maximum sentence for Barone's offense was life in prison, rather than twenty-years. n15 Neither the Probation Department, defense counsel, nor the court discerned the error. As a result, Barone had been sentenced in 1994 to life in prison for a crime -- conspiring to murder Limoli to increase his position in the Patriarca Family -- that had a statutory maximum penalty of twenty years.

- - - - - - - - - - - - **Ferrara** - - - Footnotes - - - - - - - - - - - - - - - -

n15 The government explained that Auerhahn discovered the error and informed his colleagues.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Barone and the government promptly entered into a binding plea agreement **[\*61]** that provided for his immediate release. Although the court made no finding as to whether there was an adequate factual basis for the Limoli murder charge, it accepted the plea agreement. Barone was released on October 24, 2003, after serving many years in federal prison on charges on which he had not been fairly convicted.

III. ANALYSIS

A. Summary of Analysis

As explained below, **Ferrara's** § 2255 petition is, like Barone's, meritorious, and he too is entitled to appropriate relief. As indicated earlier, **Ferrara's** amended petition asserts several claims based on the government's failure to disclose to him material exculpatory information. In essence, **Ferrara's** claims fall into two categories. First, he asserts that the government failed to disclose material exculpatory information regarding the LCN induction ceremony which, if divulged, would have resulted in the suppression of the evidence of it and a much lower sentence for **Ferrara**. Second, **Ferrara** contends that he is actually innocent of the charges relating to the Limoli murder. **Ferrara** states that the government's unlawful failure to disclose material exculpatory information negating his guilt on those charges deprived **[\*62]** his counsel of the ability to advise him properly, prompted **Ferrara** to plead guilty to them to avert the risk of a wrongful conviction resulting in a life sentence, and deprived the court of the ability to discern that there was not a factual basis for his plea to the Limoli murder charges.

The primary relief that **Ferrara** seeks is a resentencing. Among other things, he asserts that the charges involving the Limoli murder should not be included in calculating the Guideline range for his sentence and in ultimately determining a reasonable sentence. **Ferrara** contends that in 1992 the maximum properly calculated Guideline sentence for his crimes would have been 188 months in prison. If a 188 month sentence had been originally imposed, **Ferrara** would have been released on July 8, 2003. Therefore, he would be entitled to be released immediately if he were now resentenced to 188 months in prison.

The government has presented several defenses to **Ferrara's** petition. From the outset the government has argued that **Ferrara's** guilty plea extinguished any right that he would otherwise have had to a decision on the merits of the claims that the government unlawfully failed to disclose to him material **[\*63]** exculpatory information concerning the motion to suppress the intercepted evidence of the LCN induction ceremony and concerning the Limoli murder charges. See Tollett, 411 U.S. at 266. In addition, more than three years after the government responded to **Ferrara's** original petition, the government for the first time suggested that **Ferrara's** claims would involve the application of a new constitutional rule and, therefore, were barred by the doctrine announced by the Supreme Court in Teague, supra. The government also contends that Jordan's recantation represented only impeaching information that the government was not required to disclose pursuant to the Supreme Court's decision in Ruiz v. United States, 536 U.S. 622, 629, 153 L. Ed. 2d 586, 122 S. Ct. 2450 (2002). Finally, the government argues that even if **Ferrara** is not held responsible for the Limoli murder, at any resentencing he should be found to be responsible for the Corlito and DiFronzo murders. Therefore, the government contends that the Guidelines would prescribe a life sentence, and the court should again sentence **Ferrara** to twenty-two years in prison.

As described in detail below, each of the government's **[\*64]** arguments is unpersuasive. The government's Teague defense was waived by not being raised in a timely manner. Moreover, it is not meritorious. **Ferrara** is relying on rules of constitutional law that were well-established

when his conviction became final in 1992, the rules of <u>Brady v. Maryland, supra</u>, and <u>Brady v. United States, supra.</u>

**Ferrara's** guilty plea may have extinguished his right to reopen the merits of his motion to suppress the electronic surveillance of the LCN induction ceremony. The court is not now deciding that question.

