EXHIBIT C
pp. 41- 65

Teague was decided in 1989. Its holding that a petitioner in a habeas corpus proceeding may not receive the benefit of a new constitutional rule, unless the rule is retroactive, was intended to serve several important purposes. One purpose was to promote finality in criminal cases. As the Supreme Court explained, *HN26*⟨⟩"application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." Teague, 489 U.S. at 309.

Consistent with this interest in finality, the Supreme Court also sought to encourage defendants to raise claims for new constitutional rules on direct appeal, before their convictions became final. Id. at 306. Thus, the Court stated that *HN27*⟨⟩"habeas corpus has always been a collateral remedy. . . . It is not designed as a substitute for direct review.'" Id. (quoting Mackey v. United States, 401 U.S. 667, 682, 28 L. Ed. 2d 404, 91 S. Ct. 1160 (1971) **[*93]** (Harlan, J., concurring in part and dissenting in part)); see also Wright v. West, 505 U.S. 277, 292, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992); Jackson v. Virginia, 443 U.S. 307, 332 n.5, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

After 1989, various circuits followed Miller and found that a guilty plea would be vacated if it were demonstrated that the government had improperly withheld material exculpatory information from a defendant before he entered his plea. In those cases, neither the government nor the courts even raised the issue of whether such a claim was barred by Teague. See Tate, supra; Wright, supra; Sanchez, supra; McCleary, supra.

In the sole First Circuit case presenting the issue, "the government assumed arguendo that Brady [v. Maryland] might apply where a withholding of exculpatory information actually causes a guilty plea" and cited Miller for this proposition. Claudio, 44 F.3d at 15. The First Circuit, however, did not decide the issue because it found that the information the defendant claimed was withheld improperly "had no significance." Id. n16

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 The First Circuit's decision in United States v. Cordero, 42 F.3d 697 (1st Cir. 1994) is not inconsistent with Miller and the comparable cases in other circuits. After pleading guilty, in a direct appeal, Cordero sought review of the denial of his motion to suppress. Id. at 698. The First Circuit declined to decide the merits of his claim because Tollett held that "an unconditional guilty plea insulates virtually all earlier rulings in the case from appellate review." Id. (emphasis added). The First Circuit noted that Tollett expressly barred an individual who pled guilty from raising "'independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.'" Id. at 698-99, quoting Tollett, 411 U.S. at 267. The denial of a motion to suppress is, at least usually, a claim that is "independent" of the issue of whether a plea was entered voluntarily and intelligently. Id.; but see United States v. Barton, 995 F.2d. 931, 933 (9th Cir. 1993). **Ferrara's** claim that the government's improper withholding of material evidence negating his guilt induced him to plead guilty to offenses relating to the Limoli murder that he did not commit does not involve consideration of a ruling that preceded his guilty plea and is not an "independent" claim. Rather, it directly involves the question of whether his plea was knowing and intelligent.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*94]**

When **Ferrara's** conviction became final in 1992, it was clearly established that he had a right to receive from the government material exculpatory evidence pursuant to Brady v. Maryland. See Miller, 848 F.2d at 1320. It was also clearly established that he had a right to relief if his guilty plea was not entered intelligently because the government improperly deprived him of material information negating his guilt. See Brady v. United States, supra; Tollett, supra; Menna, supra; Miller, supra; Campbell, supra; White, supra.

Contrary to the government's contention, the Supreme Court's 2002 decision in United States v. Ruiz, 536 U.S. 622, 153 L. Ed. 2d 586, 122 S. Ct. 2450 (2002), does not indicate that

**Ferrara** is barred from litigating his Brady v. Maryland claim or from being provided relief if he proves that claim. Rather, Ruiz supports this court's conclusions.

*HN28* In Ruiz the Supreme Court held on a direct appeal of a defendant's sentence that the constitution does not prohibit the government from requiring a defendant to waive his right to impeachment information in return for a "fast-track" plea **[*95]** agreement that will result in a lower sentence. See 536 U.S. at 633. The Court was not addressing the government's constitutional duty to provide a defendant with material information that tends to negate his guilt. Indeed, the Court referenced the interest in "securing those guilty pleas that are factually justified." Id. at 631. It also noted that its enduring concern about the possibility that guilty pleas might be tendered by, and accepted from, innocent individuals was addressed by Ruiz's plea agreement. More specifically, the Court wrote:

> The proposed plea agreement at issue here specifies that the Government will provide "any information establishing the factual innocence of the defendant []." That fact, along with other guilty-plea safeguards, see Fed. Rule Crim. Proc. 11, diminishes the force of Ruiz's concern that, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty.

Id.

Quoting Brady v. United States, 397 U.S. at 748, the Court reiterated that, *HN29* "the Constitution insists, among other things, that the defendant **[*96]** enter a guilty plea that is voluntary' and that the defendant must make related waivers knowingly, intelligently, [and] with sufficient awareness of the relevant circumstances and likely consequences.'" Id. at 629. It then explained that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary ('knowing,' intelligent,' and sufficiently aware.')." Id. at 629 (emphasis omitted).

Therefore, *HN30* Ruiz reemphasizes the importance of guilty pleas being entered intelligently. It does not alter the Supreme Court's ruling in Brady v. United States, 397 U.S. at 757, that misrepresentations or other impermissible conduct by the government can undermine the intelligence of a plea. Nor does it erode the reasoning of Miller, 848 F.2d at 1322, that the improper failure of the government to disclose material information tending to negate guilt actually renders unintelligent and invalid a guilty plea.

Finding that in 1992 the government was constitutionally required to provide **Ferrara** with material information helpful to him with regard to guilt and punishment certainly does not impose **[*97]** any new obligation on it. See Miller, 848 F.2d at 1320. In Strickler v. Greene, 527 U.S. 263, 289 n. 35, 144 L. Ed. 2d 286, 119 S. Ct. 1936 (1999), the Supreme Court stated in applying the rule of Brady v. Maryland to sentencing in a case before it on a petition for habeas corpus, "because our opinion does not modify Brady, we reject respondent's contention that we announce a new rule' today. See Bousley v. United States, 523 U.S. 614, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998)." See also Basden v. Lee, 290 F.3d 602, 611 (4th Cir. 2002). This statement is equally applicable to the instant case.

Bousley, which the Court cited in Strickler, involved a contention that a guilty plea was not knowing and intelligent because the petitioner had not understood the elements of the offense. 523 U.S. at 618. The Supreme Court wrote that:

> We do not believe that Teague governs this case. The only constitutional claim made here is that petitioner's guilty plea was not knowing and intelligent. There is surely nothing new about this principle. . . ."

Id. at 620. This statement too is equally applicable to the instant case. n17

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n17 The Supreme Court's decision in Penry, 492 U.S. at 312-19 is also instructive. Penry presented on collateral review the issue of whether the jury instructions in a capital case properly addressed the need to consider mitigating factors in deciding whether the death penalty should be imposed. The Court found that Penry was not seeking a "new rule." Rather, habeas corpus review was permissible because its precedents previously established a right to jury instructions on mitigating factors and Penry's case merely called for an application of that principle. Id. at 315.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*98]**

HN31🔑"Teague taught that, apart from the Supreme Court, federal habeas courts ought not act as innovators in the field of criminal procedure, thereby upsetting [] convictions because [] courts were not prescient and thus failed to comply with federal law that did not exist at the time they ruled." O'Brien v. Dubois, 145 F.3d 16, 23 (1st Cir. 1998) (citations omitted), overruled on other grounds by McCambridge v. Hall, 303 F.3d 24 (1st Cir. 2002). Applying the Miller standard to the facts of this case is not an innovation, but merely a decision compelled by Brady v. Maryland and Brady v. United States. n18

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n18 Even if finding that **Ferrara's** guilty plea does not bar a decision on the merits of his claim created a new rule, it would not create a new constitutional rule. Deciding that **Ferrara** may litigate his claims on collateral review does not resolve a constitutional question. Rather, it only decides the scope of the issues that can be litigated pursuant to 28 U.S.C. § 2255. Therefore, Teague would not bar **Ferrara** from benefitting from that rule. See Teague, 489 U.S. at 309 ("Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*99]**

Moreover, it would be anomalous and adverse to the interests of justice to hold that **Ferrara's** claim is barred by Teague. As described earlier, Teague was intended, in part, to encourage defendants to raise all of their claims on direct appeal. See Teague, 489 U.S. at 306. However, the government's misconduct prevented **Ferrara** from discerning his Brady v. Maryland claim and raising it in a direct appeal. In Sanchez, the court reasoned, in part, that:

> HN32🔑If a defendant may not raise a Brady claim after a guilty plea, prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas. We therefore hold that a defendant challenging the voluntariness of a guilty plea may assert a Brady claim.

50 F.3d at 1453. This case demonstrates the wisdom of that reasoning.

In view of the foregoing, the court respectfully disagrees with the Fifth Circuit's ruling in Matthew that deciding in habeas proceedings whether a Brady v. Maryland violation occurred prior to a guilty plea involves the creation of a "new rule" for Teague purposes. See 201 F.3d at 364. [*100] The government did not raise this defense in Matthew. Id. at 359 n. 6. Rather, the Fifth Circuit addressed the question sua sponte. Id. As described earlier, no other circuit has found that Teague bars claims like **Ferrara's** in this case.