His guilty plea does not, however, preclude the court from deciding whether his convictions on the Limoli murder charges should stand. To the contrary, as many Circuits have found, **HN6** ⨳the Supreme Court in <u>Brady v. United States, supra</u>, made clear that impermissible conduct by the government can: undermine the reliability of a guilty plea; result in the acceptance of a guilty plea from a defendant who might actually be innocent; and therefore subject that plea to being vacated in a <u>§ 2255</u> proceeding.

Contrary to the government's contention, <u>Ruiz v. United States, supra</u>, confirms rather than contradicts **[*65]** this conclusion. Moreover, Jordan's recantation was not a prior inconsistent statement that merely impeached his trial testimony concerning the Limoli murder. Rather, his reports that Barone said that he had not obtained **Ferrara's** permission to kill Limoli directly negated **Ferrara's** guilt concerning the Limoli murder charges.

With regard to the merits, the government's misconduct utterly undermines the court's confidence in the outcome of **Ferrara's** case. **Ferrara** may well be innocent of the Limoli murder charges. In any event, there is a reasonable probability that if the constitutionally required disclosures had been made, **Ferrara** would not have pled guilty to them, would not have been convicted of them at trial, and would not have been held responsible for them at sentencing.

In these circumstances, the government's misconduct in not disclosing Jordan's recantation deprived **Ferrara** of Due Process.

The parties and the court agree that a new trial would not be practical. Therefore, the most appropriate remedy is to resentence **Ferrara.**

The government agrees that in the circumstances as the court has found them, the Limoli murder charges should not be relied upon at sentencing. Contrary **[*66]** to the government's contention, there is insufficient evidence to prove even by a preponderance that **Ferrara** is responsible for the Corlito or DiFronzo murders. Therefore, the Guideline range for **Ferrara's** sentence must be calculated without regard to any of the murders.

As the parties and the court also agree, in view of the Supreme Court's recent decision in <u>Booker, supra</u>, the court must consider the Guidelines as advisory and determine the most appropriate, reasonable sentence to impose. On **Ferrara's** theory, without the murders the Guideline range for his sentence in 1992 would have been 151-188 months. If given a 188 months sentence, he would have been released in July 2003. On the government's theory, absent the murders, the Guideline range would have been 210-262 months. If **Ferrara's** guilty plea only resulted in a sentence at the low end of the Guideline range, rather than in a downward departure, he would have been released in February 2005. Therefore, a hearing at which **Ferrara** will be resentenced without regard to the murders will be conducted promptly.

B. **Ferrara** Has Stated A Claim On Which Relief May Be Granted And That Claim Is Not Barred By The Teague **[*67]** v. Lane Doctrine

The court must decide whether **Ferrara's** claims are barred by the <u>Teague</u> doctrine before considering their merits. See <u>Caspari v. Bohlen, 510 U.S. 383, 389, 127 L. Ed. 2d 236, 114 S. Ct. 948 (1994)</u>. Therefore, the government's belated Teague argument is being addressed first.

For the reasons described below, **Ferrara** has stated a claim for which relief may be granted and that claim is not barred by the Teague doctrine. The government has waived its Teague

defense by failing to raise it in a timely fashion, but even if the court were to consider the defense, it would not apply in this case.

As indicated earlier, **Ferrara's** conviction became final in 1992. *HN7* In 1963, the Supreme Court held in Brady v. Maryland, supra, that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment. . . ." This principle was clearly established well before **Ferrara's** case concluded. See Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir. 1988). It was also then clearly established that suppressed evidence is material "if there is a reasonable probability **[*68]** that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985).

*HN8* The Supreme Court had also held that a reasonable probability of a different result includes going to trial rather than pleading guilty. See Hill v. Lockhart, 474 U.S. 52, 59, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985); Miller, 848 F.2d at 1322.

In addition, in 1992, *HN9* it was clearly established by the Court's 1970 decisions in Brady v. United States, 397 U.S. 742, 757, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970), and its progeny that misrepresentations or other misconduct by the government could render a guilty plea not "intelligent" and, therefore, provide a basis for granting a petitioner relief in a habeas corpus proceeding. See White v. United States, 858 F.2d 416, 422 (8th Cir. 1988); Miller, 848 F.2d at 1318-22; Campbell v. Marshall, 769 F.2d 314, 321 (6th Cir. 1985).