In addition, the facts of the instant case distinguish it from Matthew in a significant way. "Matthew [did] not challenge the factual basis for his plea." Id. at 366. In contrast, **Ferrara** asserts that he is actually innocent of the relevant charges. Indeed, he did not plead guilty to the charges arising out of the murders of Corlito and DiFronzo and began proclaiming his innocence of involvement in the Limoli homicide before his sentencing. In essence, **Ferrara** alleges that because the government did not inform him that Jordan had recanted his statements that **Ferrara** ordered the murder of Limoli, **Ferrara** was induced to plead guilty and accept a twenty-two year sentence rather than run the risk of being wrongfully convicted and sentenced to life in prison. Once again, **Ferrara** contends that his counsel was improperly deprived of information necessary to provide adequate advice and the court was deprived [*101] of information necessary to discern that there was not a proper factual basis for the proferred plea. See Brady v. United States, 397 U.S. at 758; Wright, 43 F.3d at 496. No such claim was made in Matthew. Therefore, even if Matthew was correctly decided on the facts before the Fifth Circuit, it is distinguishable in a material respect from the instant case.

Accordingly, the government waived its alleged Teague defense; that defense is, in any event, not meritorious; and **Ferrara** has stated a claim on which relief may be granted pursuant to Brady v. United States and its progeny.

C. The Reasonable Probability Standard Applies

**Ferrara** asserts that the government violated its duty to disclose material evidence negating his guilt and, therefore, he was prejudiced in his ability to decide intelligently whether to plead guilty despite his actual innocence of certain charges. As discussed earlier, the tests for materiality and prejudice are the same. See Strickland, 466 U.S. at 694; Hill, 474 U.S. at 57; Miller, 848 F.2d at 1321-22; Ruiz v. United States, 339 F.3d at 41. [*102] **Ferrara** must demonstrate a reasonable probability that, had the evidence at issue been disclosed, the result would have been different. Bagley, 473 U.S. at 682.

In the context of this case, [HN33] **Ferrara** can satisfy this burden by proving that "there is a reasonable probability that but for the withholding of the information [he] would not have entered the [guilty] plea but would have insisted on going to a full trial . . ." Miller, 848 F.2d at 1322; see also Sanchez, 50 F.3d at 1454 ("the issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the Brady material, the defendant would have refused to plead and would have gone to trial"); United States v. Stanley, 97 Fed. Appx. 180, 181 (9th Cir. 2004) ("there is not a reasonable probability under an objective standard that, but for the newly discovered evidence about the government's informant, Stanley would have refused to plead and would have gone to trial'"); United States v. McCleary, 112 F.3d 511 at *3 (4th Cir. 1997), [reported in full text format at] 1997 U.S. App. LEXIS 9391 (table); Indelicato v. United States, 106 F. Supp. 2d 151, 158 (D.Mass. 2000) [*103] (Saris, J.); Banks v. United States, 920 F. Supp. 688, 692 (E.D.Va. 1996). n19

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 The relevant cases decided since Miller have generally employed the reasonable probability test. Campbell, 769 F.2d at 323, which was decided before Miller, and White, 858 F.2d at 422, which was decided several months after Miller, each employed instead a totality of the circumstances test. This court finds that the reasonable probability test which generally applies to alleged Brady v. Maryland violations also applies to **Ferrara's** effort to obtain relief

for the government's improper failure to provide him with material information tending to negate his guilt of the charges at issue. However, the result in this case would be the same under the totality of the circumstances test.

The Sixth Circuit in Campbell, 769 F.2d at 324, and the Eighth Circuit in White, 858 F.2d at 423, considered such circumstances as: the certainty of the petitioner's factual guilt; whether there was a reasonable probability that but for the withholding of the information the petitioner would have not pled guilty; the magnitude of the constitutional violation; the degree of defense counsel's effectiveness; and any benefit, such as a lesser sentence, petitioner received in exchange for pleading guilty. In this case, the constitutional violation is clear and its magnitude is great. There is a serious question about whether **Ferrara** is actually guilty of the charges arising from the Limoli murder to which he pled guilty. There is a reasonable probability that if the government had disclosed Jordan's recantation, **Ferrara** would not have pled guilty to those charges. While **Ferrara's** plea averted a potential life sentence, it is only the government's misconduct that created a genuine risk that **Ferrara** would be convicted of any of the charges relating to murder and have received such a sentence. Therefore, the totality of the of the circumstances test also justifies granting **Ferrara** the relief he is receiving pursuant to the reasonable probability test.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*104]

In Kyles, 514 U.S. at 434, the Supreme Court explained the meaning of "reasonable probability." It wrote:

> Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. *HN34* The question is not whether the defendant would more likely than not have received a different [result] with the evidence, but whether in its absence he received [a result] worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome . . ." Bagley, 473 U.S. at 678.

Id. at 434. See also Strickler, 527 U.S. at 289-90. The First Circuit has regularly reiterated and applied this definition of "reasonable probability." See United States v. Rodriguez-Marrero, 390 F.3d 1, 28 (1st Cir. 2004); United States v. Casas, 356 F.3d 104, 114 (1st Cir. 2004); Moreno-Morales v. United States, 334 F.3d 140, 146 (1st Cir. 2003); Ellis v. United States, 313 F.3d 636, 649 (1st Cir. 2002); United States v. Josleyn, 206 F.3d 144, 152 (1st Cir. 2000). [*105] *HN35* The test of whether there is a reasonable probability that the defendant would have gone to trial if the prosecution had not withheld the exculpatory evidence "is an objective one, depending largely on the likely persuasiveness of the withheld information." Miller, 848 F.2d at 1322. It does not involve an "individualized inquiry" regarding the impact on a particular attorney or defendant. Id. at 1323. Rather:

> Given the nature of the question and the clear direction in Hill and Strickland that the likely outcome of a trial should be assessed "objectively, without regard for the idiosyncracies of the particular decisionmaker,'" Hill, 474 U.S. at 60-61 (quoting Strickland, 466 U.S. at 695), the habeas courts should [make] an objective evaluation of the likely impact that the withheld information would have had. . . .

Id. at 1323. See also Sanchez, 50 F.3d at 1454 ("we agree with the reasoning of the Second Circuit in Miller and hold that the test for whether the defendant would have chosen to go to trial is an objective one that centers on the likely persuasiveness **[*106]** of the withheld information.'"); Indelicato, 106 F. Supp. 2d at 158 ("This test for materiality is an objective one.").

D. **Ferrara** Was Denied Due Process And Is Entitled To Relief

To reiterate, **Ferrara's** claim for relief is not barred by Teague, and the appropriate standard for evaluating his claim is the "reasonable probability" standard. **HN36** The inquiry must focus on whether, but for the improper suppression of evidence by the government, there is a reasonable probability that the outcome of the proceeding would have been different. That reasonable probability is demonstrated when the suppression of exculpatory evidence undermines confidence in the outcome. Bagley, 473 U.S. at 678.

As indicated earlier and elaborated below, the government improperly withheld from **Ferrara** evidence that tends to negate his guilt on the charges relating to the Limoli murder which, if proven, would have raised the maximum punishment provided by the Guidelines to life in prison. The information that the government suppressed also indicated that Jordan had committed perjury in his testimony to the grand jury. As any competent defense lawyer would have readily recognized, **[*107]** this admission alone would also have strongly influenced a jury not to believe any testimony by Jordan that **Ferrara** was involved in the Corlito and DiFronzo killings. Any such attorney would also have recognized that the government must have had little, if any, additional evidence implicating **Ferrara** in those crimes.

**Ferrara** never admitted to murdering Corlito and DiFronzo. Although he pled guilty to the charges relating to the Limoli murder, by the time of his sentencing he was proclaiming his innocence.

In these circumstances, if proper disclosure had been made, there is a reasonable probability that: **Ferrara's** counsel would not have advised him to agree to a twenty-two year sentence; **Ferrara** would not have pled guilty to the murder related charges; and if he had attempted to do so, the court would have found that there was not a proper factual basis to accept his plea to those charges. Rather, there is a reasonable probability that **Ferrara** would have gone to trial and not been convicted of the charges relating to the Limoli, Corlito, or DiFronzo murders. There is also a reasonable probability that, if convicted of the RICO charges or other alleged offenses, **Ferrara** would not have **[*108]** been held accountable for any of the murders as relevant conduct. Therefore, the suppressed information was material, and a Brady violation occurred. See Strickler, 527 U.S. at 281; United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001).

In essence, the government's extreme misconduct prevented **Ferrara's** counsel from giving him adequate advice, prevented **Ferrara** from entering his guilty plea intelligently, and prevented the court from making a properly informed judgment concerning whether there was a factual basis for the plea. Thus, **Ferrara** is entitled to relief. See Brady v. United States, supra; Miller, supra. The reasons for these conclusions are as follows.

As described earlier, Count 3 charged that **Ferrara** conspired with Barone to murder Limoli for the purposes of gaining entrance to and maintaining and increasing positions in the Patriarca Family, in violation of 18 U.S.C. § 1952B(b) (1) and (2). Count 4 charged **Ferrara** and Barone with actually murdering Limoli for the same purposes. The government's theory was that **Ferrara** was guilty on Count 4 because he aided and abetted the **[*109]** murder of Limoli by Barone and/or because the murder was in furtherance of their conspiracy. See Pinkerton v. United States, 328 U.S. 640, 646-48, 90 L. Ed. 1489, 66 S. Ct. 1180 (1946); Patriarca, 912 F. Supp. at 604-08. Similarly, Counts 1 and 2, Racketeering Act A-3(a) charged that **Ferrara** and Barone conspired to murder Limoli and A-3(b) charged that **Ferrara** commanded Barone to kill Limoli.