Contrary to the government's contention, Tollett, supra, does not qualify this conclusion. *HN10* Tollett bars a petitioner from litigating in a habeas proceeding most independent claims of **[*69]** constitutional violations that occurred prior to the entry of his guilty plea. 411 U.S. at 267. It does not alter the holding of Brady v. United States that a petitioner may on collateral review seek relief for the suppression of material evidence negating his guilt, suppression which deprived him of the ability to decide intelligently whether to plead guilty and deprived the court of the capacity to evaluate the truthfulness of his plea.

Therefore, the rules on which **Ferrara** relies are not new constitutional rules of criminal procedure which, pursuant to Teague, 489 U.S. at 299-301, do not usually provide a basis for relief in a habeas proceeding. In any event, as noted supra, the government's Teague defense was waived because it was not timely presented and it would be inappropriate for the court to exercise its discretion to permit it to be relied upon in this case.

*HN11* In Teague, the Supreme Court decided that a new constitutional rule of criminal procedure will not be announced in a case involving collateral review unless that new rule would be applied retroactively. See 489 U.S. at 299-301. Courts "must determine, as **[*70]** a threshold matter, whether granting [a petitioner] the relief he seeks would create a new rule.'" Penry v. Lynaugh, 492 U.S. 302, 313, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304, 153 L. Ed. 2d 335, 122 S. Ct. 2242 (2002). However, the Teague rule is not jurisdictional. 489 U.S. at 300. Rather, it may be waived if it is not properly raised. Id.; Schiro v. Farley, 510 U.S. 222, 229, 127 L. Ed. 2d 47, 114 S. Ct. 783 (1994); Wilmer v. Johnson, 30 F.3d 451, 454 (3rd Cir. 1994).

At the final hearing on April 1, 2004, more than three years after the government responded to **Ferrara's** original petition, and after the court considered numerous briefs and conducted many hearings, the government for the first time mentioned that **Ferrara's** claims might be barred by the doctrine announced by the Supreme Court in Teague, supra. See Apr. 1, 2004 Tr. at 17-18. After the case was taken under advisement, the government, without the authorization of the court, for the first time filed a memorandum addressing this issue. See Apr. 6, 2004 Gov. Supp. Memo at 1-5 (Docket No. 153).

> The government acknowledges that it had abundant **[*71]** opportunities to raise the Teague claim well before it did. Indeed, inasmuch as petitioner's original §

2255 claim depends on the court's adoption of the Miller line of cases, the government could have interposed a Teague defense in its initial response [filed on September 8, 2000]. And it certainly could have done so as well at many junctures during the course of the more recent litigation regarding the petitioner's amended petition.

Gov. Mem. Pursuant to Court Order of April 9, 2004 (Docket No. 155) at 13-14.

*HN12* When, as here, the 1989 decision in Teague preceded the filing of the habeas petition and the government should have been aware of the purported defense, "the appropriate time for arguing that Teague barred consideration of petitioner's [claim is] in the answer to the habeas petition. . . ." Wilmer, 30 F.3d at 454-55. In the instant case, as in United States v. Knox, 2004 U.S. Dist. LEXIS 4084, 2004 WL 442629 (N.D. Ill. Mar. 9, 2004) at *3:

> The government's Teague argument comes too late in the day. Teague is a non-jurisdictional rule that is subject to waiver by the government. See Schiro v. Farley, 510 U.S. 222, 229, 127 L. Ed. 2d 47, 114 S. Ct. 783 (1994). **[*72]** The government waived it here by failing to mention it in its answer to [petitioner's] motion.

Id. (citations omitted).