HN37⚓A conspiracy is an agreement to commit a crime. See First Circuit Pattern Instruction 4.03; United States v. Piper, 35 F.3d 611, 614-15 (1st Cir. 1994); United States v. Richardson, 225 F.3d 46, 53 (1st Cir. 2000). The government must prove that the coconspirators "shared a general understanding about the crime." United States v. Barnes, 251 F.3d 251, 259 n. 2 (1st Cir. 2001). It must also prove that the defendant intended that the underlying crime -- the murder of Limoli -- be committed. Id.

HN38⚓Similarly, "to aid and abet means intentionally to help someone else commit a crime." First Circuit Pattern Jury Instruction 4.02; United States v. Spinney, 65 F.3d 231, 234-35 (1st Cir. 1995); United States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994). [*110] "This means that the government must prove beyond a reasonable doubt that [defendant] consciously shared the other person's knowledge of the underlying criminal act and intended to help him. . . ." United States v. Henderson, 320 F.3d 92, 110 (1st Cir. 2003).

Barone's statement that **Ferrara** wanted to kill him because Barone did not get permission from **Ferrara** to murder Limoli is evidence that **Ferrara** did not direct Barone to kill Limoli, **Ferrara** did not agree with Barone that Limoli should be killed, and that Limoli was not murdered to maintain or increase **Ferrara's** position in the Patriarca Family. To the contrary, this statement indicates that **Ferrara** did not know in advance that Barone intended to kill Limoli and objected when he came to believe that Barone had done so. Thus, this evidence tends to negate directly **Ferrara's** guilt on Racketeering Acts A-3(a) and (b), and Counts 3 and 4.

Nevertheless, the government claims that Jordan's statement that Barone asserted that he did not get permission from **Ferrara** to murder Limoli is merely a prior inconsistent statement that could have been used to impeach Jordan's anticipated trial testimony and, therefore, was [*111] not required to be disclosed prior to **Ferrara's** plea pursuant to United States v. Ruiz, supra. Brady v. Maryland itself refutes this contention.

Brady admitted his participation in a murder but testified at trial that a coconspirator did the killing. See Brady, 373 U.S. at 84. The government withheld a statement in which the coconspirator admitted he was the actual killer. Id. The Supreme Court characterized this as "evidence favorable to the accused . . . material . . . to punishment." Id. at 87. In Bagley, 473 U.S. at 676, the Supreme Court stated that in Brady, "the prosecutor failed to disclose exculpatory evidence." It contrasted the evidence in Brady to the evidence in Bagley, in which "the prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." Id. The Court then wrote, HN39 ⚓"Impeachment evidence, however, as well as exculpatory evidence, falls within the Brady rule." Id.

In United States v. Ruiz, 536 U.S. at 632, the Supreme Court held that, at least with regard to the particular [*112] defendant and the "fast-track" plea agreement at issue, "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." As Brady and Bagley confirm, however, in this case Jordan's report of Barone's statement was "exculpatory" evidence that relates directly to whether **Ferrara** is guilty of the offenses arising from the Limoli murder rather than mere "impeachment" evidence. Jordan's statement was also relevant to **Ferrara's** possible punishment because, if proven, the Limoli murder charges would have raised **Ferrara's** Guideline sentence to life in prison. Therefore, it is not the type of evidence that was at issue in United States v. Ruiz.

Barone's statement that he did not get permission from **Ferrara** to kill Limoli is "core" exculpatory evidence that the government was required to disclose if it was material. Kyles, 514 U.S. at 433-38; Bagley, 473 U.S. at 678; Strickler, 527 U.S. at 281. In this case the suppressed exculpatory information was material because "there is a reasonable probability that but for [the withholding of the information [*113] Ferrara] would not have entered the [guilty] plea but would have insisted on going to trial." Miller, 848 F.2d at 1322; see also

Sanchez, 50 F.3d at 1454; Stanley, 97 Fed. Appx. 180 at *1; McCleary, 1997 U.S. App. LEXIS 9391, 1997 WL 215525 at *3; Indelicato, 106 F. Supp. 2d at 158; Banks, 920 F. Supp. at 692.
n20 The government's failure to disclose Jordan's reports that Barone had stated that he did not get **Ferrara's** permission to kill Limoli completely undermines confidence in the outcome of **Ferrara's** case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 The government acknowledges that if Jordan's recantation is material evidence that directly negates guilt, the government was required to disclose it to **Ferrara** before trial to satisfy the constitutional requirement that he be afforded Due Process. See Apr. 1, 2004 Tr. at 53-4. As described earlier, when **Ferrara** was indicted, Local Rule 42(a)(5) of the Local Rules of the United States District Court for the District of Massachusetts required that Brady material be disclosed within fourteen days of arraignment. A violation of that Rule might not always be a constitutional violation. However, [HN40] a defendant has a constitutional right to receive Brady information sufficiently before trial to use it effectively. See Coppa, 267 F.3d at 142 (citing cases); United States v. Pollack, 175 U.S. App. D.C. 227, 534 F.2d 964, 973; (D.C. Cir.), cert. denied, 429 U.S. 924, 50 L. Ed. 2d 292, 97 S. Ct. 324 (1976). In this case, the government understood that it was required to make its Brady disclosures before the trial which had commenced by January 22, 1992, when **Ferrara** pled guilty. See Apr. 1, 2004 Tr. at 54. In any event, the constitution required that **Ferrara's** counsel be informed of Jordan's recantation well before trial to permit him to investigate it, develop trial strategy, research evidentiary issues, prepare for the opening statement he was scheduled to make on January 22, 1992, and subpoena witnesses. See United States v. Snell, 899 F. Supp. 17, 20 (D. Mass. 1995).

The Jencks Act, 18 U.S.C. § 3500, does not qualify this conclusion. Exhibit 17 was written by Coleman and was a Jencks statement concerning him. See United States v. Del Toro Soto, 676 F.2d 13, 15-16 (1st Cir. 1982); United States v. Foley, 871 F.2d 235, 238 (1st Cir. 1989). Although the government had an arguable basis for not disclosing the actual document, Brady v. Maryland required that it at least give **Ferrara,** before trial, full and fair notice of the material exculpatory information contained in Coleman's handwritten memorandum, Exhibit 17. [HN41] It is axiomatic that a statute is trumped by a constitutional right. See Marbury v. Madison, 5 U.S. 137, 138, 2 L. Ed. 60 (1803); INS v. Chadha, 462 U.S. 919, 944, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983). Virtually all exculpatory information is contained in a Jencks statement of some witness. If the Jencks Act saved the government in this case, the rule of Brady v. Maryland would be eviscerated.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*114]**

[HN42] The government must under Brady v. Maryland disclose material exculpatory evidence that would be admissible at trial or that may itself be inadmissible but is "so promising a lead to strong exculpatory evidence that there could [have been] no justification for withholding it." Ellsworth v. Warden, 333 F.3d 1, 5 (1st Cir. 2003). Barone's assertion that he did not get **Ferrara's** permission to kill Limoli meets this test.

If Barone's statement had been disclosed, a competent defense attorney would have recognized that evidence of it could be presented to the jury and would have powerful potential to refute any testimony that **Ferrara** was involved in the Limoli murder. More specifically, counsel could have sought to interview Barone and obtain his testimony. Barone, whose case had been severed and who was still awaiting trial, might have asserted his Fifth Amendment privilege not to testify. n21

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n21 If Barone asserted his Fifth Amendment privilege not to testify, he would have been an unavailable witness. See Zeigler v. Callahan, 659 F.2d 254, 269 (1st Cir. 1981). If Barone was unavailable, his statement would probably have been admissible as a statement against interest under Federal Rule of Evidence 804 (b) (3).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*115]

Nevertheless, if, as the government now implausibly contends, it would have called Jordan as a witness at **Ferrara's** trial despite his admission that he committed perjury, Jordan would have been permitted to testify about Barone's statement because it was an excited utterance admissible under Federal Rule of Evidence 803 (2). [HN43]Hearsay statements are admissible as excited utterances if there was: 1) a startling event; 2) a statement made while the declarant was subject to the influence of that event; and 3) a relation between the statement and the event. See United States v. Bailey, 834 F.2d 218, 228 (1st Cir. 1987).

Barone's statement satisfies all three prongs of this test. First, the startling event was **Ferrara's** threat to kill Barone, which led him to flee the restaurant. See United States v. Collins, 60 F.3d 4, 8 (1st Cir. 1995) (declarant "experienced the startling event of Collins threatening to return and shoot him"). Second, Barone was still under the influence of the startling event at the time he said, "I did not get permission to kill Jimmy." As Jordan testified at Barone's trial, Barone was "hysterical" **[*116]** when he returned to the apartment after being threatened by **Ferrara.** See Sept. 8, 1993 Barone Tr. at 120; Collins, 60 F.3d at 8 (declarant was "visibly upset and agitated" when he made the statement). The fact that it took some time for Barone to run from the restaurant to his apartment does not mean that the startling event was too remote in time. See United States v. Golden, 671 F.2d 369, 371 (10th Cir. 1982) (evidence admitted as excited utterance after declarant, who had been assaulted and feared for his life, drove twelve miles before making the statement). Third, the statement relates to the event because it was made by Barone to explain to Jordan why he was afraid of **Ferrara** and why they had to flee.