The court recognizes that it has the discretion to permit the government to raise a Teague defense belatedly or, indeed, to consider the implications of Teague sua sponte. See Caspari, 510 U.S. at 389; Schiro, 510 U.S. at 229; Wilmer, 30 F.3d at 455. In the circumstances of this case, however, to do so would be unfair to **Ferrara** and injurious to the interests of the administration of justice. See Schiro, 510 U.S. at 229; Wilmer, 30 F.3d at 454-55; Knox, 2004 U.S. Dist. LEXIS 4084, 2004 WL 442629 at *3.

The government admits that it could and should have asserted any Teague defense in answering **Ferrara's** original petition. Counsel for **Ferrara** and the court have unnecessarily invested many days, over too many years, in addressing issues that, as a practical matter, became moot after **Ferrara** learned in 2003 of Jordan's allegations of extreme government misconduct and **Ferrara** amended his petition. That alleged government misconduct has now been proven. The changing nature **[*73]** of the factual and legal issues caused by the government's misconduct has frustrated **Ferrara's** reasonable expectation that the merits of his petition would be decided efficiently, and his hope that his release would be expedited rather than delayed.

The respondent raised the Teague claim only after this court signaled that the government might well lose this case by granting relief to Barone and expressing its view that, as **Ferrara** argued, the Second Circuit's decision in Miller, supra, provides the applicable standard.

To permit a belated Teague defense in these circumstances would encourage the government to believe that when it has reason to foresee defeat it can keep a petitioner incarcerated and a court preoccupied by repeatedly raising a succession of defenses. This result is not in the interest of the administration of justice. See Knox, 2004 U.S. Dist. LEXIS 4084, 2004 WL 442629 at *3 (denying a belated request to present a Teague defense because the government "did not mention Teague until after the Court had ruled that [certain] claims would not be dismissed. Were the Court to allow the government to raise the issue now, we would effectively be saying **[*74]** that the parties' briefs on a contested matter are merely a dry run, with a second go-around after they see what works and what does not work.")

Moreover, if the government were now able to present a valid Teague defense, a dismissal of **Ferrara's** petition without an analysis of its merits would keep from the public record findings of extremely serious government misconduct by a prosecutor who continues to represent the United States in this District. This result too is not in the interest of the administration of justice. Therefore, the government's Teague defense has been waived.

In any event, the government does not have a meritorious Teague defense to **Ferrara's** petition. In essence, it does not appear to be an oversight that caused the government to fail in more than three years of litigation to assert a Teague defense. Rather, it appears that the government did not argue Teague because the defense had not even been raised, let alone succeeded, in all but one of the reported cases presenting comparable issues. See United States v. McCleary, 1997 U.S. App. LEXIS 9391, No. 95-6922, 1997 WL 215525 (4th Cir. May 1, 1997); Sanchez v. United States, 50 F.3d 1448 (9th Cir. 1995); **[*75]** United States v. Claudio, 44 F.3d 10, 13 (1st Cir. 1995);

United States v. Wright, 43 F.3d 491 (10th Cir. 1994); Tate v. Wood, 963 F.2d 20 (2d Cir. 1992). But see Matthew v. Johnson, 201 F.3d 353, 358-60 (5th Cir. 2000).

As the government explained on April 1, 2004, only a "quick reading" of Matthew, which had been cited by **Ferrara,** prompted its belated Teague argument. Apr. 1, 2004 Tr. at 17-18. This court finds that: the Fifth Circuit's decision in Matthew is an anomaly; its reasoning is not persuasive; and it is distinguishable on the facts from the instant case.

*HN13* In deciding whether Teague bars a habeas petitioner's claim, the court must focus on the law as it existed when his conviction became final. Teague, 489 U.S. at 301.

> In general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. . . . [A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.

Id. (emphasis omitted). A result may be "dictated **[*76]** by precedent" even if there is no case precisely on point. See Stringer v. Black, 503 U.S. 222, 228-31, 117 L. Ed. 2d 367, 112 S. Ct. 1130 (1992). More specifically, as Professor Chemerinsky has explained:

> *HN14* Stringer v. Black is important in indicating that there need not be a case directly on point to prevent a court from concluding that there is a new rule. The application of a rule to a different circumstance does not create a new rule where the application is a logical and foreseeable extension of the law.