A competent defense lawyer would have also reasoned that if Jordan refused to testify, or altered his version of events, Coleman would be permitted to tell the jury about Jordan's report of Barone's excited utterance, which would have been admitted for the truth of Barone's statement that he did not get **Ferrara's** permission to murder Limoli. Jordan's confession that he had lied in his interviews and grand jury testimony was a statement that **[*117]** "so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person would not have made the statement unless believe it to be true." Fed. R. Evid. 804(b)(3). Moreover, "corroborating circumstances clearly indicate the trustworthiness of [Jordan's] statement." Id. Thus, Coleman's testimony concerning it would have been expected to be admissible as a statement against Jordan's interest under Federal Rule of Evidence 804(b)(3).

More specifically, Jordan's July 26, 1988 plea agreement with the government was "contingent on [his] providing full and truthful information and testimony." Ex. 18. It gave him use and derivative use immunity for his truthful cooperation, and admission to the Witness Security Program. Id. Jordan correctly understood, however, that if he did not provide truthful information and testimony, he could: lose his immunity and be prosecuted for his role in the Limoli murder based on his own statements; be prosecuted for perjury; and be put in mortal peril by being ejected from the Witness Security Program. Thus, confessing that he had previously lied about **[*118] Ferrara's** role in the Limoli murder was strongly against Jordan's interest.

As this confession tended to expose Jordan to criminal liability and exculpate **Ferrara,** "corroborating circumstances clearly indicating the trustworthiness of the statement" would have been required for it to be admitted. Fed. R. Evid. 803(4). Jordan made the statement initially to Coleman, whom he particularly trusted. He did not seek to exculpate his brother-in-law, Barone. Rather, his statement would have been helpful to **Ferrara,** who could not have harmed Jordan as long as Jordan remained in the Witness Security Program. In view of these facts, a competent defense attorney would have expected to be able to get Jordan's statement

to the jury through Coleman's testimony if necessary.

As described earlier, the government's Trial Brief would have made it clear to a competent defense attorney that its case concerning the Limoli charges depended primarily, if not exclusively, on Jordan's testimony. See Trial Brief at 207-211. Prior to **Ferrara's** plea, the government disclosed in its Trial Brief that Jordan was cooperating and described in detail his anticipated testimony. **[*119]** Id. Jordan was the only witness concerning Limoli identified in the Trial Brief. Id. Pretrial discovery revealed that there was no electronic surveillance implicating **Ferrara** in the Limoli murder. Nor was there any scientific evidence that could be used against him. Thus, it would have been evident that, as the court repeatedly stated at Barone's trial, Jordan was a crucial witness and his credibility was "essential" to proving the government's case concerning Limoli. See, e.g., Oct. 18, 1993 Barone Tr. at 35-36, 50-51 (the court states, "Walter Jordan's credibility is essential to this case").

*HN44* It is well-known that the testimony of cooperating witnesses is inherently suspect and often not credited by juries because the witnesses are criminals with obvious incentives to lie to help themselves. As Ninth Circuit Judge Stephen Trott, a former United States Attorney and Assistant Attorney General in charge of the Criminal Division of the Department of Justice, has written:

> Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law.
>
> * * *
>
> Jurors suspect their motives from the moment **[*120]** they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable, openly expressing disgust with the prosecution for making deals with such "scum."

S. Trott, Words of Warning for Prosecutors Using Criminals As Witnesses, 47 Hastings L.J. 1381, 1383, 1385 (1996).

*HN45* Juries in the First Circuit are regularly instructed to consider the testimony of cooperating witnesses "with particular caution." See First Circuit Pattern Jury Instruction 2.07; United States v. Hernandez, 109 F.3d 13, 17 (1st Cir. 1997) (approving "with greater caution" instruction); United States v. Brown, 938 F.2d 1482, 1486 (1st Cir. 1991) (referring to standard accomplice jury instruction as "with caution and great care."); United States v. Paniagua-Ramos, 251 F.3d 242 (1st Cir. 2001). Experience has shown that when a cooperating witness alters his version of events or suffers a lapse of memory, it is very difficult, if not impossible, to obtain a conviction in the absence of strong, corroborating evidence that would have rightly appeared to a competent defense lawyer to have **[*121]** been absent with regard to **Ferrara's** alleged involvement in the Limoli murder. See, e.g., Collatos, 798 F.2d at 19 (cooperating witness was "thoroughly impeached by his lack of recall' on cross-examination and [defendant] was subsequently acquitted.").

In this case, it was foreseeable that Jordan would be particularly impeachable, even in the absence of the recantation of his statements and grand jury testimony concerning **Ferrara,** and his consequent admission of perjury. Later events confirm this assessment. Jordan was cross-examined for at least five days at Barone's trial. At the conclusion of the testimony, the government recognized that its evidence linking **Ferrara** to the Limoli murder was weak and argued, unsuccessfully, that it did not have to prove that **Ferrara** ordered Barone to kill Limoli in order to convict Barone of the charges against him concerning Limoli. In any event, it is evident that Jordan was not regarded by the jury as a completely credible witness. The jury twice reported that it was deadlocked. It ultimately found Barone not guilty of actually murdering Limoli and acquitted him on Count 4, thus rejecting a key part of Jordan's

testimony. **[*122]** See United States v. Barone, 846 F. Supp. 1016, 1017-18 (D. Mass. 1994); Barone, 114 F.3d at 1288. If informed of Jordan's recantation, competent defense counsel would have properly predicted that a jury was not likely to believe any testimony by Jordan implicating **Ferrara** in the Limoli murder.

As explained earlier, competent counsel would also have inferred that Limoli's sister, DiNunzio, was on the witness list to testify about his murder. It would have been evident, however, that she was not likely to have any personal knowledge of the events at issue and that getting statements of Limoli admitted through her would be difficult. This too later proved to be correct in the Barone trial. See Barone, 114 F.3d at 1291-1303.

Competent defense counsel would also have realized that the government had little evidence to prove that **Ferrara** had participated in the murders of Corlito or DiFronzo. DiFronzo was murdered in 1977, allegedly by **Ferrara** and Limoli. Trial Brief at 212. In contrast to the Limoli killing, to which Barone had pled guilty in state court, no one had been prosecuted for the DiFronzo murder. Also in contrast to Limoli, **[*123]** the DiFronzo murder was charged only as a racketeering act and not as a substantive offense. Discovery demonstrated that there was no electronic surveillance or scientific evidence connecting **Ferrara** with that crime. The only other alleged participant in the DiFronzo murder, Limoli, was dead and therefore obviously unavailable to testify. The description of the evidence concerning the DiFronzo murder in the Trial Brief was limited and general. Id. at 211-13. In view of the foregoing, competent defense counsel would have inferred that the government would try to prove **Ferrara's** involvement in the DiFronzo murder through exceptions to the hearsay rule and that its case was not strong, particularly because it foreseeably relied largely on Jordan's credibility. See Barone, 114 F.3d at 1289.

Corlito was murdered in 1979. **Ferrara,** Limoli, Barone, and an unidentified fourth person allegedly shot him. Trial Brief at 213. Once again, there had been no state prosecution for that murder, and the crime was charged only as a racketeering act, not as a substantive offense. There also was no electronic surveillance or scientific evidence linking **Ferrara** to the Corlito murder. **[*124]** The description of the government's evidence concerning Corlito in its Trial Brief was terse and vague. Id. at 213-14. Thus, competent defense counsel would have viewed the evidence linking **Ferrara** to the Corlito murder as weak as well.

Once again, the Barone trial demonstrated the validity of this assessment. At the close of the government's case-in-chief, it barely survived Barone's motion for acquittal on the Corlito murder charge. As described earlier, in denying that motion, the court stated:

> The motion to acquit is genuinely competitive on both the Corlito murder and the Credit Union robbery. I have to look at the evidence in the light most favorable to the government and, basically, Walter Jordan, if believed, says things which I believe are sufficient for those two predicate acts to remain in the case; that is, taking that as a part of all the evidence, if the jury believed it, the jury could find beyond a reasonable doubt that the events occurred and had a sufficient nexus with the alleged RICO enterprise.

Oct. 7, 1993 Barone Tr. at 6-7.

Although interested in reaching a plea agreement with the government, **Ferrara's** trial counsel now states that **Ferrara [*125]** always asserted to him that he had not ordered Limoli's murder. Nevertheless, at the January 22, 1992 change of plea colloquy, **Ferrara** admitted to conspiring to murder Limoli. See Jan. 22, 1992 Tr. at 61-3. However, as described earlier, the Presentence Report stated that:

> **[Ferrara's]** admission (in terms of a guilty plea) and having contracted for the death of James Limoli, is particularly troubling to the defendant. In fact, prior to

entering the plea, he spoke with the decedent's father, and explained the
untenable position he was in and why he found it necessary to acknowledge his
involvement in James Limoli's death, even though he disavows any planning or
participation in the killing.

Presentence Report at 105-06.