E. Chemerinsky, Federal Jurisdiction 903 (4th ed., 2003).

In addition, *HN15* "rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule." Williams v. Taylor, 529 U.S. 362, 382, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000).

> "If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific

applications without saying that those applications themselves create a new rule. . . . Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, [*77] it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent."

Id. (quoting Wright v. West, 505 U.S. 277, 308-09, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992) (Kennedy, J., concurring in judgment)).

**Ferrara** relies on well-established rules of general application -- the rules enunciated in 1963 in Brady v. Maryland, supra, and its progeny, and in 1970 in Brady v. United States, supra, and its progeny. The instant case neither imposes any new obligation on the government nor breaks any new ground. Rather, the decision in this case is dictated by precedent.

Once again, in Brady v. Maryland, 373 U.S. at 87, the Supreme Court held, in 1963, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . ." In 1985, in Bagley, 473 U.S. at 682, the Court held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See also Kyles v. Whitley, 514 U.S. 419, 433-34, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995); [*78] Ritchie v. Pennsylvania, 480 U.S. 39, 57, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987).

*HN16* Since at least 1984, the Supreme Court has treated the "materiality" requirement for Brady v. Maryland claims and the "prejudice" requirement for ineffective assistance of counsel claims as synonymous. See Hill v. Lockhart, 474 U.S. 52, 57, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985); Strickland v. Washington, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (stating that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution. . . ."); Ruiz v. United States, 339 F.3d 39, 43 (1st Cir. 2003) ("Brady [v. Maryland] claims are subject to the same prejudice requirement as ineffective-assistance claims," citing Bagley); Strickland and Miller, 848 F.2d at 1321-22. To establish "materiality" or "prejudice," a petitioner must prove a "reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see Bagley, 473 U.S. at 682; Ruiz v. United States, 339 F.3d at 41. The Supreme Court held in 1985 that [*79] a "different result" includes a "reasonable probability that [a defendant] would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59; Miller, 848 F.2d at 1322. There was nothing new about these propositions in 1992, when **Ferrara's** conviction became final.

In 1970, in Brady v. United States, supra, the Supreme Court essentially anticipated the instant case. Brady v. United States involved a petitioner who alleged that he had pled guilty to kidnaping because the trial judge was unwilling to allow him to have a non-jury trial, at which the maximum punishment would have been life in prison, and the petitioner could have been sentenced to death if he was convicted by a jury. See 397 U.S. at 743. Nine years after Brady's plea, the Supreme Court decided that making the risk of death the price of a jury trial was unconstitutional. See United States v. Jackson, 390 U.S. 570, 582, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). However, the Court declined to consider the merits of Brady's claim because it found that his guilty plea was voluntary, knowing, and intelligent. Brady v. United States, 397 U.S. at 758. [*80] This conclusion was based, in part, on the implicit finding that Brady's guilty plea had not been induced by any misrepresentation or other impermissible conduct by the government, id. at 757, and on the express conclusion that nothing in the record suggested that Brady had not committed the offense, id. at 758.

The reasoning of Brady v. United States is important to the instant case. *HN17* The Court wrote that, "waivers of constitutional rights [including the right to a trial,] not only must be

voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." Id. at 748. In a footnote to this statement, the Court identified as a relevant circumstance the ability to make "an intelligent assessment of the relative advantages of pleading guilty." Id. at 748 n.6. The Court also recognized that "often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted." Id. at 756.

The Court **[\*81]** found that Brady "had competent counsel and full opportunity to assess the advantages and disadvantages of a trial as compared with those attending a plea of guilty. . . ." Id. at 754. In these circumstances, it held that Brady's plea was entered intelligently as well as voluntarily. Id. at 754-55.

Brady v. United States established a general rule, with an express exception for cases like **Ferrara's.** It held that:

> HN18 A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.

Id. at 757 (emphasis added, citation omitted). As the emphasized language indicates, HN19 the Court did not intend the general rule of Brady v. United States to apply to **[\*82]** cases, such as the instant case, in which the intelligent character of a guilty plea is undermined by material misrepresentations or other prejudicial misconduct by the government, particularly where, as here, the petitioner asserts his actual innocence.