**Ferrara** did not in the change of plea colloquy admit to participating in the Corlito or DiFronzo
murders. See Jan. 22, 1992 Tr. at 61. In view of **Ferrara's** plea to the Limoli charges, which
generated a Guideline sentencing range of life in prison, the Corlito and DiFronzo charges had
no practical effect on the potential sentence. Thus, the government agreed that **Ferrara** need
not plead guilty to those charges. Id. **Ferrara** also did not admit **[*126]** to participating in
the Corlito and DiFronzo murders in connection with his sentencing. Rather, the Presentence
Report stated that **Ferrara** insisted that it include the following statement:

James DiFronzo and Anthony Corlito were "despicable human beings. They were
heroin addicts, killers, and James DiFronzo was a rapist. They were in short "low
lifes." Without conceding responsibility for their deaths, the defendant "does not
care, if people think that (he) did it. "

Presentence Report at 105.

Therefore, **Ferrara's** counsel was advising a defendant who was hoping to achieve an
acceptable plea agreement with the government, in part to spare his family the pain that
further publicity would cause, but in larger measure to eliminate the risk of what **Ferrara**
claimed would be a wrongful conviction on one or more murder charges that would require
that he serve life in prison. If Jordan's recantation had been disclosed, competent counsel
would have regarded the government's likelihood of success in proving the murder charges
beyond a reasonable doubt at trial, or even by a preponderance of the evidence at sentencing,
to be slim.

As explained earlier, the likely impact of the **[*127]** suppressed information must be
assessed objectively, without regard to the idiosyncracies of the particular decisionmaker. See
Strickland, 466 U.S. at 695; Hill, 474 U.S. at 59-60; Miller, 848 F.2d at 1323; Stanley, 97 Fed.
Appx. 180 at *1; Indelicato, 106 F. Supp. 2d at 158. Viewed objectively, there is a reasonable
probability that: competent counsel would have advised **Ferrara** to proceed with the trial that
had commenced rather than agree to a twenty-two year sentence; **Ferrara,** who asserted his
actual innocence of those charges, would have agreed; and **Ferrara** would have prevailed with
regard to those charges both at trial and at sentencing. See Miller, 848 F.2d at 1320; Sanchez,
50 F.3d at 1454; Stanley, 97 Fed. Appx. 180 at *1; McCleary, 1997 U.S. App. LEXIS 9391,
1997 WL 215525 at *3. Moreover, the court's confidence in the outcome of **Ferrara's** case has
been completely undermined by the facts revealed in connection with his § 2255 petition.

While not material to the court's analysis, the court finds that, as a practical matter, there is
also a reasonable **[*128]** probability that if the government had disclosed Jordan's
recantation, the parties would have reached a different plea agreement under which **Ferrara**
would not have been sentenced to more than about 188 months in prison, the high end of the
Guideline range as **Ferrara's** attorneys calculate it.

**Ferrara** was very interested in reaching a plea agreement, but not at any price. Plea
discussions continued unsuccessfully for two years before concluding after the jury had been
empaneled. If properly informed of Jordan's recantation, which confirmed **Ferrara's** claim to
be innocent of the Limoli charges and demonstrated the weakness of the government's
contentions that relied on Jordan's credibility, competent defense counsel would have

negotiated hard for an agreement that did not require that time be served for **Ferrara's** alleged involvement in the murders of Limoli, Corlito or DiFronzo. n22

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n22 Although the subjective idiosyncrasies of individual attorneys are not relevant, Miller, 848 F.2d at 1323, the court notes that **Ferrara's** counsel, Oscar Goodman, confirms that, "at a minimum, he would have sought a substantial reduction in the sentence that Mr. **Ferrara** received under the package settlement." Declaration of Oscar Goodman, P 27.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*129]**

Competent prosecutors would have realized that their chances of proving **Ferrara's** involvement in the murder charges at trial or sentencing were poor, and the reasons favoring global plea agreements were strong. As the court found in sentencing **Ferrara** and his codefendants, the global pleas served several important government interests. See Carrozza, 807 F. Supp. at 159-61. These included, but were not limited to: assuring the conviction of defendants who had committed serious crimes, id. at 160; averting the manifest risk of a mistrial because Russo was representing himself, id.; averting the risk of jury tampering, or jury nullification, as had occurred in other LCN cases, id., at 160-61; protecting the identities of fearful witnesses, id. at 161; and permitting the government to devote its limited resources to investigating and prosecuting other crimes, id. at 160. Therefore, viewing the matter objectively, it is reasonably probable that competent prosecutors would have agreed to a sentence for **Ferrara** of no more than about 188 months, and in any event significantly less than 264 months, in **[*130]** order to assure that he and his codefendants would receive long sentences without the need for a trial. n23

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n23 Herbert, a member of the original **Ferrara** prosecution team, now asserts that the government would not have agreed to less than a twenty-two year sentence for **Ferrara**. As the test is an objective one that does not depend on the idiosyncracies of particular lawyers, this subjective contention is not relevant. See Miller, 848 F.2d at 1322; Sanchez, 50 F.3d at 1454. Based on this court's experience in **Ferrara's** case, it is also not persuasive. There is no evidence that Herbert was aware of Jordan's recantation and, therefore, if the weakness of the government's case on the murder charges when he formed his view in 1992. Moreover, the government showed great flexibility in its effort to obtain global pleas from the defendants by, for example, renegotiating its agreement with Russo to permit him to deny the existence of the LCN. See Carrozza, 807 F. Supp. at 157 n.2.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*131]**

In these circumstances, there is a reasonable probability that **Ferrara** and the government would have reached a plea agreement that required a sentence of significantly less than twenty-two years for **Ferrara.** This too would have been "a different result" for the purposes of determining whether the information suppressed by the government was material.

Once again, the tests for Brady materiality and ineffective assistance of counsel prejudice claims are the same. See Strickland, 466 U.S. at 694; Hill, 474 U.S. at 57; Miller, 848 F.2d at 1321-22; Ruiz v. United States, 339 F.3d at 43. In the context of ineffective assistance of counsel claims, a more favorable plea agreement has been deemed to be a different result.

In Mask v. McGinnis, 28 F.Supp.2d 122, 123 (S.D.N.Y. 1998), the defendant rejected a plea agreement of ten years to life. His attorney incorrectly believed that the defendant would be sentenced as a violent persistent felon offender, and therefore did not correct the prosecutor's

similar belief and obtain a more favorable plea offer. Id. The defendant was convicted at trial and **[\*132]** sentenced to twenty to forty years in prison. Id. at 123-24.

In response to a habeas corpus petition, the court held that there was a violation of the defendant's constitutional right to effective assistance of counsel. It wrote that:

> a reasonable probability is a probability "sufficient to undermine confidence in the outcome." Id. [Strickland] at 694, 104 S.Ct. 2052. Here, petitioner must demonstrate a reasonable probability that, if defense counsel had realized his mistake, not only would the district attorney have offered a more lenient plea offer, but petitioner would have accepted it as well. . . .
>
> Hence, a reasonable possibility exists that if defense counsel had pointed out that petitioner was not a persistent violent felony offender, additional negotiations would have been pursued and the prosecutor probably would have been willing to offer a sentence lower than ten to life, including a sentence in the range that petitioner would have found reasonable -- eight to sixteen years. Under these circumstances, my confidence in the outcome of the proceedings is certainly undermined.

Id. at 125-126. The Second Circuit affirmed **[\*133]** that decision, writing:

> In this case, there is a large disparity between the defendant's sentence exposure following a trial and his potential exposure had a plea offer been made on the basis of accurate information. This disparity, coupled with Mask's statements that he would have accepted a reasonable offer as credited by the district court, satisfies the prejudice requirement. . . .

Mask v. McGinnis, 233 F.3d 132, 142 (2nd Cir. 2000). See also Bone v. Mahoney, 66 Fed. Appx. 670, 2003 WL 1793249, at \*3 (9th Cir. 2003) (unpublished) ("The inquiry here, in contrast, is whether there is a reasonable probability that had Bone undergone a mental evaluation he would not have pled guilty or he would have entered into a more favorable plea agreement.").

The failure to disclose exculpatory information in cases in which a defendant would have properly pled guilty in any event may not be material. However, in this case there is a demonstrated reasonable probability that, if necessary, **Ferrara** would have continued his trial and been acquitted on the murder charges, and that those charges would not have been provable at any sentencing as relevant **[\*134]** conduct. Therefore, the fact that a plea agreement more favorable to **Ferrara** would probably have been reached if Jordan's recantation had been disclosed does not deprive him of his right to relief.

However, even if the subjective, idiosyncratic current claims of the government are credited and the court assumes that it would not have entered into a plea agreement with **Ferrara** for less than twenty-two years in prison, there is a reasonable probability **Ferrara** would have continued his trial and received a different, much more favorable result.

As explained earlier, under Bagley and it progeny:

"the question is not whether the defendant would more likely than not have received a different [result] with the evidence, but whether in its absence he received [a result] worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome.'"

Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678.).

In this case, the suppression of Jordan's recantation regarding his claim that **Ferrara** ordered the Limoli murder utterly undermines **[*135]** the court's confidence that **Ferrara** would have agreed to a twenty-two year sentence in the absence of the government's misconduct. That sentence is more than six years higher than the top of the 151-188 month Guideline range that his attorney asserts would have been generated if he had been convicted of all of the non-murder charges against him. Having grappled with issues relating to the Limoli homicide in the Barone trial and Patriarca sentencing, this court seriously doubts that **Ferrara** is actually guilty of the charges concerning it. In any event, the court does not believe that the government could have fairly proved those charges, or the charges relating to the murders of DiFronzo and Corlito, either at trial or at sentencing.