The Court made the reasons for this exception clear. It was concerned that if government misconduct deprived the defendant, his counsel, and the court of material evidence negating guilt, guilty pleas might be offered by, and accepted from, innocent individuals. Id. at 757-58. More specifically, the Court wrote:

> We would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves. But our view is to the contrary and is based on our expectations that courts will satisfy themselves that pleas of guilty are voluntary and intelligently made by competent defendants with adequate advice of counsel and that there is nothing to question the accuracy and reliability of the defendants' admissions that they committed the crimes with which they are charged. In the case **[\*83]** before us, nothing in the record impeaches Brady's plea or suggests that his admissions in open court were anything but the truth.

Id. at 758.

As this statement indicates, the decision in Brady v. United States was based on the understanding that the defendant and his counsel had the information necessary to evaluate

the relevant circumstances, including the strength of the government's case, and the court had the information necessary to evaluate whether the offered admission of guilt was reliable, rather than an effort by an innocent individual to avert the more severe consequences of a potential wrongful conviction.

**HN20** Where, as in the instant case, the government withholds material information that negates guilt, even competent counsel cannot adequately advise a defendant and the court cannot properly conclude that "there is nothing to question the accuracy and reliability of the defendant's admissions." Id. Thus, there was a compelling reason for the Supreme Court to have expressly excepted from the general rule of Brady v. United States cases, such as this one, that involve misrepresentation or other government misconduct that undermines the [*84] ability of a defendant to plead guilty "intelligently" and the ability of the court to evaluate the truthfulness of his plea.

This exception parallels another exception to the usual finality of a guilty plea that the Supreme Court recognized in McMann v. Richardson, 397 U.S. 759, 774, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970). In McMann, the Court again addressed the question of whether a later change in the law could benefit a defendant who pled guilty with advice of counsel. Id. at 765-66. The case did not involve any alleged misrepresentations or misconduct by the government. In denying McMann's petition, the Court wrote:

> **HN21** When the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.

Id. at 774 [*85] (emphasis added).

Once again, the Court was relying on the adequacy of the advice of counsel in finding that a knowing and intelligent plea would usually be immune from collateral attack. In the instant case, however, there was no "ordinary error" by **Ferrara's** counsel in assessing the facts. If a "serious dereliction" by defense counsel had deprived **Ferrara** of advice given with knowledge of material information negating guilt, McMann would permit collateral review and an appropriate remedy. Id. In the instant case, it was the "serious dereliction" by the government that deprived **Ferrara** and his counsel of such information, and has rendered his guilty plea not "intelligent." Brady v. United States, 397 U.S. at 756-57, expressly permits relief to be granted in such a case.

Contrary to the government's contention, this conclusion is not qualified by Tollett, supra. **HN22** In Tollett, the Supreme Court held that a defendant who had pled guilty was "not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected." 411 U.S. at 266. Rather, the Court explained, "the focus of [*86] federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity." Id. (emphasis added). The Court construed Brady v. United States and McMann as holding that when a defendant pleads guilty:

> he may not thereafter raise independent claims relating to the deprivation of

constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [the range of competence demanded of attorneys in criminal cases].

Id. at 267 (emphasis added).

Tollett does not bar **Ferrara's** claim that the government's failure to produce material evidence negating his guilt rendered his plea not intelligent. He is not asserting an "independent" claim. Rather, **Ferrara's** claim goes to the heart of his counsel's ability to advise **Ferrara** adequately whether to plead guilty; **Ferrara's** ability to assess intelligently that advice; and the court's ability to evaluate the truthfulness of his plea. See Brady v. United States, 397 U.S. at 758; [*87] Wright, 43 F.3d at 496; Fambo v. Smith, 433 F. Supp. 590, 599 (W.D.N.Y.), aff'd 565 F.2d 233 (2d Cir. 1977) (per curiam). As the Tenth Circuit wrote in Wright:

> "without [the clearly exculpatory] evidence before it, the trial court which accepted the plea could not, in fact, satisfy itself in any meaningful sense that petitioner's guilty plea was voluntarily and intelligently made by an informed defendant with adequate advice of counsel, and that there was nothing to question the accuracy and reliability of this defendant's admission that he had committed the crime with which he had been charged."