Therefore, the information the government suppressed was material, and **Ferrara** was truly prejudiced by its suppression. See Miller, 848 F.2d at 1321-23. As the government failed to produce to **Ferrara** material exculpatory evidence, it violated its duty under Brady v. Maryland. See Strickler 527 U.S. at 281-82. As a result, **Ferrara** was denied Due Process and is entitled to an appropriate remedy. See Miller, 848 F.2d at 1321-23. **[*136]**

Indeed, this is precisely the situation that the Supreme Court had in mind when it recognized the exception to the rule of the Brady v. United States, 397 U.S. at 754, 757-58, for cases in which guilty pleas had not been entered intelligently because of government misrepresentations or misconduct. See Miller, 848 F.2d at 1320. As described earlier, in Brady v. United States, the Supreme Court wrote that, "we would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves." 397 U.S. at 758. The Court, however, was relying on its expectation that defendants, their counsel, and the courts would have the information necessary to assure that guilty pleas are entered intelligently. Id. It emphasized that, "in the case before us, nothing in the record impeaches Brady's plea or suggests that his admissions in open court were anything but the truth." Id.

In the instant case, the government's suppression of material exculpatory information undermined the safeguards on which the **[*137]** decision in Brady v. United States relied, and there is substantial reason to believe that **Ferrara** falsely pled guilty to the Limoli murder charges to avert a life sentence for that crime. As a result, the court's confidence in the outcome of the plea hearing is completely undermined. The record now impeaches **Ferrara's** plea to the Limoli charges and indicates his admission to them on January 22, 1992 was not truthful. Denying **Ferrara** a remedy would not only be fundamentally unfair to him. It would also abet the type of serious government misconduct that the Supreme Court sought to protect against in Brady v. United States, 397 U.S. 757-58, by expressly creating an exception for guilty pleas tainted by government misrepresentations and other misconduct.

E. Remedy

As **Ferrara's** § 2255 petition is meritorious and he is entitled to relief, the court must exercise its equitable authority to devise an appropriate remedy. In this case, it is most appropriate to vacate the judgment sentencing **Ferrara** to 264 months in prison and to resentence him.

As the parties and the court agree, the resentencing will be governed by the law as it now exists after the Supreme Court's **[\*138]** recent decision in Booker, 125 S.Ct. at 757. Therefore, while the Guideline range for **Ferrara's** sentence should be considered, it is only advisory. Id. The court must also consider the statutory factors set forth in 18 U.S.C. § 3553 (a), and impose a sentence that is reasonable and most appropriate. Id. *HN46* Section 3553(a) directs the court to "impose a sentence sufficient, but not greater than necessary to comply with" specified purposes. Those purposes include: protecting the public from further crimes by the defendant; deterring crimes by him and others; and providing punishment that reflects the seriousness of the offense, provides just punishment for it, and promotes respect for the law. See 18 U.S.C. § 3553 (a) (2) .

For the reasons described below, there is not a proper basis for holding **Ferrara** responsible at sentencing for the Limoli, Corlito, or DiFronzo murders. **Ferrara** contends that the Guideline range for his sentence is, therefore, 151-188 months. The government's position is that the Guideline range for the remaining crimes is 210-262 months. As **Ferrara** has already served more than a 210-month **[\*139]** sentence would have required, the court will conduct promptly a hearing to resolve disputes that affect the Guideline range if **Ferrara** is not held responsible for any of the murders and to resentence him. The reasons for this remedy are as follows.

28 U.S.C. § 2255 provides, in part, that *HN47* where, as here:

> there has been a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

*HN48* With regard to § 2255, the First Circuit has emphasized:

> the broad leeway traditionally afforded district courts in the exercise of their § 2255 authority. "The § 2255 remedy is broad and flexible, and entrusts to the courts the power to fashion an appropriate remedy." United States v. Garcia, 956 F.2d 41, 45 (4th Cir. 1992) (citing Andrews v. United States, 373 U.S. 334, 339, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963)). This is so because a district court's power under § 2255 "is derived from the **[\*140]** equitable nature of habeas corpus relief." United States v. Handa, 122 F.3d 690, 691 (9th Cir. 1997) (internal citations omitted); see also Schlup v. Delo, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("Habeas corpus is, at its core, an equitable remedy.").

United States v. Torres-Otero, 232 F.3d 24, 30 (1st Cir. 2000).

*HN49* While the court's discretion to devise an equitable remedy is considerable, it is not unfettered. See United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998). Rather, "the remedy should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'" Id. (quoting United States v. Morrison, 449 U.S. 361, 364, 66 L. Ed. 2d 564, 101 S. Ct. 665 (1981)).

In Handa, a decision relied upon by the First Circuit in Torres-Otero, the Ninth Circuit wrote that:

When part of [a] sentence is set aside as illegal, the package is "unbundled." After the unbundling the district court is free to put together a new package reflecting its considered judgment as to the punishment the defendant deserves for the crimes of which **[\*141]** he is still convicted.

Handa, 122 F.3d at 692. This approach is also appropriate in the instant case.

Similarly, [HN50] where counsel has been ineffective in failing to recommend that the defendant accept a favorable plea agreement, and a retrial would be both impractical and inequitable because of the length of the sentence already served, it has been deemed proper to maintain the conviction and reduce the sentence. See Boria v. Keane, 99 F.3d 492, 499 (2d Cir. 1996); see also United States v. Carmichael, 216 F.3d 224, 227 (2d Cir. 2000) (as a result of ineffective assistance of counsel in plea bargaining "the remedy would be the resentencing, if any, to the terms appellant would have received had he been given proper legal advice."). Once again, the principles that emerge from the ineffective assistance of counsel cases are relevant to devising a remedy for the Brady v. Maryland violation in this case. Cf. Strickland, 466 U.S. at 694; Hill, 474 U.S. at 57; Miller, 848 F.2d at 1321-22; Ruiz v. United States, 339 F.3d at 41.

As explained earlier, in this case **[\*142]** the government's unlawful suppression of material exculpatory evidence concerning the Limoli murder charges injured **Ferrara's** counsel's capacity to advise **Ferrara** effectively; deprived **Ferrara** of the ability to decide intelligently whether to plead guilty to those charges; and deprived the court of the capacity to assure that there was a proper factual basis for his plea to those charges. It is now most appropriate to maintain **Ferrara's** conviction on the RICO charges and resentence **Ferrara** without regard to the murder charges.

More specifically, neither the government nor **Ferrara** suggests that he be allowed to withdraw his guilty plea and go to trial. See Apr. 1, 2004 Tr. at 105-18. **Ferrara** and the government both assert that resentencing is the appropriate remedy because it would be impractical and unfair to grant **Ferrara** a new trial decades after many of the events in question and after he has already served more than fifteen years in prison, a period which there is a reasonable probability is longer than the sentence that would have been imposed if he had been fairly convicted or entered into a plea agreement with knowledge of Jordan's recantation. Id.

The parties and **[\*143]** the court also agree that **Ferrara's** resentencing will be governed by the law now in effect as a result of the Supreme Court's recent decision in Booker, supra. As the government acknowledges, the Teague doctrine does not bar the application of Booker to **Ferrara's** resentencing. See Gov. Memorandum Pursuant to Court Order of January 18, 2005 at 6-7.

[HN51] A defendant whose sole claim for relief under § 2255 is that his constitutional rights were violated when his sentence was enhanced by facts found by a judge at sentencing may have his claim foreclosed by Teague. See In re Anderson, 396 F.3d 1336 (11th Cir. 2005); Bey v. United States, 399 F.3d 1266 (10th Cir. 2005). However, as the government has recognized and written:

This case [] stands on a different footing. If the Court determines that the petitioner is entitled to resentencing, it will be on the basis of a perceived violation of the petitioner's constitutional due process rights, such violation relating to the

government's alleged failure to disclose exculpatory information to him. In the event that the Court finds that there was an independent constitutional **[*144]** violation that warrants § 2255 relief in the form of resentencing, it seems clear that the Court cannot apply the Guidelines in a manner that has now been determined to be unconstitutional. Rather, as the second portion of Booker instructs, the Guidelines would be advisory.

Gov. Memorandum Pursuant to Court Order of January 18, 2005 at 6-7. The court has now found that the government deprived **Ferrara** of Due Process, and agrees that Booker must govern his resentencing.

*HN52* The Supreme Court's decision in Booker:

> makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553 (a) (4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a) (Supp.2004).

Booker, 125 S.Ct. at 757.

*HN53* In the wake of Booker, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing," id. at 767. Consistent **[*145]** with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence. See id. at 764-65. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so.

United States v. Hughes, 401 F.3d 540, 2005 WL 628224 at *4 (4th Cir. 2005) .