Wright, 43 F.3d at 496 (quoting Fambo, 433 F. Supp. at 599).

In 1975, in Menna v. New York, 423 U.S. 61, 62, 46 L. Ed. 2d 195, 96 S. Ct. 241 & n.2 (1975), HN23 the Supreme Court reiterated that the bar to litigation of constitutional claims in habeas proceedings imposed by Brady v. United States and Tollett applies only when those claims do not raise questions of whether the defendant actually committed the offense or whether his guilty plea was truly knowing and intelligent. More specifically, the [*88] Court wrote:

> The point of [Brady v. United States and Tollett] is that a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case. In most cases, factual guilt is a sufficient basis for the State's imposition of punishment. A guilty plea, therefore, simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established.

Id. (emphasis added).

Once again, in the instant case, **Ferrara** contends that he is not guilty of the charges involving the Limoli murder to which he pled guilty; his plea was not "intelligent" because he and his counsel were improperly deprived of material information negating his guilt and seriously undermining the credibility of the crucial witness against him on those charges; and the court

now has substantial reason to question the factual basis for the plea to those offenses. In the language of Menna, **Ferrara** has alleged a constitutional violation logically **[*89]** inconsistent with the valid establishment of factual guilt. Thus, Menna does not foreclose **Ferrara's** claim in this case.

Rather, as the Sixth Circuit held in 1985, "the Supreme Court did not intend to insulate all misconduct of constitutional proportions from judicial scrutiny solely because that misconduct was followed by a plea which otherwise passes constitutional muster as knowing and intelligent." Campbell v. Marshall, 769 F.2d 314, 321 (6th Cir. 1985) (emphasis added). As the Sixth Circuit found, the government's improper failure to disclose exculpatory evidence can undermine the voluntary and intelligent nature of the plea. Id. at 318, 321. In 1988, the Eighth Circuit agreed. See White, 858 F.2d at 422.

Also in 1988, the Second Circuit decided Miller, supra. In Miller, the Second Circuit vacated a plea of not guilty by reason of insanity to murder charges because the government had withheld from the defendant material evidence that another person had committed the crimes in question. See 848 F.2d at 1322. In doing so, the court utilized the principles applicable to defendants who **[*90]** enter a plea of guilty. Id. at 1319, 1320.

The Second Circuit first wrote that, HN24 "it is by now [in 1988] well established that a person accused of a crime has a due process right to require the prosecution to turn over to him any material exculpatory evidence in its possession," and cited Brady v. Maryland, 373 U.S. at 87. Id. at 1319. The court then explained that:

> In the absence of special circumstances, the validity of a plea of guilty is determined by reference to whether it was intelligent and voluntary. Brady v. United States, 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463; Boykin v. Alabama, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S.Ct. 1709. As a general matter, a plea is deemed "intelligent" if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way; it is deemed "voluntary" if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally. See Brady v. United States, 397 U.S. at 750. The Brady v. United States Court made clear, however, that this test **[*91]** suffices only in the "absence of misrepresentation or other impermissible conduct by state agents." Id. at 757, 90 S.Ct. at 1473. Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, id. at 756, and of information that may be available to cast doubt on the fact or degree of his culpability, we conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.

Id. at 1320 (emphasis added).

Although Miller was decided a year before Teague, the Second Circuit essentially found that its decision was compelled by the Supreme Court's decisions in Brady v. Maryland and Brady v. United States. The court in effect reasoned that HN25 a guilty plea should not be deemed truly "knowing" or "intelligent" if the government has withheld material exculpatory information not known to the defendant and his counsel. See Miller, 848 F.2d at 1320. It also recognized that its reasoning and ruling were rooted in the fact that the general **[*92]** rule of Brady v. United States regarding the finality of guilty pleas included an express exception for cases involving misrepresentations or other government misconduct that taints such a plea. Id.