While the parties agree with the methodology to be used to redetermine **Ferrara's** sentence, they disagree on the Guideline range and the new sentence that should be imposed. **Ferrara** contends that he should not at resentencing be held responsible for the Limoli, Corlito and DiFronzo murders. He asserts that without them, the Guideline range for his sentence is 151-188 months. See Apr. 1, 2004 Tr. at 105-08. The government agrees that if it has been proven that it suppressed material exculpatory evidence concerning Limoli, the court should vacate **Ferrara's** convictions on Counts 3 and 4, and on Racketeering Act **[*146]** A-3 of Counts 1 and 2, and resentence him. Id. at 108.

It is correct for the government to concede that in circumstances as the court has found them, the new sentence should not be based on the Limoli murder charges. The court has found that the information in Coleman's handwritten memorandum, Exhibit 17, is accurate and that Jordan reported that Barone stated that he did not get permission from **Ferrara** to murder

Limoli. Once again, Jordan was the crucial witness on the Limoli charges. His testimony was essential to proving them at Barone's trial. The court finds that the government cannot now prove the Limoli murder charges even under the preponderance of the evidence standard that may be applicable now that the Guidelines are advisory. n24

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n24 **Ferrara** contends that, after Booker, facts which will enhance a sentence must be proven, to a jury, beyond a reasonable doubt. As the government has failed to prove that **Ferrara** should be held responsible for the Limoli, Corlito, or DiFronzo murders by even a preponderance of the evidence, this issue is not material.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*147]**

The parties disagree on whether **Ferrara** should be held responsible at resentencing for the Corlito and DiFronzo murders. More specifically, the government contends that the court at resentencing should find that **Ferrara** is responsible for these crimes, and that the Guidelines therefore ordinarily contemplate a life sentence. See Apr. 1, 2004 Tr. at 108-09. The government argues that the court should again depart downward and reimpose the twenty-two year sentence. Id. at 110. The government's position is, however, not persuasive.

With regard to Corlito and DiFronzo, the government proposes that the court consider only the evidence presented at the Barone trial. See Apr. 1, 2004 Tr. at 111, 114. The government correctly notes that because at any new trial the only two witnesses concerning Corlito and DiFronzo would be testifying "going on 19 [now 20] years . . . after the events . . . it would serve no purpose to have Mr. Jordan and Ms. DiNunzio come in now and try to give us their present day recollections of exactly what Mr. Barone and Mr. Limoli said to them." Id. at 113-14.

It would, however, not be fair to **Ferrara** to decide the Corlito and DiFronzo matters solely **[*148]** on the basis of the Barone trial testimony. **Ferrara** did not participate in that trial and, therefore, his counsel did not have an opportunity to cross-examine Jordan or DiNunzio. In addition, neither of them was fully cross-examined by Barone's counsel because the government unlawfully suppressed the information contained in Coleman's memorandum. Among other things, that memorandum reveals that Jordan had committed perjury.

If disclosed prior to the Barone trial, this information would not only have substantially destroyed Jordan's credibility concerning **Ferrara's** purported role in the Corlito and DiFronzo murders. It also had the potential to affect DiNunzio's testimony and the jury's assessment of her credibility. DiNunzio may not have initially told the government that Limoli purportedly implicated **Ferrara** in the Corlito and DiFronzo murders. Rather, she may have provided this information after being led to believe, when the government obtained Jordan's cooperation, that **Ferrara** was responsible for her brother's death. See Apr. 1, 2004 Tr. at 76-77. Thus, it is possible that DiNunzio would have testified differently if she had known that Barone had stated that he did not get **[*149]** **Ferrara's** permission to murder her brother. Accordingly, it would not now be equitable to evaluate DiNunzio's testimony in the Barone case in the same way that it was assessed at that trial.

In any event, the court finds that the evidence presented at the Barone trial is insufficient to prove even by a preponderance that **Ferrara** should be held responsible for the Corlito and DiFronzo murders. As described earlier, he did not plead guilty to the racketeering acts concerning those murders or admit in the Presentence Report that he committed them. Because the Limoli charges generated a Guideline range of life in prison, the court did not at the 1992 sentencing consider whether **Ferrara** should be held responsible for those crimes.

As also described earlier, at the Barone trial the court found the evidence concerning the Corlito murder to be weak and the motion to acquit to be "genuinely competitive." Oct. 7,

1993 Barone Tr. at 6-7. However, the court ruled that the evidence was sufficient for those two predicate acts to go to the jury on the legally required assumption that it could find Jordan believable. At that time the court was, pursuant to <u>Federal Rule of Criminal Procedure 29</u> **[\*150]** , looking at the evidence in the light most favorable to the government, and resolving all credibility questions and evidentiary conflicts in its favor. See <u>United States v. Serrano, 870 F.2d 1, 5 (1st Cir. 1989)</u>. In view of this liberal standard, the value to the administration of justice of jury verdicts, and the court's authority under <u>Rule 29 (b)</u> to set aside a jury verdict after trial, this court very rarely grants a Rule 29 motion. Nevertheless, the Corlito and DiFronzo evidence on the charges was deemed barely sufficient to allow them to be presented to the Barone jury. The jury twice declared itself deadlocked before returning verdicts and plainly did not credit all of Jordan's testimony because it did not convict Barone of actually murdering Limoli.

Prior to Booker, in the absence of a conviction on a particular charge the court was required to make an independent assessment of the credibility of the evidence and the weight to give whatever evidence it believed to be true. Thus, under the mandatory Guidelines a defendant could have been punished even for alleged conduct that was not proven to a jury beyond a reasonable doubt. See <u>United States v. Watts, 519 U.S. 148, 150-57, 136 L. Ed. 2d 554, 117 S. Ct. 633 (1997).</u> **[\*151]** However, Jordan, who was impeached in many ways at the Barone trial, now asserts that he was willing to commit perjury to convict **Ferrara.** This, among many other things, influences the court not to credit, let alone give meaningful weight to, his Barone trial testimony concerning the Corlito and DiFronzo murders. The hearsay related by DiNunzio does not add enough to prove **Ferrara's** complicity in those crimes even by a preponderance of the evidence.

Therefore, the court will resentence **Ferrara** without regard to the impact that the Limoli, Corlito, or DiFronzo murders would have on the Guideline range. There are two disputes which must be resolved to calculate the advisory Guideline range. **Ferrara** contends that he should be given a two-level downward adjustment for acceptance of responsibility. The government disagrees. Although in view of the binding plea agreement the issue was not material, **Ferrara** did not in 1992 object to the denial of the potential adjustment for acceptance of responsibility. See Apr. 29, 1992 Tr. at 13. Thus, the court's tentative view is that, on the present record at least, **Ferrara** should again be denied this adjustment.

The remaining issue relates to **[\*152]** the proper adjustment for **Ferrara's** role in the extortion of Morris Weinstein. The Probation Department recommended a three-level enhancement based on a recommended finding that **Ferrara** was a manager or supervisor concerning that crime. See Presentence Report at 111. The government objected and asserted that **Ferrara** should have received a four-level adjustment as a leader. Id., Addendum, Gov. Objection 4. Because it did not affect the Guideline range or the sentence to be imposed, the court did not resolve this dispute at **Ferrara's** sentencing in 1992. If at resentencing **Ferrara** receives a three-level enhancement and no adjustment for acceptance of responsibility, he will be a 34-III and his advisory Guideline range will be 188-235 months. n25 If the adjustment is raised to four-levels, **Ferrara** will be a 35-III and his advisory Guideline range will be 210-262 months.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n25 The court will provide the parties the Probation Department's current, alternative calculations prior to sentencing.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Assuming without **[\*153]** finding that the government's positions on acceptance of responsibility and the appropriate adjustment for the Weinstein extortion are correct, 210 months may be the maximum possible reasonable and appropriate sentence for **Ferrara.** Such a sentence would have been fully served in February 2005. n26

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n26 The Bureau of Prisons calculations regarding **Ferrara's** release dates based on possible alternative sentences that might have been imposed have been given to the Probation Department and will be provided to the parties prior to **Ferrara's** resentencing.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

More specifically, in its 1992 plea agreement, the government acknowledged that **Ferrara** deserved a substantial downward departure for his participation in the linked global plea agreements and, after considering the factors described in 18 U.S.C. § 3553 (a) (1) and (2), the court agreed. See Carrozza, 807 F. Supp. at 161-65. The government has already received the many benefits of that bargain. Among other things it obtained **[*154]** convictions without a lengthy trial, which would have involved the disclosure of fearful witnesses, and inherently had an uncertain outcome. In the circumstances, **Ferrara** seems to have a compelling argument that he should be sentenced to no more than the low-end of the range as calculated by the government in the absence of the Limoli, Corlito, and DiFronzo murders. The passage of time has prevented him from receiving a downward departure, as was contemplated by his plea agreement and given by agreement to most of his codefendants.

Moreover, the § 3553(a)(1) and (2) factors suggest that a sentence of about 210 months may be the most reasonable and appropriate sentence even if the advisory Guideline range is life in prison. n27

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n27 18 U.S.C. § 3553 (a) (1) and (2) states:

> *HN54*Factors to be considered in imposing a sentence-The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider-(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*155]**

As indicated earlier, § 3553 (a) requires that a court "impose a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in paragraph 2 of [§ 3553 (a)]." **Ferrara** has now served the equivalent of a sentence of more than 210 months. n28

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n28 The Bureau of Prison advises that **Ferrara** has earned all available "good time" credits,

which result in a 15% reduction in his sentence after the first year. See <u>18 U.S.C. § 3624(b)</u>.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

A sentence of 210 months, or almost eighteen years, is a long sentence that adequately reflects the seriousness of the RICO and other offenses to which **Ferrara** pled guilty. See <u>18 U.S.C. § 3553(a)(2)</u>. The government agreed that a downward departure to a sixteen-year sentence was appropriate for Russo, who was held responsible for murdering Barboza and started with a Guideline range of life in prison. See <u>Carrozza, 807 F. Supp. at 158-59</u>. As the court found in accepting the global **[*156]** plea agreements in 1992, a sixteen year sentence for even a RICO offense involving murder is, in the context of this case at least, sufficient to deter a member of the LCN and others who might be tempted to emulate him. <u>Id. at 163-64</u>.

Nevertheless, the court would not exercise its discretion to release **Ferrara** now if it were proven that he is likely to be a danger to the community. However, the court notes that **Ferrara** is now fifty-five years old. He reportedly has medical problems. See Apr. 1, 2003 Tr. at 107. After observing **Ferrara** over almost fifteen years, it is evident to the court that the many years he has been in prison has been very hard on **Ferrara's** health.

Echoing arguments made at his 1992 sentencing, see Apr. 29, 1992 Tr. at 46, his counsel now assert that **Ferrara:**

> just wants to get back out of the labyrinths of the Bureau of Prisons to a position where he can have a decent and stable and legitimate and responsible life. He has the potential to be a responsible citizen, and he is determined to do it.


Apr. 1, 2004 Tr. at 107-8. **Ferrara** is a graduate of Boston College. He is intelligent enough to recognize that it would not only be **[*157]** wrong, it would be very unwise for him to return to a life of crime when he is released. As the court said in sentencing **Ferrara** in 1992, the Patriarca Family has been decimated. See <u>Carrozza, 807 F. Supp. at 164</u>. Moreover, "[when] released, the defendant [] will be on supervised release for [] five years. Should [he] commit another crime, or indeed associate with his codefendants or any other felons, it is virtually certain that he will be caught and again sentenced to prison." Id. In these circumstances, a sentence of about 210 months appears likely to be sufficient to reasonably assure the safety of the community and to provide just punishment.

In essence, the court found in 1992 that sentences including the sixteen-year sentence for Russo fully satisfied the statutory purposes of sentencing set forth in <u>§ 3553 (a) (1)</u> and <u>(2)</u>. See Carrozza, supra. It now appears that a sentence of about eighteen years for **Ferrara** should also fully satisfy those purposes.

Such a sentence should also promote respect for the law. See <u>§ 3553 (a) (2) (A)</u>. It will assure that **Ferrara** does not serve more time than necessary or appropriate because the government's **[*158]** unlawful conduct corrupted the plea in this case, and has made it impossible to conduct now either a trial or an evidentiary hearing to determine the true facts concerning the Limoli, Corlito, and DiFronzo murders.

**Ferrara** has now served more than fifteen years in prison. As described earlier, if he had been sentenced to 188 months he would have been released in July 2003, and if he had been sentenced to 210 months he would have been released in February 2005. Therefore, the government's misconduct has already caused **Ferrara** to serve more time in prison than is likely to have been required if Jordan's recantation had not been unlawfully suppressed. Indeed, if **Ferrara's** contention is correct and his properly calculated Guideline range would in 1992 have been 151-188 months, the government's unlawful conduct has caused him to serve at least several extra years in prison. n29

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n29 If **Ferrara's** twenty-two year sentence is not reduced and he continued to earn good time credits, he would be released in January 2009.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*159]**

Thus, this case is comparable to Boria, 99 F.3d at 499, in which the ineffectiveness of his counsel caused the defendant to serve more time than he would have served if he had been adequately represented with regard to the proposed plea agreement. In Boria, the judgment of conviction was not disturbed, but the petitioner's sentence was reduced to time served and he was discharged. Id.

Once again, in this case the government's unlawful suppression of evidence: deprived **Ferrara's** counsel of the ability to advise his client adequately; deprived **Ferrara** of the information necessary to decide intelligently whether to plead guilty to the Limoli murder charges; and deprived the court of the information necessary to assure that there was a proper factual basis for **Ferrara's** plea of guilty to those charges. The government's misconduct utterly undermines the court's confidence in the outcome of **Ferrara's** case. Reducing **Ferrara's** sentence will be a remedy tailored to the constitutional violation, which does not unnecessarily infringe upon other legitimate interests. See Morrison, 449 U.S. at 364; Gordon, 156 F.3d at 381. It is, therefore, **[*160]** the remedy being ordered.

IV. CONCLUSION

The resentencing of **Ferrara** may result in **Ferrara's** prompt release. It may also generate litigation concerning whether his release should be stayed pending a possible appeal. The court will provide an opportunity for the government to consider this question and for the parties to brief the issue of a stay if necessary.

It should be noted that the government has at times acknowledged that it had improperly deprived defendants of material exculpatory evidence and agreed that they were entitled to an appropriate remedy. For example, following the first trial of alleged terrorists after September 11, 2001, in 2004 the Department of Justice agreed that highly publicized convictions in Michigan should be vacated. See United States v. Koubriti, 336 F. Supp. 2d 676 (E.D. Mich. 2004). As the United States Attorney for the Eastern District of Michigan wrote in that case:

> The government has concluded that there is no reasonable possibility that it could endure further hearings and emerge with the convictions intact. In its best light, the record would show that the prosecution committed a pattern of mistakes and oversights **[*161]** that deprived the defendants of discoverable evidence (including impeachment material) and created a record filled with misleading inferences that such material did not exist. Accordingly, the government believes that it should not prolong the resolution of this matter pursuing hearings it has no reasonable prospect of winning.

United States v. Karim Koubriti, et al., Cr. No. 01-80778 (E.D. Mich.), Gov. Consolidated Response Concurring in The Defendants' Motions for a New Trial (Aug. 31, 2004). Therefore, the government moved for the dismissal of all of the terrorism-related charges and agreed that the defendants should be granted a new trial on the remaining charges concerning alleged fraudulent documents. See Koubriti, supra.

In granting those motions, the court stated that:

> The position the government has now taken -- confessing prosecutorial error and
> acquiescing in most of the relief sought by the Defendants -- is not only the legally
> and ethically correct decision, it is in the highest and best tradition of Department
> of Justice attorneys. Given the nature and background of this case, the
> Government's decision could not have been an easy **[*162]** one and, no doubt, is
> one that will come in for criticism and second -- guessing from some quarters.
> However, it is the right decision.

Id. at 679. The government subsequently agreed that a defendant who had been detained for
more than three years should be sentenced to six months in prison, the maximum time
permitted by the Guidelines, and released. See David Ashenfelter, One Time Terrorist Gets
Apology from Judge, The Detroit News, Mar. 23, 2005. In imposing that sentence, the judge
stated to the defendant:

> I would be remiss if I did not say that the procedures that are normally followed in
> criminal cases were not followed in your case, and for that you have the apology of
> the United States Government. . . . Some of the procedures failed you and,
> unfortunately, failed the system in this case.

Id.

As described earlier, in October 2003, in the companion case to **Ferrara's,** the government
agreed to Barone's immediate release from prison. It did not, however, then agree that
**Ferrara's** release was also justified. Therefore, **Ferrara's** incarceration has been prolonged to
a point where it has now likely exceeded the sentence that would **[*163]** have been imposed
in the absence of the government's unconstitutional conduct, and the extensive analysis in this
Memorandum has been necessary.

Because **Ferrara** may now be suffering irreparable harm as a result of the government's
misconduct, the court is ordering that the parties confer and inform the court whether the
government will be seeking a stay pending appeal if **Ferrara** is resentenced to time served. If
so, the parties will have to submit memoranda addressing whether such a stay should be
granted. See Hilton v. Braunskill, 481 U.S. 770, 776, 95 L. Ed. 2d 724, 107 S. Ct. 2113
(1987); Canterbury Liquors & Pantry v. Sullivan, 999 F. Supp. 144, 149-52 (D. Mass. 1999).

V. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Vincent M. **Ferrara's** First Amended Motion Pursuant to 28 U.S.C. § 2255 to Vacate and Set
Aside Sentence is ALLOWED.

2. The parties shall confer and, by April 20, 2005, inform the court whether they have agreed
to a resolution of this case and, if not, whether the government requests a stay of **Ferrara's**
release pending appeal.

3. If they have not agreed to a resolution of this case, the parties shall, by April 27, 2005,
file **[*164]** memoranda addressing what sentence consistent with the findings in this
Memorandum should be imposed at resentencing and, if necessary, whether a stay pending
appeal should be granted.

4. A hearing at which **Ferrara** will be resentenced in conformity with this Memorandum and Order shall be held on May 3, 2005, at 10:00 a.m.

MARK L. WOLF

UNITED STATES DISTRICT JUDGE

ORDER

The attached April 11, 2005 memorandum from the Probation Department is hereby provided to the parties for use in connection with the resentencing of petitioner Vincent **Ferrara.**

MARK L. WOLF

UNITED STATES DISTRICT JUDGE

Source: Legal > Cases - U.S. > Federal & State Cases, Combined 🔟
Terms: ferrara (Edit Search | Suggest Terms for My Search)
Mandatory Terms: **date in-between 04/01/2005 : 05/01/2005**
View: Full
Date/Time: Monday, September 19, 2005 - 10:06 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
🔳 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.